# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **HARVEY WINDSOR,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:   4:10-cv-2223-AKK** |
| | ) | |
| **JEFFERSON S. DUNN,** | ) | |
| **Commissioner of the Alabama** | ) | |
| **Department of Corrections, et al.,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## <u>MEMORANDUM OPINION</u>

Harvey Windsor has petitioned for a writ of habeas corpus under 28 U.S.C. § 2254. *See generally* Doc. 16.[1] Windsor challenges his 1992 capital conviction and death sentence in the Circuit Court of St. Clair County, Alabama for the murder of Rayford Howard, alleging that a variety of constitutional violations require a reversal of his conviction and sentence. After careful consideration, the court disagrees and finds that Windsor's petition is due to be denied.

---

[1] " Doc. ___" refers to the number assigned to each document filed in the court's electronic filing system.  Citations to the state-court record, doc. 23, correspond with the Respondents' volume, tab, and page number designations reflected in the paper file. And "ACCA," which is used throughout this opinion, refers to the Alabama Court of Criminal Appeals.

# I.

## A.

On June 8, 1992, a St. Clair County jury convicted Windsor of capital murder. *See Windsor v. State (Windsor I (ACCA))*, 683 So. 2d 1013, 1014 (Ala. Crim. App. 1993), *rev'd*, 683 So. 2d 1021 (Ala. 1994). The jury found that on February 25, 1988, Windsor intentionally killed Mr. Howard during a robbery at Mr. Howard's convenience store.[2] The guilty determination triggered a penalty-phase hearing under Alabama law. *Windsor I (ACCA)*, 683 So. 2d at 1014. After the penalty hearing, a unanimous jury recommended that Windsor receive a death sentence. *Id.* The trial court accepted the jury's penalty finding and sentenced Windsor to death. *Id.*[3] As documented in the sentencing order, the court determined that "the only aggravating circumstance relied upon by the State of Alabama [wa]s circumstance (4) of Section 13A-5-49." Vol. 21, Tab 69 at 25-28. The court determined "beyond

---

[2] *See* Ala. Code § 13A-8-41 ("A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 [(robbery in the third degree)] and he: (1) [i]s armed with a deadly weapon or dangerous instrument; or (2) [c]auses serious physical injury to another."); Ala. Code § 13A-6-2(a)(1) (defining murder as an intending and causing "the death of another person").

[3] A Colbert County, Alabama jury convicted Windsor of capital murder for shooting another store owner, Randal Earl Pepper, later on February 25, 1988. *Windsor (Colbert Cty.) v. State*, 593 So. 2d 87, 88-90 (Ala. Crim. App. 1991). After a reversal of the conviction and a retrial, a jury convicted Windsor of felony murder. *Id.* at 92-93; Vol. 11, Tab 38 at 2-3. Windsor is serving a life sentence for the Colbert County conviction. Vol. 11, Tab 38 at 2.

a reasonable doubt that the capital offense of which [Windsor] was convicted was committed while [Windsor] was an accomplice in the commission of, or attempt to commit, or flight after committing, or attempting to commit robbery." *Id.* The court considered the mitigating evidence about which Windsor's mother testified and found "that the aggravating circumstance . . . outweigh[ed] the mitigating circumstances . . . , and the mitigating circumstances did not outweigh the aggravating circumstance found." *Id.*

## B.

The ACCA summarized the evidence supporting the capital conviction:

> The evidence presented by the state tended to show that on February 25, 1988, [Mr.] Howard in St. Clair County and [Mr.] Pepper in Colbert County were robbed and murdered. The appellant and Lavon Guthrie were charged with the offenses. This appeal concerns only the robbery and murder of [Mr.] Howard.

> On February 25, at approximately 2:00 p.m., [Mr.] Howard was found dead in his store in St. Clair County. He died as a result of a shotgun blast to the chest. Money had been taken from the store's cash register and the victim's pants pockets had been emptied. A witness saw someone carrying a "sawed-off shotgun" leave the victim's store, open the breech and reload the gun, and get into a black sports car.

> On this same day, the appellant and Guthrie were seen in St. Clair County travelling together in a black Ford Mustang automobile with gold stripes and the word "boss" written in gold on the sides. At approximately 1:00 p.m. that day, the appellant and Guthrie had visited Sammie Sue Wilson Osborn at her house. Ms. Osborn's house was located approximately five miles from [Mr.] Howard's store.

3

The automobile in which the appellant was riding was seen later that afternoon travelling at a high rate speed in Marshall County and in Lawrence County. The automobile was also seen at Tommy's Store, a convenience store, in Lawrence County. An occupant of the car discarded two Budweiser beer cans in the parking lot of Tommy's Store.

The automobile was also seen at approximately 8:00 p.m. at a store in Colbert County. The attendant at the Colbert County store, Randal Earl Pepper, was killed by a shotgun blast to the head. The appellant was identified as the person running from the store and getting into the automobile. When the appellant was arrested, he had in his possession a .25 automatic pistol that had belonged to Mr. Pepper.

The automobile in which the appellant and Guthrie were travelling had been stolen on February 23, 1988, from Connie's Quick Stop convenience store in Tiftonia, Tennessee. The automobile was recovered on February 26, at Tiftonia Baptist Church, two-tenths of a mile from Connie's Quick Stop. Guthrie's sister's house was located between Connie's Quick Stop and the Tiftonia Baptist Church.

When the automobile was searched, the following items were recovered: a ring of keys, a receipt from Parisian department store, a .20 gauge shotgun shell, and cigarette butts. One of the keys on the recovered ring opened a padlock that secured the rear door of Howard's Store. The Parisian receipt was for a suit that Mr. Howard had purchased for his wife. The .20 gauge shotgun shell had been fired from the same gun as a shell that was recovered outside Howard's store. The appellant's fingerprint was found on one of the cigarette butts.

Additionally, Guthrie's fingerprints were found on Mr. Howard's driver's license, which was recovered, along with his wallet and its contents, beside the road a few miles from his store. Guthrie's fingerprints were also found on one of the Budweiser beer cans that was left at Tommy's Store in Lawrence County.

*Windsor v. State (Windsor II (ACCA))*, 683 So. 2d 1027, 1030 (Ala. Crim. App. 1994) (footnote omitted).

On appeal, the ACCA found that the circuit court clerk's practice of excusing prospective jurors without judicial involvement and an improper prosecutorial remark about Windsor's failure to testify denied Windsor a fair trial and reversed his conviction. *Windsor I (ACCA)*, 683 So. 2d at 1016-19. The State sought review of the ACCA's decision, and the Alabama Supreme Court reversed. *Windsor v. State (Windsor I)*, 683 So. 2d 1021, 1027 (Ala. 1994). The Court found no evidence that the circuit court clerk's role in the jury selection process had harmed Windsor constitutionally or prejudiced him under Alabama law. *Windsor I*, 683 So. 2d at 1024, 1027. Evaluating the prosecutor's comment under the previously adopted Eleventh Circuit Court of Appeals Fifth Amendment standard, the Court found no reversible error. *Id.* at 1024.

On remand, the ACCA affirmed the conviction and sentence. *Windsor II (ACCA)*, 683 So. 2d at 1041. Windsor appealed, and the Alabama Supreme Court affirmed. *Windsor v. State (Windsor II)*, 683 So. 2d 1042, 1062 (Ala. 1996). The Supreme Court denied Windsor's petition for a writ of certiorari. *Windsor v. Alabama*, 520 U.S. 1171 (1997).

5

### C.

On April 1, 1998, Windsor sought collateral review by filing an Alabama Criminal Procedure Rule 32 petition in St. Clair County Circuit Court. *Windsor v. State (Windsor Rule 32)*, 89 So. 3d 805, 808 (Ala. Crim. App. 2009). On November 18, 1998, the Rule 32 court dismissed some of Windsor's claims as procedurally barred and gave him thirty days to amend the petition consistent with the specificity requirement of Rule 32.6(b). *Windsor Rule 32*, 89 So. 3d at 808-09. Windsor amended his petition and the Rule 32 court dismissed some claims on August 17, 1999 and set the pending claims for an evidentiary hearing. *Id.* at 809. After a continuance and a case reassignment, a new judge dismissed Windsor's remaining Rule 32 claims on February 17, 2006, without a hearing. *Id*. The ACCA affirmed in 2009. *Id.* at 826.

Windsor appealed, and the Alabama Supreme Court affirmed the ACCA except for an unaddressed ineffective assistance of counsel claim. *Windsor Rule 32*, 89 So. 3d at 826-27. Windsor argued that his trial counsel should have objected when the prosecutor told the jury members that they could "ignore the[] mitigating circumstances" during the penalty phase. *Id.* at 827 (internal quotation marks omitted) (alternation supplied). On remand, the ACCA found that the prosecutor's

remark about mitigation did not unfairly prejudice Windsor and affirmed the dismissal of the Rule 32 petition. *Id*. at 830.

## D.

On August 17, 2010, Windsor filed a § 2254 petition in this court. Doc. 1. Windsor moved for, and this court granted, a stay pending the completion of the state collateral review process. Docs. 3, 8. After the Alabama Supreme Court denied Windsor's petition for writ of certiorari in 2012, this court lifted the stay, and Windsor amended his § 2254 petition. Docs. 12, 13, 16. The Respondents filed an answer and brief, docs. 25, 26, and Windsor replied, doc. 28.

## II.

"The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). Consequently, this court may only review questions of federal constitutional and statutory law in a habeas action. Claims that turn solely upon state law principles fall outside the ambit of this court's authority to provide relief under § 2254. *Alston v. Dep't of Corr.*, 610 F.3d 1318, 1326 (11th Cir. 2010). Before evaluating Windsor's claims, the court reviews several principles common to habeas proceedings.

## A.

A habeas petitioner must present his federal claims to the state court and exhaust the state remedies available before seeking relief in federal court. 28 U.S.C. § 2254(b)(1); *Medellin v. Dretke*, 544 U.S. 660, 666 (2005). Exhaustion ensures that state courts have the first opportunity to address and, if necessary, correct federal issues affecting the validity of state court convictions. As the Eleventh Circuit has explained:

> In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies. . . .
>
> Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (internal quotation marks omitted). The Supreme Court has written these words:
>
>> [T]hat the federal claim must be fairly presented to the state courts . . . . it is not sufficient merely that the federal habeas applicant has been through the state courts. . . . Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.
>
> *Picard*, 404 U.S. at 275, 92 S. Ct. at 512. . . .
>
> Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law

claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).

## B.

## 1.

Procedural default occurs when a habeas petitioner failed to raise a federal claim in compliance with the state's procedural rules, and the state court dismissed it without considering the merits because of the procedural violation.[4]  *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2009). Generally, if the last state court to examine a claim expresses clearly and explicitly that the claim is barred because the petitioner

---

[4]Under the "procedural default" doctrine,

the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default, although the habeas doctrines of exhaustion and procedural default "are similar in purpose and design and implicate similar concerns," *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 7 (1992). *See also Coleman v. Thompson*, 501 U.S. 722, 731–732, 111 S. Ct. 2546 (1991). In habeas, state-court remedies are described as having been "exhausted" when they are no longer available, regardless of the reason for their unavailability. *See Gray v. Netherland*, 518 U.S. 152, 161, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996). Thus, if state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, *ibid.*, but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding. *Id.*, at 162, 116 S. Ct. 2074; *Coleman*, *supra*, at 744–751, 111 S. Ct. 2546.

*Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006).

failed to follow state procedural rules, and that procedural bar provides an adequate and independent state ground for denying relief,[5] then federal procedural default principles preclude habeas review of that claim.[6] The Supreme Court defines an "adequate and independent" state court decision as one that "rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment." *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (internal quotation marks omitted) (quoting *Coleman*, 501 U.S. at 729) (emphasis in *Lee*). The questions of

---

[5]*See Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Cone v. Bell*, 556 U.S. 449, 465 (2009) ("[W]hen a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review.").

[6]As the Eleventh Circuit put it,

> [t]he federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. *Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar*, *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), *and that bar provides an adequate and independent state ground for denying relief. See id.* at 262, 109 S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988). The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991) (emphasis added).

whether a state procedural rule is "independent" of the federal question and "adequate" to support the state court's judgment, so as to have a preclusive effect on federal review of the claim, "is itself a federal question." *Lee*, 534 U.S. at 375 (internal quotation marks omitted) (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

To be considered "independent" of the federal question, "the state court's decision must rest solidly on state law grounds, and may not be 'intertwined with an interpretation of federal law.'" *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). An example of intertwining would be when "the State has made application of the procedural bar depend on an antecedent ruling on federal law, that is, on the determination of whether federal constitutional error has been committed." *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985). Thus, if "the state court must rule, either explicitly or implicitly, on the merits of the constitutional question" before applying the state's procedural rule to a federal constitutional question, then the rule is dependent on federal law. *Id*.

To be "adequate," the state procedural rule must be both "firmly established and regularly followed." *Lee*, 534 U.S. at 375 (internal quotation marks omitted) (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). The rule must be "clear [and] closely hewn to" by the state for a federal court to consider it as adequate. *James*, 466

11

U.S. at 346. That does not mean that the state's procedural rule must be rigidly applied in every instance, or that occasional failure to do so will render the rule inadequate. "To the contrary, a [state's] discretionary [procedural] rule can be 'firmly established' and 'regularly followed'— even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009). The adequacy requirement means only that the procedural rule "must not be applied in an arbitrary or unprecedented fashion." *Judd*, 250 F.3d at 1313; *Card*, 911 F.2d at 1517. In sum, a habeas court may review a state court decision based on an inadequate procedural rule, but not on an adequate one.

## 2.

Generally, habeas review of a procedurally defaulted federal claim in state court may occur under three circumstances: (1) when the petitioner demonstrates that he had good "cause" for not following the state procedural rule, and, that he was actually "prejudiced" by the alleged constitutional violation; or (2) when the state procedural rule was not "firmly established and regularly followed"; or (3) when the failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring).[7]

---

[7]*See, e.g., Coleman*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim

As to the first requirement, the "cause and prejudice" standard is conjunctive, and a petitioner must prove both parts. To show "cause," a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim in the state courts. *Carrier*, 477 U.S. at 488. "Objective factors that constitute cause include "'interference by officials'" that makes compliance with the state's procedural rule impracticable, and 'a showing that the factual or legal basis for a claim was not reasonably available to counsel.'" *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991), *superseded by statute on other grounds as recognized in Banister v. Davis*, __ U.S. __, 140 S. Ct. 1698 (2020). While "[a]ttorney error [on direct review] that constitutes ineffective assistance of [trial] counsel" can constitute "cause" to overcome a procedural default, generally the constitutional ineffectiveness of post-conviction counsel on collateral review will not support the cause and prejudice exception to procedural default. *Coleman*, 501 U.S. at 754. This rule flows from the absence of a constitutional "right to counsel in state post-conviction proceedings."

---

will result in a fundamental miscarriage of justice") (citation and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same) (quoting *Carrier*, 477 U.S. at 496); *Davis v. Terry*, 465 F.3d 1249, 1252 n. 4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (quoting *Schlup*, 513 U.S. at 327).

*Id*. at 752 (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989)).[8]

A habeas petitioner must show also that the alleged constitutional violation caused him actual "prejudice." This entails showing "not merely that the errors at [a petitioner's] trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). If the "cause" is of the type described in *Martinez v. Ryan*, then the reviewing court should consider whether the petitioner can demonstrate "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 12-15 (citing for comparison *Miller-El v. Cockrell*, 537 U.S. 322 (2003) and describing standards for certificates of appealability to issue).

---

[8]But in two landmark cases, the Court carved out limited equitable exceptions in which errors by counsel on post-conviction collateral review can constitute "cause" to overcome a procedurally defaulted claim. In *Maples v. Thomas*, 565 U.S. 266 (2012), the Court found that post-conviction counsel's gross professional misconduct (e.g., abandonment of the petitioner) severed the agency relationship between counsel and the petitioner and, thus, established the necessary "cause" to overcome a procedural default. *Id*. at 281. In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Court held that post-conviction counsel's failure to raise an ineffective assistance of trial counsel claim at an initial review collateral proceeding could serve as the necessary "cause" to overcome procedural default when the state prohibits that type of claim from being raised during the direct review process. *Id*. at 11-12.

Finally, in a "rare," "extraordinary," and "narrow class of cases," a federal court may consider a procedurally defaulted claim in the absence of "cause" when: (a) a fundamental miscarriage of justice "has probably resulted in the conviction of one who is actually innocent," *Murray*, 477 U.S. at 537-38 (internal quotation marks omitted) (quoting *Carrier*, 477 U.S. at 496); or (b) the petitioner shows "by clear and convincing evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty," *Schlup v. Delo*, 513 U.S. 298, 323-27 & n. 44 (1995) (internal quotation marks omitted) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

## C.

The writ of habeas corpus "has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). That is especially true when federal courts engage in habeas review of a state court conviction pursuant to 28 U.S.C. § 2254 because "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Brecht*, 507 U.S. at 633 (internal quotation marks omitted) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983), *superseded by statute on other grounds as recognized in Slack v. McDaniel*, 529 U.S. 473 (2000)). "Those few who are ultimately successful [in obtaining federal

habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-41 (1963), *overruled on other grounds by Wainwright v. Sykes*, 433 U.S. 72 (1977). "Accordingly, . . . an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634.

Consistent with these finality and comity principles, Congress amended the preexisting habeas law under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[9]  AEDPA includes several provisions which require federal courts to defer broadly to state court determinations of federal constitutional claims. First, Section 2254(e)(1) requires district courts to presume that a state court's factual determinations are correct, unless the habeas petitioner rebuts the presumption with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Section 2254(e)(1) "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002)

---

[9]Windsor filed his petition after AEDPA became law. *See* Pub. L. No. 104-132, 110 Stat. 1214 (1996). Accordingly, the court applies AEDPA to his claims. *See id*. § 107(c), 110 Stat. at 1226; *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (applying AEDPA to habeas petitions filed after Act's effective date); *Hightower v. Schofield*, 365 F.3d 1008, 1013 (11th Cir. 2004) (same); *see also Martin v. Hadix*, 527 U.S. 343, 356 (1999) (discussing retroactivity of AEDPA amendments to § 2254).

(citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). The deference that attends state court findings of fact pursuant to § 2254(e)(1) applies to all habeas claims, regardless of their procedural stance. Thus, a presumption of correctness attaches to a state court's factual findings, even when a federal court examines a habeas claim de novo. *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1313 (11th Cir. 2012).

And, "[b]y its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). It does not matter whether the state court decision contains a lengthy analysis of the claim or is a summary ruling "unaccompanied by explanation." *Id.* Further, AEDPA's "backward-looking language" requires an examination of the state court decision on the date rendered. *Cullen v. Pinholster*, 563 U.S. 170 (2011). Consequently, "[s]tate court decisions are measured against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'" *Id.* at 182 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)). Additionally, "review under § 2254(d)(1) [and (d)(2)] is limited to the record that was before the state court that adjudicated the claim on the merits," *Cullen*, 563 U.S. at 181, and a federal habeas court conducting § 2254(d) review should not consider new evidence "in the first instance effectively *de novo*," *id.* at 182.

Under ADEPA, a habeas court cannot grant relief unless it determines that the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[10] The "contrary to" and "unreasonable application" clauses of § 2254(d) are "independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) (citing *Williams*, 529 U.S. at 405-07).[11] When

---

[10]The Court has interpreted § 2254(d)(1)'s reference to "clearly established Federal law, as determined by the Supreme Court of the United States" to cover only "the holdings, as opposed to the dicta, of [the Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412 (O'Connor, J., majority opinion with respect to part II); *see also, e.g., Carey v. Musladin*, 549 U.S. 70, 74 (2006) (similar); *Osborne v. Terry*, 466 F.3d 1298, 1305 (11th Cir. 2006) (similar); *Warren v. Kyler*, 422 F.3d 132, 138 (3d Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

[11]As the Court explained in *Williams*:

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) '*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) '*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States.'"

*Williams*, 529 U.S. at 404 (O'Connor, J., majority opinion with respect to part II) (emphasis in original).

considering a state court's adjudication of a petitioner's claim, therefore, the habeas court must consider these clauses separately.

## 1.

A state court determination can be "contrary to" clearly established Supreme Court precedent in at least two ways:

> First, . . . if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405.[12] But as the Eleventh Circuit has noted, the majority opinion in *Williams* does not limit the construction of § 2254(d)(1)'s "contrary to" clause to the two examples set forth above. Instead, the statutory language "simply implies that 'the state court's decision must be substantially different from the relevant precedent of [the Supreme] Court.'" *Alderman*, 468 F.3d at 791 (internal quotation marks omitted) (quoting *Williams*, 529 U.S. at 405).

---

[12]*See also, e.g., Brown v. Payton*, 544 U.S. 133, 141 (2005) (similar); *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (similar); *Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001) (similar).

**2.**

A state court's determination of a federal constitutional claim can result in an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407. But, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id*. at 410 (emphasis in original). Consequently, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. Therefore, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable," and not whether the state court "correctly" applied Supreme Court precedent. *Id*. at

409.[13] "Objectively unreasonable" means "that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Thus, if fairminded jurists can debate the correctness of a state court's denial under federal law, then the outcome is not "objectively unreasonable," and the second clause of § 2254(d)(1) precludes relief.

### 3.

The "unreasonable determination of the facts" clause of § 2254(d)(2) "imposes a 'daunting standard—one that will be satisfied in relatively few cases.'" *Cash v. Maxwell*, 565 U.S. 1138, 132 S. Ct. 611, 612 (2012) (Sotomayor, J., respecting denial of certiorari) (quoting *Maxwell v. Roe*, 628 F.3d 486, 500 (9th Cir. 2010)). As the Supreme Court has noted

> in related contexts, "[t]he term 'unreasonable' is no doubt difficult to define." *Williams v. Taylor*, 529 U.S. 362, 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). It suffices to say, however, that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Cf. id.*, at 411, 120 S. Ct. 1495.

---

[13] *See also Bell*, 535 U.S. at 694 (observing that the "focus" of the inquiry into the reasonableness of a state court's determination of a federal constitutional issue "is on whether the state court's application of clearly established federal law is objectively unreasonable," and stating that "an unreasonable application is different from an incorrect one"); *Richter*, 562 U.S. at 100-03 (similar).

*Wood v. Allen*, 558 U.S. 290, 301 (2010). Therefore, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)) (alteration in *Wood*). Conversely, "when a state court's adjudication of a habeas claim result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Adkins v. Warden, Holman Corr. Facility*, 710 F.3d 1241, 1249 (11th Cir. 2013) (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n. 5 (11th Cir. 2008) (en banc)).

**4.**

Section 2254(d)(2), which governs federal court review of state court findings of fact, limits the availability of federal habeas relief on any claims that are grounded in a state court's factual findings, unless the findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Moreover, § 2254(e)(1) provides that state court factual determinations are "presumed to be correct" and that the habeas petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The Supreme Court has not "fully

22

explored the interaction of § 2254(d)(2)'s 'unreasonableness' standard and § 2254(e)(1)'s 'clear and convincing evidence' standard." *Cave v. Sec'y, Dep't of Corr.*, 638 F.3d 739, 744-45 (11th Cir. 2011) (quoting *Gore v. Sec'y, Dep't of Corr.*, 492 F.3d 1273, 1294 n. 51 (11th Cir. 2007)). Still, federal habeas courts "must presume the state court's factual findings to be correct unless the petitioner rebuts that presumption by clear and convincing evidence." *Ward v. Hall*, 592 F.3d 1144, 1177 (11th Cir. 2010) (citing § 2254(e)(1); *Parker v. Head*, 244 F.3d 831, 835-36 (11th Cir. 2001)). And § 2254(e)(1) "commands that for a writ to issue because the state court made an 'unreasonable determination of the facts,' the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Id.* at 1155 (alteration in original).

## D.

Federal habeas "exists only to review errors of constitutional dimension." *McFarland v. Scott*, 512 U.S. 849, 856 (1994). Additionally, "[w]hen the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). Two consequences flow from these fundamental principles: (1) the habeas petitioner bears the burden of overcoming the presumption of "legality" that attaches to the state court conviction and sentence, and of establishing a factual basis demonstrating that federal

post-conviction relief should be granted,[14] and (2) the habeas petitioner must meet "heightened pleading requirements."[15] The mere assertion of a ground for relief, without sufficient factual detail, does not satisfy either the petitioner's burden of proof under § 2254(e)(1), or the requirements of Rule 2(c) of the *Rules Governing Section 2254 Cases in the United States District Courts*, which requires a state prisoner to "specify all the grounds for relief available to the petitioner," and "state the facts supporting each ground." Rule 2(c)(1) and (2), *Rules Governing Section 2254 Cases*; *see also* 28 U.S.C. § 2242 (stating that an application for writ of habeas corpus "shall allege the facts concerning the applicant's commitment or detention").

Under the heightened pleading standard, a habeas petitioner must support each claim with facts sufficient to justify a favorable decision if the allegations are proven true. *See, e.g., Blackledge v. Allison*, 431 U.S. 63, 75 n. 7 (1977) (observing that a habeas petition must "state facts that point to a 'real possibility of constitutional error'") (quoting Advisory Committee Notes to Rule 4 of the *Rules Governing Section 2254 Cases*). Additionally, "[c]itation of the controlling constitutional,

---

[14]*See, e.g.*, 28 U.S.C. § 2254(d) and (e)(1); *Hill v. Linahan*, 697 F.2d 1032, 1036 (11th Cir. 1983) ("The burden of proof in a habeas proceeding is always on the petitioner.").

[15]*McFarland*, 512 U.S. at 856; *Borden v. Allen*, 646 F.3d 785, 810 (11th Cir. 2011) (holding that Section 2254 requires "fact pleading," and not merely "notice pleading").

statutory, or other bases for relief for each claim also should be stated." 1 Randy

Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 11.6,

at 654 (5th ed. 2005). As another district court has held:

> It is not the duty of federal courts to try to second guess the meanings of statements and intentions of petitioners. Rather the duty is upon the individual who asserts a denial of his constitutional rights to come forth with a statement of sufficient clarity and sufficient supporting facts to enable a court to understand his argument and to render a decision on the matter.

*Nail v. Slayton*, 353 F. Supp. 1013, 1019 (W.D. Va. 1972).

### III.

The court turns now to Windsor's claims, which number 17 in total, Claims A-Q. The court divides Windsor's claims into three sections. In section A the court addresses Windsor's guilt-phase claims, the penalty-phase claims in section B, and the claims Windsor has abandoned or failed to pursue in section C. Within each subsection, the court considers the claims in alphabetical order.

### A.

### 1.

Windsor challenges in Claim A purportedly improper comments by the prosecutor during the guilt phase. At issue are the following comments the prosecutor made during the guilt-phase closing arguments:

> Intent is a state of mind--anything that is rarely capable of positive proof. I expect the judge will tell you that. If we could get into that mind over there and put out here what is in there, we would have no reason for a jury.

Vol. 5, Tab 13 at 990. After the trial court overruled Windsor's objection, the prosecutor continued:

> I'll tell you that he did have the intent to kill. If you find the intent to kill, there can be but one verdict. The state of mind--not capable of positive proof. How can you decide what his intent was? We have to prove--to find him guilty of capital murder--the intent. Intent can be inferred from his actions. Judge Austin will tell you in his charge that the intent can be inferred from his actions. Let's look at his actions. What did he do? How do we decide his intent? What are his actions?

*Id.* Windsor objected again and pointed out that "[t]here has been no proof of any gun that killed [Mr. Howard]." *Id.* at 991. The trial court overruled the objection after stating that "[t]he jury has heard the evidence." *Id.*

### a.

Windsor contends that the prosecutor's reference to "get[ting] into that mind over there and put[ting] out here what is in there" violated his Fifth Amendment rights to avoid self-incrimination, remain silent, due process, a fair trial, and a reliable sentencing under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Doc. 16 at 12 ¶ 26. Windsor raised this claim on direct appeal to the ACCA, in which he alleged violations of these four amendments within the claim's caption. Vol. 9, Tab 32 at i,

7-9. The Respondents contend, however, that Windsor did not fairly present federal claims under the Sixth or Eighth Amendment at the state level and that "a state court remedy is no longer available." Doc. 26 at 18-19. In reply, Windsor maintains that "[t]o the extent it may be significant in these proceedings," he addressed but did not argue the Sixth and Eighth Amendment claims on direct appeal, in reply, and on certiorari. Doc. 28 at 6; Vol. 9, Tab 32 at 7; Vol. 10, Tab 34 at 5; Vol. 10, Tab 37 at 1. Windsor points out also that in *Windsor II*, the Alabama Supreme Court certified that it had reviewed the issues that Windsor raised for plain error and considered the appropriateness of the death penalty judgment. *See* doc. 28 at 6-7 (citing *Windsor II*, 683 So. 2d at 1061-62).

After reviewing the referenced filings, this court has confirmed that Windsor identified the Sixth and Eighth Amendments in the caption of the claim in state court. But within the body of these documents, Windsor did not discuss either amendment, much less factually support an underlying constitutional right that either amendment protects. A petitioner must fairly present the federal right he contends is at stake and give the state court the "first opportunity to hear th[at] claim. . . ." *Picard*, 404 U.S. at 275. Referencing a constitutional amendment in headings without developing the corresponding right under that amendment's umbrella does not meet the exhaustion

requirement.[16] Moreover, even accepting Windsor's position that he exhausted the claim under the Sixth and Eighth Amendments, Windsor's allegations are too conclusive and nonspecific to satisfy Rule 2(c)'s requirement that federal habeas petitioners meet heightened pleading requirements.[17] Finally, in his briefing before this court, Windsor has not developed why those amendments entitle him to habeas relief. Merely alleging a habeas claim without developing argument constitutes either abandonment or a failure to meet the burden of proof. *See Tharpe v. Humphrey*, No. 5:10-CV-433 CAR, 2014 WL 897412, at *3 n. 4 (M.D. Ga. Mar. 6, 2014), *aff'd sub nom. Tharpe v. Warden*, 834 F.3d 1323 (11th Cir. 2016). Therefore, Windsor has

---

[16]Windsor does not dispute that dismissing his Sixth and Eighth Amendment claims without prejudice and allowing him to exhaust them in state court would be futile under Alabama law. *Compare* Doc. 26 at 20, *with* Doc. 28 at 2-7. Windsor does not invoke the cause and prejudice, firmly established, or fundamental injustice exception to excuse his procedural default. *See* § II.B.2 *supra*. Consequently, whether procedural default precludes substantive review of these claims rises or falls on the court's fair presentation assessment. *See Al-Amin v. Shartle*, No. 1:12-CV-1688-AT-GGB, 2016 WL 10718765, at *17 (N.D. Ga. Mar. 24, 2016) ("[A] failure to provide any citation to authority or arguments in support waives an issue."), *report and recommendation adopted in part, rejected in part on other grounds*, No. 1:12-CV-1688-AT-GGB, 2017 WL 6596602 (N.D. Ga. Sept. 29, 2017), *aff'd sub nom. Al-Amin v. Warden Georgia Dep't of Corr.*, 932 F.3d 1291 (11th Cir. 2019), *cert. denied, Al-Amin, v. Ward*, 2020 WL 1668291, at *1 (U.S. Apr. 6, 2020); *see Shartle*, 2016 WL 10718765, at *17 (citing Eleventh Circuit waiver cases and observing that "[t]he same principles apply at the district court level").

[17]*See* Rule 2(c), *Rules Governing Section 2254 Cases* (requiring petitioner to "specify all the grounds for relief[,]" "state the facts supporting each ground[,]" and "state the relief requested"); *McFarland*, 512 U.S. at 856 (explaining that habeas Rule 2(c) requires heightened pleading); *Mayle v. Felix*, 545 U.S. 644, 649 (2005) (contrasting that Rule 2(c) "requires a more detailed statement" than Federal Civil Procedure Rule 8(a)(2)'s "short and plain statement of the claim" standard).

either abandoned or not proven an entitlement to habeas relief under the Sixth and Eighth Amendments.[18]

### b.

Windsor claims under the Fifth and Fourteenth Amendments fare no better. In his brief in state court, Windsor cited *Griffin v. California*, 380 U.S. 609 (1965),[19] and presented the federal claim as one arising under the Fifth Amendment's self-incrimination clause. Vol. 9, Tab 32 at 7. Although the ACCA granted Windsor relief on his *Griffin* claim, the Alabama Supreme Court reversed. *Windsor I*, 683 So. 2d at 1023. In reversing the ACCA, the Court observed that "[a] prosecutor must be extremely careful not to overstep the mark or to break with the established protocol regarding statements about th[e] privilege [against self-incrimination]." *Id.* After identifying the Fifth Amendment as the source of Windsor's federal claim, the Court evaluated the prosecutor's comment under Eleventh Circuit precedent. *Id.* at 1024 (quoting *Marsden v. Moore*, 847 F.2d 1536, 1547 (11th Cir. 1988), and citing *United*

---

[18]The court understands that Windsor relies on the Fourteenth Amendment for the purpose of constitutional incorporation only. But to the extent Windsor contends that the Fourteenth Amendment provides an independent basis for habeas relief, that theory fails under Rule 2(c), abandonment, or lack of proof too.

[19]*Griffin* held that "the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin*, 380 U.S. at 615.

*States v. Betancourt*, 734 F.2d 750, 758 (11th Cir. 1984)).[20]  The Court determined that the prosecutor, rather than intentionally commenting on Windsor's failure to testify, "was explaining the difference between felony murder and capital murder, and arguing that the State had proven Windsor guilty of capital murder" and clarifying to the jury that "[i]n order to do so, the State had to prove Windsor's intent to kill." *Id.* at 1023. The Court concluded that "[i]n this narrow context," the prosecutor's remarks correlated with the State's reliance on circumstantial evidence to prove Windsor's intent to kill. *Id.* at 1023; *see also id.* at 1024 ("We cannot say that the [prosecutor] . . . intended to . . . remark on Windsor's failure to testify [or] .

---

[20]The Eleventh Circuit explained that:

> Convictions can be overturned where a comment on a defendant's exercise of his right to remain silent, either by the prosecutor or by counsel for a co-defendant, impairs the integrity of that right. *See, United States v. Aguiar*, 610 F.2d 1296, 1302 (5th Cir.1980), *cert. denied*, 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 31 (1981). However, not every statement is an impermissible comment on silence. The standard for determining if the comment was impermissible is "whether the statement was manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of an accused to testify." *United States v. Dearden*, 546 F.2d 622, 625 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 295, 54 L.Ed.2d 188 (1977). In making this determination the court must "look to the context in which the statement was made . . . to determine the manifest intention which prompted it and its natural and necessary impact upon the jury." *United States v. Forrest*, 620 F.2d 446, 455 (5th Cir.1980), quoting *Samuels v. United States*, 398 F.2d 964, 967 (5th Cir.), *cert. denied*, 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969).

*Betancourt*, 734 F.2d at 758.

. . that the natural and necessary reaction of the jury would be to conclude that the prosecutor was referring to Windsor's failure to take the stand[.]"). Thus, the Court found that "the trial court properly overruled the objection to the prosecutor's statement." *Id.* at 1024.

To obtain habeas relief on his exhausted *Griffin* claim, Windsor must show that the Alabama Supreme Court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). To meet this standard,[21] Windsor relies on three cases discussed above—*Griffin*, *Betancourt*, *Marsden*—as well as *Solomon v. Kemp*, 735 F.2d 395 (11th Cir. 1984), *Bui v. Haley*, 321 F.3d 1304 (11th Cir. 1994),[22] and the ACCA opinion from his

---

[21]"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams*, 529 U.S. at 405 (O'Connor, J., majority opinion with respect to part II).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13.

[22]The reliance on *Bui*, which quoted the district court's acknowledgment of the axiom that "'one cannot know another's state of mind,'" *Bui*, 321 F.3d at 1314, is misplaced. That language is not a holding, and *Bui* is not an improper prosecutorial comment case but an equal protection decision under *Batson v. Kentucky*, 476 U.S. 79 (1986). *Bui*, 321 F.3d at 1307.

death penalty proceedings in Colbert County (*Windsor* (*Colbert Cty.*)). Docs. 16 at 11-12 ¶ 25; 28 at 2. None of the cases is helpful.

The *Griffin* Court did not endorse a test for lower courts to use when determining whether a prosecutorial comment violated a defendant's right not to testify. *Solomon* clarified that the Eleventh Circuit's improper prosecutorial comment test comes from the former Fifth Circuit Court of Appeals,[23] which in turn relied on decisions that trace back to the Tenth and Second Circuit Court of Appeals,[24] and to *Morrison v. United States*, 6 F.2d 809 (8th Cir. 1925), the apparent original source of the standard.[25] But Windsor does not challenge the Alabama Supreme Court's reliance on the Eleventh Circuit's prosecutorial constitutional test. Instead, Windsor contends that the Court's reasoning and result were deficient under AEDPA's

---

[23]*Solomon*, 735 F.2d at 401 & n. 2 (quoting *Dearden*, 546 F.2d at 625, and noting that, in *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted *Dearden* as binding precedent upon its split from the Fifth Circuit).

[24]*See Davis v. United States*, 357 F.2d 438, 441 (5th Cir. 1966) (citing Tenth and Second Circuits' Fifth Amendment standard); *see also Knowles v. United States*, 224 F.2d 168, 170 (10th Cir. 1955) ("[T]he test is whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."); *United States v. Fay*, 349 F.2d 957, 961 (2d Cir. 1965) (adopting *Knowles* holding).

[25]*Knowles*, 224 F.2d at 170 (citing *Morrison*); *see Morrison*, 6 F.2d at 811 ("The test is: Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?").

contrary to and unreasonable application clauses. Doc. 16 at 12 ¶ 26. The court disagrees.

To support his claim, Windsor relies primarily on the outcome of the "Colbert County capital murder conviction [which was] . . . reversed due to an improper comment on [Windsor's] decision not to testify." Doc. 28 at 5. But that case involved unrelated conduct by the prosecutor. Specifically, during closing argument in that trial, the prosecutor stated:

> And the strongest piece of circumstantial evidence that you have in this case, and [defense counsel] just glossed over this—State's Exhibit No. 31 [the victim's gun], it has been identified a number of ways in this case, but they can't explain this—they can't explain why this weapon was in the defendant's pocket when he was arrested. Can you offer me another reasonable hypothesis as to how that weapon got there?

*Windsor (Colbert Cty.)*, 593 So. 2d at 90. Windsor's counsel objected and moved for a mistrial, based on the prosecutor's "'point[ing] to the defendant'" when he said "'[t]hey cannot explain why he had the deceased's pistol in his possession at the time of his arrest.'" *Id.* In response, the prosecutor maintained that the argument was a response to an inadequate explanation from Windsor's counsel "'of how the gun could have gotten there.'" *Id.* The prosecutor admitted pointing in the defense's direction but contended that the context of his statement showed that the gesture was

a reference to counsel instead of Windsor. *Id.* at 90-91. The trial court denied the

motion and gave no curative instructions. *Id.* at 92-93.

Relying mostly on Alabama law and a blocked quotation from an Eleventh

Circuit opinion, the ACCA granted Windsor a new trial. *Windsor (Colbert Cty.)*, 593

So. 2d at 91, 93. The ACCA explained that

> because the prosecutor's comment, especially in conjunction with his
> gesture towards the defense table at which the appellant was seated,
> constituted an indirect comment on the appellant's failure to testify and
> because, from the evidence presented, only the appellant could have
> explained why he had possession of the victim's handgun, the
> prosecutor's comment could have been construed as "alerting the jury
> to the [appellant's] opportunity to refute the State's case." *Ex parte
> Tucker*, 454 So.2d 552, 553 (Ala.1984).

*Id.* at 92. In reversing, the ACCA also noted that "the trial court . . . took no action to

eradicate the prosecutor's comment." *Id.*

The different outcome in *Windsor (Colbert Cty.)* does not establish that the

rejection of Windsor's *Griffin* claim in the St. Clair County proceedings involved a

contrary to or unreasonable application of federal constitutional law. Importantly, the

St. Clair County prosecutor did not point at the defense table when he uttered "if we

could get into that mind over there and put out here what is in there. . . ." And unlike

the Colbert County case in which only Windsor could explain the presence of the

gun, the Alabama Supreme Court reasoned that the context of the prosecutor's

remarks supported a meaning separate from Windsor's failure to testify, i.e. the State's burden to prove circumstantially Windsor's intent to kill Mr. Howard. *Windsor I*, 683 So. 2d at 1023.

Moreover, even if Windsor is correct that the state courts addressed his Fifth Amendment rights differently or inconsistently in separate (but factually related) proceedings, it does not open the door to habeas relief.[26]  To carry his habeas burden, Windsor must show that the different Fifth Amendment outcome in the St. Clair County case was objectively unreasonable under *Griffin*. To prevail, Windsor must do more than argue that this court would have decided his *Griffin* claim differently. Rather, Windsor must show instead that the Alabama Supreme Court's opinion was in contravention of U.S. Supreme Court precedent or "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. He has failed to do so, and, accordingly, the court denies Claim A.

---

[26]The ACCA did not mention *Griffin*, the Fifth Amendment, or the federal right against self-incrimination in *Windsor (Colbert Cty.)*. Consequently, the decision is of questionable Fifth Amendment value. But even if the ACCA had invoked the Fifth Amendment, an Alabama court's interpretation of the Fifth Amendment is not "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## 2.

Windsor contends in Claim B that the State introduced unreliable and tainted identification witness testimony in violation of his rights to due process, a fair trial, and a reliable sentencing proceeding under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Doc. 16 at 12, 20 ¶¶ 27, 38.

### a.

One of the witnesses, Sammie Sue Osborne, whose house was "about five miles" from Mr. Howard's convenience store, identified Windsor as the man who visited her home with Guthrie "[a]bout midday" on the date of Mr. Howard's murder.[27]  Vol. 2, Tab 11 at 388, 389; Vol. 3 at 402-03. Ms. S.S. Osborne, who knew Guthrie through another trial witness, Ms. B. Osborne, Vol. 2, Tab 11 at 388-89, testified at a hearing that Guthrie and Windsor arrived in the same car and that Guthrie told her that Windsor's first name was "Harvey," *id.* at 389, 390, 401; Vol. 3 at 402, 403. Ms. S.S. Osborne recalled that Windsor and Guthrie drank Budweiser beer and "stayed for about thirty minutes." Vol. 3 at 403. Ms. S.S. Osborne recalled that

---

[27]Windsor and the Respondents spell Ms. S.S. Osborne's last name with an "e" in their habeas filings. *See, e.g.*, docs. 16, 26, 28. The court reporter who transcribed Ms. S.S. Osborne's testimony omitted the "e". Vol. 2, Tab 11 at 388. Consistent with the Alabama Supreme Court's spelling in *Windsor II* and the habeas record, this court includes an "e" unless quoting from a source that omits it. The same is true for witness Bobbie Osborne referenced below.

Windsor wore an old army coat and jeans, but she could not remember details about his physical appearance. Vol. 2, Tab 11 at 390; Vol. 3 at 405, 406.

When Ms. S.S. Osborne testified that she could identify Windsor in the courtroom as the man who came with Guthrie to her home on the day of the murder, Windsor objected. Vol. 2, Tab 11 at 390-91. The trial court instructed the prosecutor that he would "have to lay a predicate if [Ms. S.S. Osborne] ha[d] an independent recollection of [Windsor that was] independent of a lineup" before asking her to identify Windsor in the courtroom. *Id.* at 391. As a result, the prosecutor asked Ms. S.S. Osborne if the Alabama Bureau of Investigation had visited her or if she had seen case-related photographs before trial. *Id.* Ms. S.S. Osborne testified that someone with the St. Clair County Sheriff's Office showed her a book of photographs, *id.* at 391-92, and that she identified Windsor as the person who accompanied Guthrie to her home after reviewing the pictures, *id.* at 393. And Ms. S.S. Osborne then identified Windsor as the person who came with Guthrie to her house by pointing him out in the courtroom and describing the clothes he was wearing. *Id.* at 394-95. She added that Windsor "sat right across [from her at] the [kitchen] table," and that Windsor was the same person she had selected from the photo array before trial. *Id.* at 395. She affirmed that her identification of Windsor in the courtroom was an independent recollection. *Id.*

On cross-examination, Windsor's counsel asked Ms. S.S. Osborne if she remembered telling him a few days before the trial that she did not remember how Windsor looked and only remembered what he was wearing. Vol. 2, Tab 11 at 396. Ms. S.S. Osborne responded, "I told you if I s[aw] [Windsor], I could probably identify him." *Id.* Windsor's counsel argued that he needed to review the photographs Ms. S.S. Osborne viewed in order to evaluate the reliability of her courtroom identification. *Id.* The trial court disagreed:

> If her in-court identification is not based on the photographs, then the photographs aren't relevant. What she just said sounds like it came from the textbooks. She did not remember what he looked like. She could not even describe him in the photographs; but her seeing the gentleman in the courtroom today, "That is the guy I saw", that is based on seeing him today. If it had been written in the textbook, it wouldn't be any better than that. The Court finds the in-court identification is not based on being tainted by the photographs.   It is an independent identification based on recollection. [The] Court will allow the State to go into it without a hearing concerning the photographic lineup.

*Id.* at 396-97.

> Windsor's counsel objected:

> I object in that the photographs that she is making an identification from has never been presented. We are saying any subsequent identification would be tainted as a result of that photograph being shown to her in that it could be--again I will put in the record it is our understanding there was writing on it. The writing could be so prejudicial so as to influence this lady's identification. It could have had anything on it that would have influenced her identification. Until we see that, I'm going to object to any further identification.

38

*Id.* at 397-98. The trial court stated that Windsor was entitled to see the photographs and that Windsor's counsel could cross-examine Ms. S.S. Osborne on her independent recollection of Windsor based on that evidence. *Id.* at 398. After the prosecutor stated that he did not have the photographs and Ms. S.S. Osborne reiterated that she could not recall who showed them to her, the trial court overruled the objection:

> I have just held a hearing whereby she made an independent identification of the defendant. Where that happens, the argument you are asserting does not apply.

*Id.* at 400. The trial resumed, and Ms. S.S. Osborne identified Windsor in front of the jury as the person she saw with Guthrie on February 25, 1988. *Id.* at 401.

### b.

The other witness, Tommy Pepper, is the son of the homicide victim in Windsor's Colbert County case. Mr. T. Pepper identified Windsor in a pretrial photographic lineup and in the courtroom during the St. Clair County trial "as the man he had seen running from his father's . . . store on the night of his father's murder." *Windsor II*, 683 So. 2d at 1051. Windsor argued that Mr. T. Pepper's admission that he saw "Windsor's picture in the newspaper before seeing the photographic lineup" tainted the identifications. *Id.*

During a hearing outside the jury's presence, Mr. T. Pepper identified Windsor as the man he saw running out of his father's store on the day of his father's murder. Vol. 4 at 701-03. Mr. T. Pepper testified that he remembered meeting with Doug Hargett and another person from the sheriff's office shortly after the murder during which he selected Windsor's picture from a photo array, and initialed and dated the picture "[i]n the bottom righthand corner." *Id.* at 703-04, 708. Mr. T. Pepper recalled reviewing six unmarked photographs "lined up side by side in two rows," *id.* at 704, 705, 707, and added that he identified Windsor independently from a photograph, *id.* at 709-710.

On cross-examination, Mr. T. Pepper denied following investigative coverage of his father's murder, including an article in his local paper on the morning of the pretrial identification. Vol. 4 at 711, 712, 713. Windsor's counsel asked Mr. T. Pepper if he remembered testifying about reading the paper in a similar hearing in Colbert County, and Mr. T. Pepper responded that he did not recall. *Id.* at 711. Windsor's counsel showed Mr. T. Pepper two photographs from the article and queried if Windsor's picture from the lineup was an exact match with the newspaper. *Id.* at 712-13. Mr. T. Pepper answered that he was unable to identify the photograph from the paper because he did not read the article, and that he did not recall telling anyone that

he had read the article before or finding out Windsor's name after the pretrial identification. *Id.* at 713-15, 719, 720.

Hargett, an investigator with the Colbert County Sheriff's Office, testified also during the screening hearing. Vol. 4 at 721, 723, 751. Hargett recalled that before the pretrial interview, Mr. T. Pepper "gave . . . a general physical description of the subject that he saw" on the night of his father's homicide in a written statement. *Id.* at 726. However, the sheriff's office did not complete a sketch based on the description due to "[t]he size of [the] department." *Id.* at 727. Hargett recalled that the sheriff's office arrested Windsor on March 6, 1988 and provided the picture for the photo array. Vol. 4 at 721-22. Hargett stated that he met with Mr. T. Pepper the next day, *id.* at 721, and that Mr. T. Pepper reviewed "a photo spread consisting of six colored photographs of all white males," *id.* at 723. Hargett remembered seeing "some photographs in the local paper[,]" but he could not recall the date. *Id.* at 722. When Windsor's counsel showed Hargett the front page of the local newspaper from the day Hargett met with Mr. T. Pepper, Hargett identified the publication and confirmed that the district attorney released Windsor's photograph to the paper. *Id.* at 722-23. And Hargett testified that Mr. T. Pepper stated that he had read the local paper before the pretrial identification interview. *Id.* at 723. While Hargett was unsure if the photos in the paper and the array were identical, he stated that the images were

"in close proximity." *Id.* at 724. And when the prosecutor asked Hargett if Mr. T. Pepper indicated "whether or not he (Mr. T. Pepper) could make an independent identification of Windsor," Hargett responded, "Yes, sir, he did." *Id.* Finally, Hargett added that after Mr. T. Pepper identified Windsor in the photo array, Mr. T. Pepper initialed and dated the back of the photograph. *Id.* at 724-25.

The trial court denied the motion to quash Mr. T. Pepper's identification after determining that the totality of the photographic lineup was "not unduly suggestive." *Windsor II*, 683 So. 2d at 1051. The court found that the pictures were of white younger males with similar hair and beard styles and color, but for one substantially different photo. *Id.* The court found insufficient evidence existed to establish that the newspaper photo tainted Mr. T. Pepper's pretrial photographic and in-court identifications. *Id.*; *see also* Vol. 4 at 728.

After the hearing, Mr. T. Pepper identified Windsor in open court. Vol. 4 at 732. He denied following the news coverage about his father's homicide and testified that he did not recall telling Hargett about seeing an article before the interview. *Id.* at 733-34. Mr. T. Pepper stated that he saw Windsor for "a matter of seconds" from about thirty yards away on the evening of the crime, *id.* at 735, that it was dark outside with some lighting and shadows, and he was running toward the store when he saw

Windsor, *id.* at 736. Windsor's counsel inquired twice if Mr. T. Pepper had gotten a "good look" at Windsor, and Mr. T. Pepper responded affirmatively. *Id.* at 735-36.

When Hargett returned to testify before the jury, Windsor's counsel asked him about the interview with Mr. T. Pepper. Vol. 4 at 765. Hargett testified that they arrested Windsor the day before he met with Mr. T. Pepper and that either the district attorney or the sheriff released Windsor's photograph to the press. *Id.* at 766. Hargett described the picture of Windsor in the photo spread and in the press release as "[s]ubstantially the same." *Id.* at 767. Hargett testified that the local paper ran an article the morning he met with Mr. T. Pepper that contained the press release photo of Windsor, and that Mr. T. Pepper stated that he had read the article. *Id.* at 767-68. On cross, Windsor's counsel asked Hargett if the district attorney influenced the sheriff's office's decision to use the photo array instead of a lineup. Vol. 4 at 773. Hargett confirmed that the district attorney wanted to use a photo array, and that the sheriff's office discussed with the district attorney the lineup option given the media coverage of Windsor's arrest. *Id.*

## c.

Windsor challenged unsuccessfully the reliability of the trial identification testimony on direct appeal. Vol. 9, Tab 32 at iv, 50-56; Vol. 11, Tab 38 at i, 4-19, 15; Vol. 11, Tab 42 at i, 1-12. Windsor alleged violations of his rights to due process, a

fair trial, and a reliable verdict under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Vol. 11, Tab 42 at 2-3. Citing *Neil v. Biggers*, 409 U.S. 188 (1972) and *Manson v. Brathwaite*, 432 U.S. 98 (1977), Windsor presented his federal claim to the Alabama Supreme Court as one arising under the Fourteenth Amendment's due process clause.[28] Vol. 11, Tab 42 at 16-18. The court will review these cases first before addressing Windsor's claim.

In *Biggers*, the Supreme Court disagreed with the district court's conclusion that a rape victim's pretrial identification of a defendant at a single-suspect showup (versus a lineup) violated due process. *Biggers*, 409 U.S. at 193, 195, 200. Before answering this question, the Court summarized the facts and holdings from four other eyewitness testimony opinions,[29] *id.* at 196-98, and provided "[s]ome general guidelines [that] emerge[d] from these cases[:]"

---

[28]In *Barron v. Baltimore*, 32 U.S. (7 Pet.) 243 (1833), the Supreme Court held that it lacked jurisdiction to hear a Fifth Amendment takings claim against the City of Baltimore, Maryland because the Fifth Amendment of the United States Constitution (and the Bill of Rights more broadly) limit the power of the federal government rather than the states. *Id.* at 248-49, 250-51. Because Windsor challenges state conduct under 28 U.S.C. § 2254, the Fifth Amendment provides no basis for habeas relief except through the Fourteenth Amendment incorporation process. While Windsor is without a cognizable Fifth Amendment due process claim, the Fourteenth Amendment provides similarly that states may not "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend XIV, § 1.

[29]*Stovall v. Denno*, 388 U.S. 293, 301-02 (1967) (holding that a totality of the circumstances standard applies when a defendant claims that the suggestiveness of a pretrial identification procedure such as a showup violated due process), *abrogated on other grounds by United States v. Johnson*, 457 U.S. 537 (1982), *Johnson in turn abrogated by Griffith v. Kentucky*, 479 U.S. 314

It is, first of all, apparent that the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' *Simmons v. United States*, 390 U.S., at 384, 88 S.Ct., at 971. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of 'irreparable' it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in *Foster*. Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. But as *Stovall* makes clear, the admission of evidence of a showup without more does not violate due process.

What is less clear from our cases is whether, as intimated by the District Court, unnecessary suggestiveness alone requires the exclusion of evidence. While we are inclined to agree with the courts below that the police did not exhaust all possibilities in seeking persons physically comparable to respondent, we do not think that the evidence must therefore be excluded. The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from using a less reliable procedure where a more reliable one may be available, and would not be based on the assumption that in every instance the admission of evidence of such a confrontation offends due process. *Clemons v. United States*, 133 U.S.App.D.C. 27, 48, 408 F.2d 1230, 1251 (1968) (Leventhal, J., concurring); *cf. Gilbert v. California*, 388 U.S. 263, 273, 87 S.Ct. 1951, 1957, 18 L.Ed.2d 1178 (1967); *Mapp*

---

(1987); *Simmons v. United States*, 390 U.S. 377, 384 (1968) (holding that eyewitness identification at trial after a pretrial photographic identification "will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"); *Foster v. California*, 394 U.S. 440, 442 (1969) (holding that pattern of suggestive pretrial identification procedures violated the defendant's due process rights); and *Coleman v. Alabama*, 399 U.S. 1, 5-6 (1970) (upholding trial court's admission of an in-court identification over the petitioners' claim that an "'impermissibly suggestive'" pretrial lineup "'g[a]ve rise to a very substantial likelihood of irreparable misidentification'") (quoting *Simmons*).

> *v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Such a
> rule would have no place in the present case, since both the confrontation
> and the trial preceded *Stovall v. Denno*, *supra*, when we first gave notice
> that the suggestiveness of confrontation procedures was anything other
> than a matter to be argued to the jury.

*Id.* at 198-99 (footnotes omitted). Against this backdrop, the Court assessed whether

under the totality of the circumstances the victim's "identification was reliable even

though the confrontation procedure was suggestive." *Id.* at 199. The Court

summarized the reliability factors to include:

> the opportunity of the witness to view the criminal at the time of the
> crime, the witness' degree of attention, the accuracy of the witness' prior
> description of the criminal, the level of certainty demonstrated by the
> witness at the confrontation, and the length of time between the crime
> and the confrontation.

*Id.* at 199-200. "Weighing all the factors," including the victim's "more than

ordinarily thorough" description of her assailant and the "'no doubt'" certainty of her

identification, the Court found "no substantial likelihood of misidentification" and

upheld the trial court's admission of the eyewitness evidence. *Id.* at 201.

And in *Manson*, the Court clarified that, post-*Stovall*, the totality of

circumstances test rather than a blanket exclusionary rule applies to a suggestive

pretrial identification procedure comprising of one photograph. *Manson*, 432 U.S. at

106-07; *see also id.* at 114 ("We therefore conclude that reliability is the linchpin in

determining the admissibility of identification testimony for both pre- and post-

*Stovall* confrontations."). Although the Court observed that using a photographic array would be a better practice, balancing the *Biggers* factors, "[t]he defect, if there be one, goes to weight and not to substance." *Id.* at 114.

### d.

In analyzing Windsor's claim that the trial court erred in admitting the identification testimony of Ms. S.S. Osborne and Mr. T. Pepper, the Alabama Supreme Court referenced several Supreme Court decisions.[30]   Based on these cases, the Court concluded the trial court properly admitted the identification testimony, noting as to Ms. S.S. Osborne that she based her in-court identification on Windsor's visit to her home during which Windsor sat across from her at the kitchen table, and that the record lacked "evidence suggesting misidentification." *Windsor II*, 683 So. 2d at 1051. As for Mr. T. Pepper, the Court found his testimony supported the trial court's decision to admit his out-of-court and in-court identifications. *Id.* Specifically, the Court focused on Mr. T. Pepper's testimony that he did not recall telling anyone

---

[30]The Alabama Supreme Court cited *Stovall*, *Biggers*, *Manson*, *Simmons*. The Court also cited a Seventh Circuit case, *United States v. Briggs*, 700 F.2d 408 (7th Cir. 1983), and several state court decisions. *Windsor II*, 683 So. 2d at 1050. In *Briggs*, the Seventh Circuit found that "it is incumbent upon a defendant to establish that the confrontation procedure in fact was suggestive prior to reaching the threshold 'totality of the circumstances' test of reliability." *Briggs*, 700 F.2d at 412. The Alabama cases underscored the acceptability of admitting an in-court identification based on a witness's recollection that was independent from a suggestive pretrial identification procedure. *Windsor II*, 683 So. 2d at 1050.

about seeing the newspaper photo of Windsor before the photographic lineup, that "he got a good look at [Windsor] on the evening of the crime," and that he identified Windsor independently from the photographs. *Id.*

To obtain habeas relief on the exhausted due process claim,[31] Windsor must show that the Alabama Supreme Court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Windsor relies on a litany of decisions to support his position.[32] But Windsor does not explain how these authorities meet the objective unreasonableness standard. And to the extent that these cases suggest a different due process result,

---

[31] Windsor alleges conclusively in his petition that the trial court's admission of the eyewitness testimony violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Doc. 16 at 20 ¶ 38. The Fifth Amendment is inapplicable here. *See* n. 28 *supra*. Because Windsor does not elaborate why he has a cognizable constitutional right under the Sixth or Eighth Amendment, the court dismisses Windsor's claims based on those amendments as abandoned, underdeveloped, or unproven. *See, e.g., United States v. Krasnow*, 484 F. App'x 427, 429 (11th Cir. 2012) ("A party abandons all issues on appeal that he or she does not 'plainly and prominently' raise in his or her initial brief." (quoting *United States v. Jernigan*, 341 F.3d 1273, 1283 n. 8 (11th Cir. 2003))); *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n. 13 (11th Cir. 2007) (explaining that a court need not address a "perfunctory and underdeveloped argument" that lacks legal authority or elaboration).

[32] Windsor cites *Manson*, *Simmons*, *Biggers*, *Foster*, *Perry v. New Hampshire*, 565 U.S. 228 (2012), *Berger v. United States*, 295 U.S. 78 (1935), *Napue v. Illinois*, 360 U.S. 264 (1959), *Miller v. Pate*, 386 U.S. 1 (1967), an excerpt from Justice Brennan's dissenting opinion in *Watkins v. Sowders*, 449 U.S. 341, 351 (1981), *Mardsen v. Moore*, 847 F.2d 1536 (11th Cir. 1988), *O'Brien v. Wainwright*, 738 F.2d 1139 (11th Cir. 1984), *United States v. Owens*, 682 F.3d 1358 (11th Cir. 2012), and other cases. Doc. 16 at 14-15, 17 ¶¶ 30, 33; Doc. 28 at 7-8, 14.

none demonstrates that the Alabama Supreme Court's reliability assessment obviously conflicts with clearly established Supreme Court precedent. For example, the Supreme Court found in *Foster* that the "suggestive elements" of the pretrial identification process "made it all but inevitable that [the witness] would identify [the] petitioner whether or not he was in fact 'the man.'" *Foster*, 394 U.S. at 443 (quoting *Biggers v. Tennessee*, 390 U.S. 404, 407 (1968)(Douglas, J., dissenting)). The constitutionally-deficient identification steps in *Foster* included two suggestive lineups in which the petitioner "was the only person" to participate twice and an intervening "one-to-one confrontation between the petitioner and witness." *Foster*, 394 U.S. at 443.

Unlike the situation in *Foster*, Ms. S.S. Osborne's pretrial identification process contained no element of suggestiveness. While Windsor argued that the sheriff's office could have tainted the photo array,[33] Windsor had the burden to show (not simply suggest) the existence of suggestiveness. In that respect, he should have pressed harder for the pretrial production of the photo array to substantiate his contention of a compromised identification process. In the absence of a tainted

---

[33]*See* Vol. 2, Tab 11 at 397-98 (stating that "[the photo array] could have had anything on it that would have influenced her identification").

procedure linked to law enforcement, Windsor's due process claim based on Ms. S.S. Osborne's identification testimony fails.[34]

The due process claim based on Mr. T. Pepper's testimony is a closer constitutional call because of the substantially similar photographs in the newspaper and the photo array and the conflicting testimony about whether Mr. T. Pepper read the newspaper on the day at issue. Windsor cites *Berger*,[35] *Napue*,[36] and *Miller*,[37] as well as non-Supreme Court cases,[38] for the proposition that "authorities [who]

---

[34]*See Windsor II*, 683 So. 2d at 1051 (observing that the record lacked "evidence suggesting misidentification"); *Briggs*, 700 F.2d at 412 (explaining that establishing a suggestive confrontation procedure is a prerequisite to reaching the *Biggers* reliability factors) (*Briggs* cited with approval in *Windsor II*).

[35]*Berger*, 295 U.S. at 88 (observing that "[t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done").

[36]*Napue*, 360 U.S. at 265, 272 (holding that a prosecutor's failure to correct a witness's false testimony that the witness "had received no promise of consideration in return for his testimony" violated the petitioner due process rights and may have impacted the jury's guilty verdict).

[37]*Miller*, 386 U.S. at 5-6, 7 (concluding that the prosecutor's deliberate misrepresentation to the jury that stains on shorts introduced at trial were from blood (not paint) entitled the petitioner to habeas relief).

[38]Because these cases are not Supreme Court holdings, they are not clearly established law. *See* 28 U.S.C. § 2254(d)(1). Alternatively, the cited cases do not show that the Alabama Supreme Court's treatment of this claim was objectively unreasonable. *See, e.g., Watkins*, 449 U.S. at 351 (quoting excerpt from Justice Brennan's dissenting opinion about the unreliability of eyewitness testimony); *Mardsen*, 847 F.2d at 1545-46 (concluding that due process required the exclusion of eyewitness testimony as unreliable after a suggestive identification procedure of "only [one] male in the photograph"); *O'Brien*, 738 F.2d at 1141 (denying habeas relief and explaining that the evidence which weakened the eyewitness identification "was 'grist for the jury mill.'") (quoting

deliberately set out to exploit a potentially suggestive identification" act unconstitutionally. Doc. 16 at 17 ¶ 33. Allegedly, whether "by design or coincidence, the photograph of Windsor shown to Mr. [T.] Pepper was either identical or a close approximation of the photo that appeared on the front page of the paper the day that Mr. [T.] Pepper made the identification." *Id.* at 17 ¶ 32. And Windsor notes that the district attorney "instructed the sheriff to use a photo spread rather than a more reliable line up procedure," and that the authorities did not do anything "to safeguard the reliability of the identification process despite knowing that Mr. [T.] Pepper had . . . read the March 7th edition [of the newspaper]" that contained Windsor's picture. *Id.* at 17 ¶ 33.

These facts trigger reliability concerns. Still, they fall short of the prosecutorial misconduct addressed in *Berger*, *Napue*, and *Miller*, and the inevitable pretrial identification in *Foster*. Indeed, Windsor acknowledges that nothing in the record confirms that the sheriff's office deliberately used a picture in the photo array that

---

*Manson*, 432 U.S. at 116); *Owens*, 682 F.3d at 1360, 1362 (Barkett, J., dissenting) (discussing the unreliable nature of eyewitness testimony); *New Jersey v. Henderson*, 27 A.3d 872, 896 (N.J. 2011) (summarizing studies on how an administrator's expectations may influence the outcome of a lineup or photo array identification) (cited in *Owens* dissenting opinion); *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 405-06 (7th Cir. 1975) (concluding that the due process clause does not require the exclusion of showup identification evidence even though the prosecutor cannot "justify the failure to use a more reliable identification procedure").

was substantially similar to the one published in newspaper and concedes that a coincidental closeness of the images may not call for constitutional exclusion. Doc. 16 at 17 ¶ 32. Windsor argues instead that the sheriff's office should have used a lineup procedure in light of the timing of the newspaper article and Mr. T. Pepper's interview to produce a more reliable identification. *Id.* at 17-18 ¶ 33. But accepting that contention does not mean that due process precedent required it or that the Alabama Supreme Court's rejection of Windsor's reliability claim was objectively unreasonable. *See Simmons*, 390 U.S at 384 (declining to prohibit pretrial identification by photograph "as a matter of constitutional requirement"). And while the Alabama Supreme Court did not write about each *Biggers* factor, its reference to Mr. T. Pepper's "got a good look" testimony signifies that the Court placed significant value on the reliability test's first and second factors—opportunity to view the suspect and degree of attention paid. Finally, although the Court did not discuss whether "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification[,]" *Simmons*, 390 U.S. at 384**,** its reference to *Simmons* is consistent with an implicit conclusion that the risk posed did not require exclusion of the evidence.[39]

---

[39]*See Neal v. Puckett*, 239 F.3d 683, 695 (5th Cir.) ("[I]t is not immediately clear to us whether a federal habeas court looks exclusively to the objective reasonableness of the state court's ultimate conclusion or must also consider the method by which the state court arrives at its

To close, Windsor has the burden of satisfying the unreasonable application standard and failed to do so on this unreliable testimony claim.[40] Thus, the court denies Claim B.

### 3.

Windsor contends in Claim C that the State did not offer race-neutral reasons for striking two African Americans from the venire in violation of *Batson*, *Powers v. Ohio*, 499 U.S. 400 (1991), and his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Docs. 16 at 22 ¶ 41; 28 at 15. Allegedly, the record does not support the prosecutor's explanations for striking the two prospective jurors. Doc. 16 at 21 ¶ 39. The court disagrees.

### a.

Using peremptory challenges to exclude potential jurors "solely on account of their race" is a violation of the Fourteenth Amendment's equal protection clause.

---

conclusion."), *reh'g en banc granted by* 239 F.3d 683 (5th Cir.), *habeas relief denied en banc by* 264 F.3d 1149 (5th Cir. 2001); *Wright v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1254 & n. 2 (11th Cir. 2002) (holding that "the summary nature of a state court's decision does not lessen the deference that it is due" on habeas review and quoting with approval *Neal* and *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *Hennon*, 109 F.3d at 335 (limiting the scope of unreasonable application review to "whether the determination is at least minimally consistent with the facts and circumstances of the case").

[40]Windsor invokes the "contrary to" clause too. Doc. 16 at 20 ¶ 38. Based on this court's unreasonable application analysis, Windsor has not shown a contrary application of Supreme Court precedent either.

*Batson*, 476 U.S. at 89.[41] The Court has established a "three-step inquiry" for evaluating a "defendant's *Batson* challenge to a peremptory strike." *Rice*, 546 U.S. at 338.

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Id.* (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995); citing *Batson*, 476 U.S. at 96-98 (internal quotations and citations omitted)).

At trial, the court overruled Windsor's challenge to the strikes, noting that Windsor did not have "a prima facie case of racial discrimination under *Batson*" because the prosecutor "used two of its seventeen peremptory strikes to" remove two of the four black venire members and that the jury panel had "more blacks proportionately . . . than . . . the venire." Vol. 2 at 286, 287. Despite this finding, the

---

[41]In *Powers*, the Supreme Court held that a criminal defendant's race is irrelevant when considering a *Batson* claim. *Powers*, 499 U.S. at 402.

court required the prosecutor nonetheless to provide "race neutral reasons" to facilitate subsequent review of the *Batson* claim. *Id.* at 286-87. In response, as to the first challenged juror, the prosecutor cited failing to report, appearing late or being under the influence of alcohol for jury service, opposing jury service for conflicting work-related reasons, and expressing opposition to the death penalty initially. *Id.* at 288-89. And for the second juror, the prosecutor cited a disbelief in "capital punishment except for certain cases." *Id.* at 289. The prosecutor added that the State had used peremptory strikes on everyone who disbelieved in capital punishment. *Id.* Consequently, the trial court found that the prosecutor's explanations were race neutral – "such that [a prosecutor] would strike any juror regardless of [the person's] race." Vol. 2 at 289-290. And on direct appeal, the Alabama Supreme Court "conclude[d] that the reasons given by the prosecutor were race-neutral and that the striking of the two African–Americans from the jury did not violate *Batson* . . . [or] *Powers*[.]" *Windsor II*, 683 So. 2d at 1050.

### b.

The court accepts that Windsor has made a prima facie case. Consequently, the court proceeds to the next two steps of the analysis and finds that the prosecutor's reasons for striking the two venire members were unrelated to race and satisfy step

two.[42]  As the *Purkett* Court has noted, "[w]hat it means by a 'legitimate reason' is

not a reason that makes sense, but a reason that does not deny equal protection." 514

---

[42]The *Purkett* Court provided the following guidance on the second and third steps of a *Batson* habeas claim:

> The Court of Appeals appears to have seized on our admonition in *Batson* that to rebut a prima facie case, the proponent of a strike "must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges," *Batson, supra*, 476 U.S., at 98, n. 20, 106 S.Ct., at 1724, n. 20 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981)), and that the reason must be "related to the particular case to be tried," 476 U.S., at 98, 106 S.Ct., at 1724. *See* 25 F.3d, at 682, 683. This warning was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith. What it means by a "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection. *See Hernandez, supra*, at 359, 111 S.Ct., at 1866; *cf. Burdine, supra*, at 255, 101 S.Ct., at 1094 ("The explanation provided must be legally sufficient to justify a judgment for the defendant").

> The prosecutor's proffered explanation in this case-that he struck juror number 22 because he had long, unkempt hair, a mustache, and a beard-is race neutral and satisfies the prosecution's step two burden of articulating a nondiscriminatory reason for the strike. "The wearing of beards is not a characteristic that is peculiar to any race." *EEOC v. Greyhound Lines, Inc.*, 635 F.2d 188, 190, n. 3 (CA3 1980). And neither is the growing of long, unkempt hair. Thus, the inquiry properly proceeded to step three, where the state court found that the prosecutor was not motivated by discriminatory intent.

> In habeas proceedings in federal courts, the factual findings of state courts are presumed to be correct, and may be set aside, absent procedural error, only if they are "not fairly supported by the record." 28 U.S.C. § 2254(d)(8). *See Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983). Here the Court of Appeals did not conclude or even attempt to conclude that the state court's finding of no racial motive was not fairly supported by the record. For its whole focus was upon the reasonableness of the asserted nonracial motive (which it thought required by step two) rather than the genuineness of the motive. It gave no proper basis for overturning the state court's finding of no racial motive, a finding which turned primarily on an assessment of credibility, *see Batson*, 476 U.S., at 98, n. 21, 106 S.Ct., at 1724, n. 21. *Cf. Marshall, supra*, at 434, 103 S.Ct., at 850.

U.S. at 769. Therefore, to prevail at step three, Windsor must overcome the state court's finding of no purposeful racial discrimination with clear and convincing evidence.[43]  Windsor has failed to make this showing.

Windsor correctly points out that the trial judge stated that "I don't have evidence of [the first prospective juror's drinking alcohol yesterday.]" Vol. 2 at 269. Still, the prosecutor's reliance on the stricken venire members' capital punishment statements outweighs that evidentiary deficit and supports the trial court's conclusion. Nothing about the prosecutor's death penalty-driven rationale was inherently discriminatory. And Windsor does not refute the prosecutor's statement that he used peremptory strikes on white venire members who shared similar views

─────────────────

*Purkett*, 514 U.S. at 769. The Court's reference to 28 U.S.C. § 2254(d)(8) and the "fairly supported by the record" standard corresponds with the pre-AEDPA version of § 2254.

[43]As the Court held in *Rice*,

> On direct appeal in federal court, the credibility findings a trial court makes in a *Batson* inquiry are reviewed for clear error.   Under AEDPA, however, a federal habeas court must find the state-court conclusion an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.   Thus, a federal habeas court can only grant [the habeas] petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge.   State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence.

*Rice*, 546 U.S. at 338-39 (internal citations and quotations omitted).

about capital punishment, nor does Windsor challenge the prosecutor's explanation that he also struck the first individual due to his or her conflicting work-related reasons for opposing jury service. And, even if Windsor is correct that the second stricken individual was not "unequivocally" against the death penalty, *see* doc. 16 at 21 ¶ 39, the focus of *Batson* is the sincerity of the prosecutor's motive for the strike rather than the reasonableness of the decision. While the prospective juror may perhaps support the death penalty in some circumstances, there is nothing inherently discriminatory about a prosecutor focusing only on the anti-death penalty component of the juror's answers if the prosecutor does so consistently across the panel.

To close, Windsor has not rebutted the correctness of the trial court's findings with clear and convincing evidence to show he is entitled to habeas relief under *Batson*.[44]  Consequently, the court denies Claim C.[45]

---

[44]Windsor alleges that he is entitled to habeas relief under both prongs of 28 U.S.C. § 2254(d)(1). Doc. 16 at 22 ¶ 41. Consistent with binding *Batson* authorities, this court has evaluated Windsor's *Batson* claim under 28 U.S.C. § 2254(d)(2). *See* doc. 28 at 15 ("Windsor thinks that the facts and citations to authority contained in his First Amended Petition for Writ of Habeas Corpus are sufficient for this Court to review this issue."). Still, the foregoing analysis shows that the Alabama Supreme Court's *Batson* review was neither contrary to nor an unreasonable application of Supreme Court precedent. Thus, Windsor cannot obtain habeas relief under § 2254(d)(1) either.

[45]Windsor alleges conclusively in his petition that the state's *Batson*-conflicting strikes violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Doc. 16 at 22 ¶ 41. But the Fifth Amendment is inapplicable here. *See* n. 28 *supra*. And because Windsor does not elaborate why he has a cognizable constitutional right under the Sixth or Eighth Amendment, Windsor's claims based on those amendments are abandoned, underdeveloped, or unproven.

**4.**

Windsor maintains in Claim D that the State's reliance on Mr. T. Pepper's identification testimony violated his rights to due process, a fair trial, and a reliable sentencing procedure under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[46] Doc. 16 at 25 ¶ 46. As to this claim, Windsor does not rely on an unreasonable application of *Biggers* as discussed in Claim B. Rather, Windsor proceeds on a theory of a contrary to or objectively wrong outcome under *Johnson v. Mississippi*, 486 U.S. 578 (1988), *Gardner v. Florida*, 430 U.S. 349 (1977), and *Woodson v. North Carolina*, 428 U.S. 230 (1976).[47]  Docs. 16 at 24, 25 ¶¶ 44, 46; 28 at 15.

This claim is based on the life sentence Windsor received in his retrial for the murder of the elder Mr. Pepper in Colbert County. In that retrial, Mr. T. Pepper did

---

[46]Although Windsor alleges in his petition that the State's reliance on Mr. T. Pepper's eyewitness testimony violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights, doc. 16 at 25 ¶ 46, Windsor focuses only on Eighth and Fourteenth Amendment authorities in framing this constitutional issue. Doc. 16 at 24 ¶ 44; Doc. 28 at 15. Thus, he has abandoned his claims, if any, related to these other amendments. Moreover, the Fifth Amendment is inapplicable here. *See* n. 28 *supra*. And, because Windsor does not elaborate why he has a cognizable constitutional right under the Sixth Amendment, that claim is abandoned, underdeveloped, or unproven.

[47] In *Johnson*, the Supreme Court held that the state court incorrectly concluded that "the reversal of [a prior] conviction did not affect the validity of a death sentence based on that conviction" and ordered "a reexamination of [the] petitioner's death sentence" under the Eighth Amendment. *Johnson*, 486 U.S. at 580, 584. The Supreme Court considered the constitutionality of a presentence report process and a mandatory death sentence statute in *Gardner* and *Woodson*. *See Gardner*, 430 U.S. at 351 (holding that a trial court's reliance on undisclosed portions of a presentence investigative report to impose a death sentence violated the Fourteenth Amendment's due process clause); *Woodson*, 428 U.S. at 305 (concluding that death sentences "under North Carolina's mandatory death sentence statute violated the Eighth and Fourteenth Amendments").

not identify Windsor as the man running from his father's store because the prosecution consented to the suppression of that testimony. Doc. 16 at 22, 24 ¶¶ 42, 44. Windsor contends that the absence of Mr. T. Pepper's testimony is the "singular difference" in his two Colbert County criminal trials. *Id.* Consequently, he argues that the modified scope of Mr. T. Pepper's testimony and the lesser-included offense verdict in the Colbert County retrial undermine the reliability of the St. Clair County death sentence. Doc. 16 at 22 ¶ 42. And, Windsor theorizes that without Mr. T. Pepper's identification testimony, the jury in his St. Clair County case also would not have returned a death sentence. Vol. 11, Tab 38 at 2. The Rule 32 court disagreed and rejected the claim as procedurally barred under Rule 32.2(a). Vol. 15 at 210-15; Vol. 15, Tab 55 at 267. The ACCA affirmed:

> The circuit court properly found that this claim was precluded because several arguments about [Mr. T.] Pepper's testimony were raised and addressed at trial and on direct appeal. *See* Rule 32.2(a)(2) and (4), Ala. R.Crim. P. To the extent Windsor may raise additional arguments about [Mr. T.] Pepper's testimony, those arguments are precluded because he could have raised them at trial and on direct appeal, but did not. *See* Rule 32.2(a)(3) and (5), Ala. R.Crim. P.

*Windsor Rule 32*, 89 So. 3d 805, 825 (Ala. Crim. App. 2009).

### a.

The Respondents contend that Windsor has procedurally defaulted on this claim, asserting that the independent and adequate state ground doctrine normally

precludes a habeas court from considering a claim dismissed under Rule 32.2(a) and

that Windsor has not alleged facts that establish an exception to the habeas procedural

bar.[48]  Doc. 26 at 27. Windsor concedes that "[t]he State's argument that this claim

was not raised on direct appeal is correct." Doc. 28 at 16. Still, based on his contention

that "[t]he facts relevant to this issue did not occur until [he] was retried on his Colbert

County charge on February 1, 1993," Windsor argues that he "can prevail upon a

claim of newly discovered evidence" under Rule 32.1(e)(1)[49]  and that "the issue was

properly before the State Courts in [his] Rule 32 Petition." *Id.*

    The court revisits some of the procedural history in light of Windsor's

temporal-based argument. Briefly, after the jury returned a capital offense verdict in

the St. Clair County case, the trial court sentenced Windsor to death in June 1992.

Vol. 6, Tab 28 at 1127; Vol. 8, Tab 30 at 13-28. After the court denied Windsor's

motion for a new trial, Vol. 8, Tab 30 at 9-11, Windsor appealed and filed his initial

---

[48]*See Wainwright*, 433 U.S. at 87 (treating a waived trial objection like a state procedural waiver and holding that a petitioner cannot obtain habeas review of the claim absent establishing cause and prejudice); *see also Brownlee v. Haley*, 306 F.3d 1043, 1065-66 (11th Cir. 2002) (holding that an Alabama court's denial of post-conviction relief under Rules 32.2(a)(3) and (5) creates a habeas procedural bar subject to two exceptions—cause and prejudice and fundamental miscarriage of justice).

[49]Ala. R. Crim. P. 32.1(e)(1) states: "The facts relied upon were not known by the petitioner or the petitioner's counsel at . . . trial or sentencing[,] . . . posttrial[,] . . . or in . . . a[] previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence[.]"

brief with the ACCA in November 1992, Vol. 9, Tab 32 at 71. Windsor filed his post-remand brief in April 1994, Vol. 11, Tab 38 at i, 32, but did not present this unreliability claim in his brief even though by his own admission the facts relevant to this issue occurred in his "retrial on his Colbert County charge on February 1, 1993." Doc. 28 at 16. Because of that admitted default, Windsor cannot rely on Rule 32.1(e) to save this claim. In particular, Windsor's noncompliance with Rule 32.2(a)(5)—Rule 32's direct appeal procedural bar—precludes him from relying on Rule 32.1(e)'s new evidence opening.[50] And because Windsor does not identify, much less demonstrate, why an exception may entitle him to habeas review despite the independent and adequate state ground hurdle, he has abandoned challenging the application of this habeas bar.

### b.

Alternatively, to the extent Windsor is seeking to invoke the cause and prejudice exception based on his contention that the timing of the Colbert County retrial prevented him from arguing this claim to the trial court, *see* doc. 28 at 16, cause requires that Windsor "show that some objective factor external to the defense

---

[50] *See* Ala. R. Crim. P. 32.1(e)(1) (providing that "[s]ubject to the limitations of Rule 32.2," a petitioner may seek relief based on "[n]ewly discovered material facts" that were unknown and, despite reasonable diligence, undiscoverable during trial, sentencing, posttrial, or a "previous collateral proceeding").

impeded counsel's efforts to comply with the State's procedural rule." *Carrier*, 477

U.S. at 488. Examples of acceptable cause include when the facts support a federal

claim which "is so novel that its legal basis is not reasonably available to counsel,"

or when a claim involves "'some interference by officials.'" *Id.* (citations omitted).[51]

In Windsor's case, however, he has not argued that an evolving constitutional

principle or official interference caused his noncompliance with Rule 32.2(a)(3) or

(5). Instead, he relies on the favorable prospective developments in the Colbert

County retrial as cause for not complying with Rule 32.2(a). However, Windsor

offers no support for his contention that the court can construe the scope of the cause

test that broadly. Moreover, he does not explain why he omitted this February 1993

claim when he filed his post-remand brief in April 1994. Vol. 11, Tab 38 at i, 32.

Consequently, Windsor has not shown cause.

Windsor also cannot satisfy the prejudice standard, which requires that he

demonstrate that a constitutional error actually and substantially disadvantaged his

defense. *Frady*, 456 U.S. at 170. Windsor has not substantiated why the State's

tactical consent to the motion to suppress and the non-death verdict in the Colbert

---

[51]*See also Reed*, 468 U.S. at 17 (describing three categories of novel federal law—when the Court overrules prior precedent, overturns a practice "which a near-unanimous body of lower court authority has expressly approved[,]" or rejects a practice previously approved in other of the Court's decisions) (internal quotation marks omitted) (citing and quoting *Johnson*, 457 U.S. at 549, 551.

County retrial transformed the State's prior reliance on Mr. T. Pepper's identification testimony in the St. Clair County case into an unconstitutional act. "[A petitioner] must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* (emphasis in original). He cannot make that showing where, as here, Mr. T. Pepper did not recant his testimony, and the Colbert County trial court did not suppress his identification testimony. Instead, the State chose not to oppose Windsor's motion to suppress in that case. *Johnson*, *Gardner*, and *Woodson* do not hold that a constitutional violation occurs if a state agrees to suppress (previously-used) identification testimony in the retrial of a factually-related, but separate criminal case. And absent a constitutional error, Windsor cannot meet the prejudice prong.[52]

Finally, relief is not warranted because *Johnson*, *Gardner*, and *Woodson* do not substantiate that the State violated Windsor's constitutional rights, or that the

___

[52]Windsor also cannot satisfy the fundamental miscarriage of justice exception since he does not allege or show that his actual or factual innocence entitles him to habeas review. *See Schlup*, 513 U.S. at 315-16 ("Schlup's claim of innocence is thus 'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" And, explaining that when a petitioner alleges that his trial was unfair, he must offer sufficient evidence of "doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice").

ACCA acted contrary to or unreasonably applied Supreme Court precedent. Therefore, for all these reasons, the court denies Claim D.

**5.**

Windsor cites "irregularities" with the jury summoning and empaneling processes in Claim E. Doc. 16 at 25-26 ¶ 47. Allegedly, the St. Clair County Clerk's Office's practice of excusing potential jurors without appearing before the trial judge, the sheriff's inability to locate some potential jurors, and the trial court's reduction of potential jurors through a lottery system constitutionally compromised the venire.[53] *Id.* Windsor asserts that the excusal practice and "the sheriff's inability to locate and serve some potential jurors, resulted in the removal of 102 potential jurors from the venire list *before* [his] jury venire was summoned to appear." *Id.* (emphasis in original). Windsor objects also to the trial court's lottery-based dismissal of other prospective jurors which he contends reduced the venire for his case to 60 members. *Id.* Allegedly, "[t]he trial court's refusal to quash the venire given the irregularities in the composition" violated his rights to due process, a fair trial by an impartial jury

---

[53]In reply, Windsor abandons the challenge that the state denied him the "right to be present during the illegal granting of excuses to prospective jurors by court personnel . . . ." Doc. 28 at 17; *cf. Lewis v. United States*, 146 U.S. 370, 376 (1892) (holding that because preemptory "challenges [are] an essential part of a trial," a defendant has the right under the confrontation clause to be present for that process).

selected from a fair cross section of the community, and a reliable sentencing proceeding under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[54]  *Id.* at 28 ¶ 51.

### a.

Windsor challenged the constitutionality of the clerk office's practice of approving excuses without judicial involvement before the ACCA successfully. The ACCA held that the trial court's noncompliance with two statutes applicable to excusing persons summoned for jury service—§§ 12-16-74 and 12-16-145 of the Code of Alabama (1975)[55]—violated Windsor's federal due process rights and

---

[54]Windsor alleges in his petition that the jury venire composition violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Doc. 16 at 28 ¶ 51. However, the Fifth Amendment is inapplicable here. *See* n. 28 *supra*. And because Windsor does not elaborate why he has a cognizable right under the Eighth Amendment, that claim is abandoned, underdeveloped, or unproven.

[55]Section 12-16-74 provides partially:

> The court shall require the names to be called from the venire list of all persons who have been served with a summons to appear in court that day for service as jurors and whose service has not been previously excused or postponed. The court may hear any excuses not previously heard and shall pass upon the qualifications of those in attendance for grand jury service. The court may in any case, including capital cases, excuse or postpone the service of any prospective juror outside the presence of the parties and their counsel in accordance with the provisions for excusal contained in Section 12-16-63.

Ala. Code § 12-16-74. And, Under Alabama's alternate juror selection and qualification plan, "the presiding circuit judge, or a court official designated by him, shall have the authority to disqualify the prospective juror or to excuse or postpone his service to any future date, notwithstanding the provisions of any other law." Ala. Code § 12-16-145.

"impinge[d] the integrity of the jury selection process." *Windsor I (ACCA)*, 683 So. 2d at 1015, 1016. The court found that "the due process rights of American citizens" attach to Alabama's statutory options for excusing potential jurors and that, because only a trial judge or a presiding judge's designee has the authority to excuse prospective jurors, the dismissal of prospective jurors by the clerk's office denied Windsor due process under the Fourteenth Amendment. *Id.* at 1015, 1017.

The Alabama Supreme Court reversed. *Windsor I*, 683 So. 2d at 1027. The Court noted that Windsor objected to "the practice in St. Clair County of excusing jurors by telephone []as arbitrary[,] . . . unlawful[,] and result[ing] in a 'tainted jury,'" and that Windsor's claim "seem[ed] to involve a Sixth Amendment fair-cross-section argument."[56]  *Id.* at 1025. The Court determined however that Windsor's allegations "d[id] not truly rise to the level of a constitutional challenge to the array." *Id.* In

---

[56]The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed[.]" U.S. Const. amend. VI. The Supreme Court has interpreted this language to prohibit systematic exclusion of demographic groups from jury service: "Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975) (citations omitted). Whether a petitioner is part of the excluded group is inconsequential to a constitutional cross-section claim. *See Taylor*, 419 U.S. at 523, 537 (holding unconstitutional a Louisiana statute which "provided that a woman should not be selected for jury service unless she had previously filed a written declaration of her desire to be subject to jury service" in male defendant's case); *Duren v. Missouri*, 439 U.S. 357, 359 (1979) (holding unconstitutional statute which "provided an automatic exemption from jury service for any women requesting not to serve" in male petitioner's case).

particular, after examining the "two alternative plans and procedures for qualifying, selecting, drawing, summoning, and empaneling juries in Alabama" and "four distinct stages" of the jury selection process, the Court discussed the record of excuses in Windsor's case. *Id.* at 1024-25. Based on the county clerk's testimony, the Court found that she, her assistant clerks, and occasionally a judge excused 30 prospective jurors, but that "[e]xactly which jurors were excused for what reasons [wa]s not clear from the record." *Id.* at 1025. Generally, the clerk recalled that "'students [who] were taking exams and people who were on vacations and elderly people and physically impaired people'" received excuses. *Id.* The Court found that "[n]one of these reasons would be inappropriate if a juror presented it to the judge after appearing." *Id.* The Court observed that the State "could have avoided this problem entirely" by delegating authority under either jury selection plan and providing "some catalog of acceptable excuses to guide those so empowered[.]" *Id.* at 1026.

The Court highlighted one "suggestion of impropriety" in which the clerk acknowledged that the practice did not preclude a friend of someone in the courthouse from obtaining an excuse based on that relationship. *Windsor I*, 683 So. 2d at 1026. The clerk "'suppose[d]'" that such a situation could have occurred in Windsor's case.

68

*Id.* Still, the Court found no evidence of legal fraud under Ala. Code § 12-16-80 or purposeful demographic interference in the resulting venire:[57]

> Windsor has shown nothing to indicate any purposeful and systematic exclusion of any identifiable class of potential jurors, nor has he shown that he suffered any harm as a result of such an alleged exclusion. Although there may be some slight discrepancy between the percentages of certain classes of persons living in St. Clair County and the percentages of those same classes as represented on the venire from which Windsor's jury was chosen, no statistical analysis would reveal the invidious discrimination already prohibited by Alabama law.

*Id.* The Court concluded that "the actions of the clerk, her staff, and possibly a judge or two, were not a usurpation of authority, but, instead were the natural result of an attempt to conform to the spirit, if not the letter, of the statutes." *Id.* at 1027.

## b.

Turning to the Sixth Amendment analysis first, Windsor relies on *Duren* and *Taylor* to argue that the Alabama Supreme Court's rejection of his cross-section claim contradicted or unreasonably applied Supreme Court precedent.[58]   Doc. 16 at 27, 28

---

[57]Section 12-16-80 of the Alabama Code gives a trial court the power to quash a jury venire upon proof of legal fraud. Ala. Code § 12-16-80.

[58]Additionally, Windsor cites *Castaneda v. Partida*, 430 U.S. 482 (1977), doc. 16 at 27 ¶ 48, and *Duncan v. Louisiana*, 391 U.S. 145 (1968), doc. 28 at 17, to support his Sixth Amendment cross-section claim. But neither case advances Windsor's Sixth Amendment contention. In *Castaneda*, the Supreme Court applied the Fourteenth Amendment's equal protection clause "in the context of grand jury selection." 430 U.S. at 494. In *Duncan*, the Supreme Court held that "the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee." 391 U.S. at 150.

¶¶ 48, 51. To prove a Sixth Amendment fair-cross-section violation, Windsor must show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364. Windsor meets the first element—he contends that "the arbitrary process used to compose the venire in this case—which the Circuit Clerk admitted might be subject to abuse—resulted in a venire in which African-Americans were underrepresented . . . ." Doc. 16 at 27 ¶ 48. However, Windsor cannot meet the second element. He has not offered a statistical analysis or other proof to substantiate an underrepresentation of African Americans in his venire.[59] Nor does this court believe that a quantitative assessment would show an underrepresentation of African Americans. As the Alabama Supreme Court noted, Windsor's counsel argued that "the population of St. Clair County is . . . 10% African-American" and although "the fair-cross-section requirement is inapplicable to petit juries," 16% of the jurors in Windsor's trial were African Americans. *Windsor I*, 683 So. 2d at 1025 n. 2.

---

[59] *See Duren*, 439 U.S. at 365-66 ("Given petitioner's proof that in the relevant community slightly over half of the adults are women, we must disagree with the conclusion of the court below that jury venires containing approximately 15% women are 'reasonably representative' of this community.").

Therefore, because Windsor is without a prima facie cross-section claim,[60] the Alabama Supreme Court's rejection of this alleged Sixth Amendment violation was neither contrary to nor an unreasonable application of Supreme Court precedent.

### c.

The rest of Windsor's arguments are also unconvincing. First, Windsor alleges that the deficiently-formed jury venire violated his right to fundamental fairness in a capital case. Docs. 16 at 28 ¶ 51; 28 at 18-19. Citing several decisions in which the Supreme Court identified the need for heightened reliability in death penalty cases,[61] Windsor argues that the arbitrary composition of the venire resulted in an unreliable

---

[60]Windsor also cannot satisfy the third element because none of the challenged practices—i.e. the clerk's testimony about a potential for friendship-based abuse in the practice of approving excuses, the sheriff's inability to locate persons summoned for jury service because of bad addresses, and the trial court's lottery-based reduction of venire members—do not evidence purposeful race exclusion.

[61]*See Woodson*, 428 U.S. at 305 ("Because of th[e] qualitative difference [between the death penalty and a sentence of imprisonment], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."); *Gardner*, 430 U.S. at 357-58 ("From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action."); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."); *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980) ("'It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.'") (quoting *Gardner*, 430 U.S. at 358); *see also Gregg v. Georgia*, 428 U.S. 153, 188 (1976) ("While *Furman* did not hold that the infliction of the death penalty per se violates the Constitution's ban on cruel and unusual punishment, it did recognize that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice.").

and unconstitutional conviction and death sentence. Doc. 16 at 26 ¶ 48. But none of the cases establishes that the State denied Windsor due process because irregularities in forming the jury venire resulted in an unreliable conviction and sentence.

Second, although he acknowledges that "a mere error of state law" is not "a denial of due process,"[62] doc. 28 at 18, Windsor contends that his situation exceeds this because the Alabama statutes governing juror excuses create liberty interests in which federal due process attaches. *Id.* at 18-19. To support this contention, Windsor relies on cases in which the Supreme Court applied the due process clause to infringements unrelated to jury venire challenges.[63] And because the Alabama Supreme Court did not expressly address whether the State violated Windsor's Fourteenth Amendment due process rights, Windsor contends that this court's review

---

[62]*See Grygor v. Burke*, 334 U.S. 728, 731 (1948) ("We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question.").

[63]*See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) ("Where, however, a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law."); *Hicks*, 447 U.S. at 346 ("The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion."); *Vitek v. Jones*, 480, 487-88 (1980) (holding that a state prisoner has a liberty interest under the due process clause to challenge an involuntary transfer to a mental facility); *Barclay v. Florida*, 463 U.S. 939, 941-42, 958 (1983) (finding no constitutional defect in a death sentence involving a trial court's reliance on an improper aggravating circumstance); *Barclay*, 463 U.S. at 985 (Marshall, J., dissenting) (arguing that Florida's prohibition against "reliance on non-statutory aggravating circumstances" triggered the *Hicks*'s liberty interest analysis).

is "unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause." Doc. 28 at 20 (quoting *Williams*, 529 U.S. at 406).[64] The court disagrees. In reversing the ACCA and finding no viable constitutional claim based on the "array" of venire members, the Alabama Supreme Court held implicitly that Windsor had no cognizable liberty interest or other federal due process right based on a noncompliance with "the letter" of Ala. Code §§ 12-16-74 and 12-16-145. Windsor does not discuss the Alabama Supreme Court's implicit holding or cite binding authority which shows that the decision "contradicts the governing law[.]" *See Romine*, 253 F.3d at 1364 (internal quotation marks omitted) (quoting *Williams*, 529 U.S. at 405). Nor has Windsor established that the Court made an objectively unreasonable determination that he lacked a cognizable federal claim. Consequently, a § 2254(d)(1) dismissal is appropriate.

Finally, under de novo review, Windsor has not persuaded this court that the practice of excusing jurors (without strictly following Ala. Code §§ 12-16-74 and 12-16-145) deprived him of a liberty interest[65] or fundamental fairness in the trial

---

[64]*See also Romine v. Head*, 253 F.3d 1349, 1365 (11th Cir. 2001) ("Failure to apply that governing law (or the same rule in state law) is tantamount to applying a rule that contradicts governing law, for these purposes."); *id.* ("In other words, when there is grave doubt about whether the state court applied the correct rule of governing federal law, § 2254(d)(1) does not apply.").

[65]Liberty under the due process clause as broader than the "mere freedom from bodily restraint" and "extends to the full range of conduct which [an] individual is free to pursue[.]" *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), *supplemented sub nom. Brown v. Bd. of Educ.*, 349 U.S. 294

proceedings. The due process clause "'imposes . . . an exercise of judgment upon the whole course of the proceedings (resulting in a conviction) in order to ascertain whether they offend those canons of decency and fairness . . . even toward those charged with the most heinous offenses.'" *Rochin v. California*, 342 U.S. 165, 169 (1952) (quoting *Malinski v. New York*, 324, 416-17 (1945)). Consequently, consistent with *Grygor*, *see* n. 62 *supra*, Windsor has shown (at most) a state procedural error that does not benefit from Fourteenth Amendment due process protection.[66]

For all these reasons, the court denies Claim E.

## 6.

In Claim F Windsor contends that the trial court's denial of a continuance violated his Sixth Amendment right to counsel.[67]  Docs. 16 at 30 ¶ 55; 28 at 20. "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance

---

(1955).

[66]Windsor offers no explanation why the sheriff's inability to serve prospective jurors or the trial court's lottery-based dismissal of prospective jurors violated his federal due process rights. Thus, those issues are underdeveloped and unproven and are not entitled to any relief.

[67]Although Windsor alleges in his petition that the trial court's denial of a continuance violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights, doc. 16 at 30 ¶ 55, Windsor focuses only on the Sixth Amendment in reply, doc. 28 at 20-23. Thus, he has waived his claims, if any, related to these other amendments. Moreover, the Fifth Amendment is inapplicable here. *See* n. 28 *supra*. And, because Windsor does not elaborate why he has a cognizable Eighth or (aside from incorporation) Fourteenth Amendment right, the claims based on those amendments are abandoned, underdeveloped, or unproven.

of Counsel for his defence." U.S. Const. amend. VI. Under this provision, "a criminal

defendant has a [non-absolute] right to retain counsel of his choice." *United States v.*

*Koblitz*, 803 F.2d 1523, 1527, 1528 (11th Cir. 1986) (citing *Chandler v. Fretag*, 348

U.S. 3, 9-10 (1954)).[68] Protection of this right "requires that a criminal defendant

have 'a fair or reasonable opportunity to obtain particular counsel, and [suffer from]

no arbitrary action prohibiting the effective use of such counsel.'" *Koblitz*, 803 F.2d

at 1527 (quoting *Gandy v. Alabama*, 569 F.2d 1318, 1323 (5th Cir. 1978)). An

"erroneous deprivation of the right to counsel of choice, with consequences that are

necessarily unquantifiable and indeterminate, unquestionably qualifies as structural

error." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (internal quotation

marks omitted) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 282 (1993)).

Consequently, if a trial court wrongfully denies a defendant "the right to counsel of

choice, . . . . [n]o additional showing of prejudice is required to make the violation

'complete.'" *Gonzalez-Lopez*, 548 U.S. at 146.

But "[n]ot every restriction on counsel's time or opportunity to investigate or

to consult with his client or otherwise to prepare for trial violates a defendant's Sixth

---

[68] *See also Wheat v. United States*, 486 U.S. 153, 159 (1988) ("[T]he right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment. . . . [but] is circumscribed in several important respects.").

Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 12 (1983) (citing *Chambers v. Maroney*, 399 U.S. 42, 53-54 (1970)). And because "judges necessarily require a great deal of latitude in scheduling trials[,] . . . . broad discretion must be granted [to] trial courts on matters of continuances[.]" *Morris*, 461 U.S. at 12. However, a trial court violates the counsel clause when it "unreasoning[ly] and arbitrar[ily] 'insist[s] upon expeditiousness in the face of a justifiable request for delay[.]'" *Id.* (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

### a.

On the first day of trial, Windsor sought a "continuance to allow an additional, experienced attorney, Kevin Doyle [a lawyer with the Alabama Capital Resource Center], . . . to join [the] defense team[,]" *Windsor II (ACCA)*, 683 So. 2d at 1032, and "prepare for trial." *Windsor II*, 683 So. 2d at 1047. In the motion, Doyle stated that he "want[ed] to become involved in the defense of [Windsor,]" but that he "could not familiarize himself with the facts and issues of th[e] case unless" the court delayed the trial. Vol. 7 at 308 ¶ 2. Doyle indicated that he would enter an appearance "upon the court granting a continuance of the trial of this matter[.]" *Id.* at 308 ¶ 4. In addressing the motion, the trial court sought clarification several times why Doyle

had delayed entering an appearance.[69]  In response, Doyle cited an "understanding that [there] was a plea bargain agreement on the table[.]" Vol. I, Tab 5 at 37. The court stated, "Now I talked with y'all a week or so ago and told you that that was not the case." *Id.* Doyle acknowledged that "a misunderstanding" about a plea bargain had caused him "not [to] foresee the necessity of . . . becoming involved formally on the trial level." *Id.* at 38. The court expressed "concern[] with the timing of the motion," stating that it "was informed, as late as Friday--or that something like this might be done Friday, but it was not," and that "[t]he Jury is here and everybody else is here, and now we have this motion." *Id.* at 38-39. The court denied the motion and one of Windsor's trial attorneys inquired about the number of cases set for trial, arguing that "[a] continuance, in the sense of judicial economy, would not be a waste for the State" because the court could use the venire for the other cases. Vol. I, Tab 5 at 41-42. The court stated its belief that two other defendants had cases on the docket and moved to the next pretrial motion. *Id.* at 42. Doyle never appeared as additional trial counsel. *Id.*

---

[69]*See* Vol. I, Tab 5 at 36 ("Mr. Doyle, you are not going to make an appearance until the motion is granted?"); *id.* at 36 ("I just want to know if it is a fact that it is your position that you will not enter an appearance unless and until this motion is granted."); *id.* at 38 ("That is my point. As far as I know, you still have not entered a Motion to Appear.").

The ACCA denied Windsor's counsel clause claim on direct appeal and the Alabama Supreme Court affirmed. Relying on two Sixth Amendment decisions—*United States v. Llanes*, 374 F.2d 712 (2d Cir. 1967) and *Bowman v. United States*, 409 F.2d 225 (5th Cir. 1969)—, the ACCA found that the trial "court refused to grant the continuance at such a late date, but did not in any way prohibit the new attorney from joining in representing the appellant." *Windsor II (ACCA)*, 683 So. 2d at 1032. For its part, without referencing the Sixth Amendment, the Alabama Supreme Court pointed out that Windsor had two lawyers representing him and held that "[t]he trial judge did not abuse his discretion by refusing on the day of trial to grant a continuance in order for an additional attorney to join in Windsor's defense." *Windsor II*, 683 So. 2d at 1046-47.

### b.

Because a "federal [habeas] court should 'look through' [an] unexplained decision to the last related state-court decision that does provide a relevant rationale . . . [and] then presume that the unexplained decision adopted the same reasoning," *Wilson v. Sellers*, __ U.S. __, 138 S. Ct. 1188, 1192 (2018), the court discusses first *Llanes* and *Bowman* which the ACCA cited. In *Llanes*, an attorney expressed "uncertain[ty]" to the district court about whether the representation should continue at a trial calendar setting in light of the defendant's dissatisfaction with his services.

*Llanes*, 374 F.2d at 717. "The judge declined to make a different appointment." *Id*. The defendant moved for the appointment of new counsel two days later, and the district court denied that request. *Id*. On appeal, the Second Circuit affirmed, noting that "the right to counsel 'cannot be . . . manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice,'" and that "[j]udges must be vigilant that requests for appointment of a new attorney on the eve of trial should not become a vehicle for achieving delay." *Id.* (citations omitted). And in *Bowman,* the old Fifth Circuit found no Sixth Amendment violation when the trial court denied the defendant's "request[] [for] new counsel or a continuance . . . [to] procure [new] counsel of his own choosing" made on the morning of trial. *Bowman*, 409 F.2d at 226.

### c.

In support of his claim, Windsor cites *Gonzalez-Lopez*, *Morris*, *Koblitz*, *Strickland v. Washington*, 466 U.S. 668 (1984), and *Ungar*. Docs. 16 at 29 ¶ 52; 28 at 20-22. Windsor relies on these cases mostly for core right-to-counsel principles and offers little insight on why these opinions show that the state appellate courts contradicted or unreasonably applied Supreme Court precedent when it rejected his claim. These cases are not helpful. *Morris* and *Ungar* involve representation-based continuance requests. But neither case holds that a trial court infringes on a

defendant's right to counsel if it denies a continuance request made on the trial's first day based on a lawyer's desire to formally appear as additional counsel. In fact, in both cases, the Supreme Court found no constitutional violation in circumstances that included a situation that was more compelling than the one in Windsor's case.[70] Given these holdings, *Morris* and *Ungar* do not satisfy Windsor's contrary to or unreasonable application burden.

Next, although he agrees that "this issue was correctly evaluated on the basis of an abuse of discretion by the trial court," Windsor maintains that the Alabama Supreme Court abused its discretion under *Gonzalez-Lopez* <u>if</u> it considered "the fact that Windsor had two lawyers" as "mitigat[ion] against any prejudice resulting from the refusal to continue the case." Doc. 28 at 21. This point is unpersuasive. The Court did not mention prejudice, and Windsor's belief on this point is admittedly speculative: "But to the extent the Alabama Supreme Court used this fact . . . ." *See id.* The status of Windsor's representation was relevant to the Court's abuse of

---

[70]*See Morris*, 461 U.S. at 6-8, 13 (concluding that trial court did not violate the respondent's Sixth Amendment right to counsel by denying a "midtrial motion" to continue until the hospitalized public defender "initially assigned to defend [the respondent] was available"); *Ungar*, 376 U.S. at 590 (holding that court committed no constitutional violation in denying one-week continuance request for counsel to prepare because, in part, the defendant (who was a lawyer) sought relief on "the day of the scheduled hearing" and was "familiar with the court's practice of not granting adjournments").

discretion inquiry because Windsor sought additional counsel of choice as opposed to replacement counsel.[71]  In any event, *Gonzalez-Lopez* is distinguishable. The Supreme Court found that after an erroneous deprivation of counsel has occurred, the *Strickland*-based concept of prejudice is unnecessary to complete the Sixth Amendment violation. 548 U.S. at 146. However, because the government conceded that the trial court deprived the defendant of his right to use his chosen lawyer, the Court did not address the constitutional contours of a Sixth Amendment erroneous deprivation. And, because the Alabama Supreme Court did not find an erroneous deprivation of additional counsel in Windsor's case, the reliance on *Gonzalez-Lopez* does not satisfy the contrary to or unreasonable application burden.

### d.

Finally, Windsor maintains that "[t]o deny a continuance based on a misunderstanding without any on the record analysis of why the trial court thought it should not be granted was an abuse of discretion." Doc. 28 at 22. Windsor oversimplifies the trial court's reasoning. Instead of the purported misunderstanding about the plea, the trial court expressed concerns about the lateness of Doyle's motion and the conditional appearance he included within it. *See* Vol. I, Tab 5 at 36 ("You

---

[71]Windsor states in his reply that Mr. Doyle was "to join the team as lead counsel[,]" but neither the hearing transcript nor the motion supports this statement. Doc. 28 at 21.

are not now appearing on behalf of Windsor?"); *id.* at 38-39 (expressing "concern[]
with the timing of the motion."). Consequently, the trial court did not unreasoningly
or arbitrarily reject Doyle's late request to postpone the trial. *Morris*, 461 U.S. at 12.

To close, Windsor has not shown a contrary or unreasonable application of the
Supreme Court right-to-counsel precedent in the denial of his trial continuance
request claim. Thus, the court denies Claim F.

## 7.

In Claim G Windsor contends that the trial court violated his Sixth Amendment
rights of confrontation and cross-examination when it admitted hearsay testimony
concerning statements that Guthrie made about him.[72]  Doc. 16 at 31 ¶ 56. The two
statements at issue are (1) Ms. S.S. Osborne's testimony that Guthrie identified
Windsor as "Harvey" when they visited her home on the day of Mr. Howard's
murder, and (2) Ms. B. Osborne's testimony that Guthrie referred to the man who

---

[72] Although Windsor alleges in his petition that the trial court's admission of hearsay
statements attributable to Guthrie violated his Fifth, Sixth, Eighth, and Fourteenth Amendment
rights, doc. 16 at 33-34 ¶ 60, Windsor discusses only the Sixth Amendment as incorporated through
the Fourteenth Amendment in framing this constitutional issue, doc. 16 at 31 ¶ 56; doc. 28 at 23,
25; *see* Vol. 11, Tab 42 at 28 (describing the rights to confront and cross-examine witnesses as
rights protected by the Sixth and Fourteenth Amendments); *see also Pointer v. Texas*, 380 U.S. 400,
404 (holding that the confrontation clause applies to the states through the Fourteenth Amendment
and includes a right to cross-examine witnesses). But, the Fifth Amendment is inapplicable here.
*See* n. 28 *supra*. And, because Windsor does not elaborate why he has a cognizable Eighth or (aside
from incorporation) Fourteenth Amendment right, the claims based on those amendments are
abandoned, underdeveloped, or unproven.

was with him when they stopped outside of her residence that same day as a "buddy".

Doc. 16 at 31-32 ¶ 57; *see also* Vol. 2, Tab 11 at 390; Vol. 2, Tab 11 at 376-77. The

ACCA and the Alabama Supreme Court rejected this claim on appeal. *Windsor II*

*(ACCA)*, 683 So. 2d at 1034; *Windsor II*, 683 So. 2d at 1053.

### a.

"A petitioner has the burden of establishing his right to federal habeas relief

and of proving all facts necessary to show a constitutional violation." *Romine*, 253

F.3d at 1357 (citations omitted). Windsor relies on *Bruton v. United States*,[73] 391

U.S. 123 (1968), *Cruz v. New York*,[74] 481 U.S. 186 (1977), and *Crawford v.*

---

[73]In *Bruton*, the Supreme Court faced the question of "whether the conviction of a defendant at a joint trial should be set aside [under the confrontation clause] although the jury was instructed that a codefendant's confession inculpating the defendant had to be disregarded in determining his guilt or innocence." 391 U.S. at 123-24. The Court rejected limiting instructions directing the jury to disregard the truth of the co-defendant's hearsay confession as constitutionally inadequate:

> Here the introduction of Evans' confession posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all. *See Anderson v. United States*, 318 U.S. 350, 356—357, 63 S.Ct. 599, 602, 87 L.Ed. 829; *cf. Burgett v. State of Texas*, 389 U.S. 109, 115, 88 S.Ct. 258, 262, 19 L.Ed.2d 319.

*Id.* at 136.

[74] In *Cruz* the Court considered "whether *Bruton* applies where the defendant's own confession, corroborating that of his codefendant, is introduced against him." *Cruz*, 481 U.S. at 188. Before answering this question of "interlocking confessions," the Court observed that "[o]rdinarily, a witness is considered to be a witness 'against' a defendant for purposes of the

*Washington*,[75]  541 U.S. 36 (2004), to support his confrontation claim. Docs. 16 at 31

¶ 56; 16 at 32 ¶ 58; 16 at 33 ¶ 59. These cases do not support Windsor's contention

that a confrontation clause violation occurred in his trial. To begin, *Bruton* and *Cruz*

are inapplicable as the State did not try Windsor and Guthrie jointly in St. Clair

County for the death of Mr. Howard, and the guilt-phase of Windsor's trial contained

no confession evidence. Additionally, because Guthrie made the statements at issue

---

Confrontation Clause only if his testimony is part of the body of evidence that the jury may consider in assessing his guilt." *Id.* at 190-91. Overturning the plurality opinion in *Parker v. Randolph*, 442 U.S. 62, 99 (1979), the Court held that the confrontation clause bars "a nontestifying codefendant's confession incriminating the defendant [that] is not directly admissible against the defendant . . . even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." *Id.* at 191, 193.

[75]In *Crawford* the Court reversed a state conviction for a stabbing under the confrontation clause when the jury considered the petitioner's wife's "tape-recorded statement to the police describing the [offense], even though [the petitioner] had no opportunity for cross-examination." 541 U.S. at 38, 69. The Court drew a distinction between nontestimonial hearsay and testimonial evidence:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law— as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

*Id.* at 68 (footnote omitted). Because the petitioner's wife's statement was the result of a police interrogation and, therefore, testimonial, "the only indicium of reliability sufficient to satisfy constitutional demands [wa]s the one the Constitution actually prescribes: confrontation." *Id.* at 69.

to witnesses outside of a testimonial setting, the constitutional requirement for cross-examination is inapplicable, and the State's hearsay rules govern the admission of the nontestimonial evidence. *Crawford*, 541 U.S. at 69. In that respect, Windsor's contention that the state appellate courts improperly concluded the out-of-court statements fell within an exception to the hearsay rule, *see* doc. 28 at 24-25, is unavailing. "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984).[76]

Finally, Windsor argues in reply that this court should review this claim de novo consistent with *Williams*, 529 U.S. at 406, and *Romine*, 253 F.3d at 1364, because the state appellate courts did not provide any Sixth Amendment analysis. Doc. 28 at 25-26. But even accepting that de novo review applies, Windsor has not proven a confrontation clause violation under *Bruton*, *Cruz*, or *Crawford*, much less demonstrated that the non-structural constitutional error had a "substantial-and-injurious-effect" on his trial.[77]

---

[76] *See also McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir. 1992) ("A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved."); *Hunt v. Tucker*, 93 F.3d 735, 737 (11th Cir. 1996) ("[F]ederal courts must follow the interpretation of Alabama law made by the highest court of that State absent a constitutional violation.").

[77] Before AEDPA, "the Supreme Court held [in *Brecht*] that on federal habeas, courts must assess the prejudicial impact of constitutional error in a state criminal trial under the 'substantial-and-injurious-effect' standard." *Wellons v. Hall*, 554 F.3d 923, 939 (11th Cir. 2009), *judgment vacated on other grounds*, 558 U.S. 220 (2010). Under the *Brecht* standard, "habeas petitioners

For all these reasons, the court denies Claim G.

## 8.

Windsor maintains in Claim K alleged violations of his Eighth and Fourteenth Amendment rights based on the State's purported failure to introduce sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that he intentionally killed Mr. Howard.[78] Doc. 16 at 45 ¶ 77. Windsor cites the State's "introduc[tion] . . . of subsequent criminal acts [involving the robbery and killing of Mr. Pepper in Colbert County that occurred the evening of February 25, 1988], tainted and unreliable identifications [of Windsor by witnesses Ms. S.S. Osborne and Mr. T. Pepper], and [unspecified] irrelevant and prejudicial evidence." Doc. 16 at 45 ¶ 77. The core contention is "that there was insufficient evidence of [Windsor's] specific intent to kill" Mr. Howard during the course of the robbery. *See, e.g.,*

---

may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Wellons*, 554 F.3d at 939-940 (internal quotation marks omitted) (quoting *Brecht*, 507 U.S. at 637). Although *Brecht* is a pre-AEDPA decision, the Court "confirmed the application of *Brecht*'s more deferential 'substantial-and-injurious-effect' standard when assessing the prejudicial impact of constitutional error on federal habeas review" post-AEDPA in *Fry v. Pliler*, 551 U.S. 112 (2007). *Id.* at 940.

[78]Although Windsor alleges in his petition that the State's insufficient evidence to support a conviction violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights, doc. 16 at 45 ¶ 77, Windsor focuses on Eighth and Fourteenth Amendment authorities in framing this issue, *id*; doc. 28 at 35. For the reasons stated earlier, the Fifth Amendment is inapplicable here. *See* n. 28 *supra*. And, because Windsor does not elaborate why he has a cognizable right under the Sixth Amendment, this claim is abandoned, underdeveloped, or unproven.

*Johnson v. Alabama*, 256 F.3d 1156, 1169 (2001). Basically, Windsor pleads a violation of *Jackson v. Virginia*, 443 U.S. 307 (1979), which held that a petitioner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324.[79]

**a.**

The ACCA denied this claim on direct appeal, *Windsor II (ACCA)*, 683 So. 2d at 1036, and the Alabama Supreme Court affirmed, finding sufficient circumstantial evidence existed for a jury to convict Windsor of capital murder:

> The evidence offered at the trial placed Harvey Lee Windsor in the company of Colon Lavon Guthrie on the date of the crime. The two men were identified as being in a Ford Mustang automobile bearing the word "Boss" and matching the description of the vehicle used by the suspects, and bearing a license plate that had been on an automobile in the yard of Windsor's uncle. The Mustang automobile, when the police recovered it, contained articles tying the automobile and Windsor to the murder of [Mr.] Howard.

---

[79] *See also Jackson*, 443 U.S. at 316 ("[A]n essential of the due process guaranteed by the Fourteenth Amendment[is] that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.") (citing *In re Winship*, 397 U.S. 358 (1970)); *Enmund v. Florida*, 458 U.S. 782, 787, 797 (1982) (concluding that "the Eighth Amendment [forbids the] imposition of the death penalty on one . . . who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed").

*Windsor II*, 683 So. 2d at 1056. Windsor's connection to the Mustang included a partial fingerprint found on a cigarette butt left inside the vehicle.[80] *See* Vol. 5 at 936; *Windsor II (ACCA)*, 683 So. 2d at 1030.

### b.

Consistent with *Jackson*, "federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (internal quotation marks and citation omitted) (quoting *Jackson*, 443 U.S. at 324 n.16). Thus, this court must "gauge[]" the adequacy of the State's evidence "in the light most favorable to the

---

[80]In addition to the evidence cited by the Alabama Supreme Court, as discussed previously, Ms. S.S. Osborne identified Windsor as the man who accompanied Guthrie to her home approximately one hour before Mr. Howard's murder. Vol. 3 at 403. Ms. S.S. Osborne testified also that she lived about five miles from Mr. Howard's convenience store. *Id.* And Mr. T. Pepper identified Windsor as the man he saw running from his father's convenience store after the separate murder of his father in Colbert County.[80] Vol. 4 at 695-96, 701-03. Mr. T. Pepper added that he saw Windsor thirty yards away "dancing or jumping around in a real frisky type movement from the store," heard him utter, "'Shit, man,'" and "saw the outline of a[nother] person in the vehicle." *Id.* at 697-99. The State offered this testimony about the murder of Mr. Pepper as circumstantial evidence of an earlier joint plan between Windsor and Guthrie to rob and murder Mr. Howard. Vol. 6, Tab 16 at 1050-51. As the Alabama Supreme Court stated, "[t]he robbery and murder of [Mr.] Howard and the robbery and murder of Randall Earl Pepper occurred only hours apart, on the same day. Both victims were convenience store owners, and the crimes were factually similar." *Windsor II*, 683 So. 2d at 1053. Finally, after officers arrested Windsor, they found a .25 caliber pistol on his person (which belonged to Mr. Pepper) and a sawed-off shotgun in the Mustang. Vol. 5 at 848, 859; *see also Windsor II (ACCA))*, 683 So. 2d at 1030 (pointing out that Windsor possessed "a .25 automatic pistol that had belonged to Mr. Pepper" on day of arrest); doc. 16 at 66 ¶ 107 (Windsor's confirming that the trial evidence substantiated that the automatic pistol in his possession was Mr. Pepper's).

prosecution" that Windsor intended for Mr. Howard to die under "applicable [Alabama criminal] law[.]" *Jackson*, 443 U.S. at 324. Moreover, this court may set aside the jury's verdict "only if no rational trier of fact could have agreed with the jury," and may only set aside the State court's decision if it was "objectively unreasonable." *Coleman*, 566 U.S. at 651. To put it bluntly, Windsor "face[s] a high bar" when pursuing a *Jackson* claim because of the dual deferential layers. *Id.* And because federal courts owe "due respect to the role of the jury and the state courts" under AEDPA, a petitioner will not prevail on a *Jackson* claim unless the conviction "was so insupportable as to fall below the threshold of bare rationality." *Id.* at 656.

### i.

The Grand Jury of St. Clair County indicted Windsor for the capital offense of murdering Mr. Howard during a robbery or an attempted robbery in violation of § 13A-5-40(a)(2) of Alabama's Criminal Code. Vol. 6, Tab 29 at 201. The State tried Windsor as an accomplice to Guthrie in the murder. Vol. 6, Tab 16 at 1056. Under Alabama's criminal complicity statute,

> [a] person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
>
> (1) He procures, induces or causes such other person to commit the offense; or

(2) He aids or abets such other person in committing the offense; or

(3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally required to make.

Ala. Code § 13A-2-23.

The trial court charged the jury on accomplice liability, explaining without any objection, that "to hold an individual liable of a criminal offense as an accomplice, the State must prove beyond a reasonable doubt that he aided and abetted in the crime." Vol. 6, Tab 16 at 1056, 1069. The trial court defined aiding and abetting as "all assistance rendered by acts or words of encouragement or by support, [and] actual or constructive presence to render assistance should it become necessary." *Id.* at 1056. The trial court clarified that "to prove the charge of capital murder by accomplice liability, the State must prove beyond a reasonable doubt that the accomplice had a particularized intent to kill . . . because . . . capital murder involves an intentional murder." *Id.* at 1057. The trial court cautioned the jury twice that finding Windsor guilty of capital murder required a determination that he had "an intent to kill" Mr. Howard beyond a reasonable doubt. *Id.* at 1057.

### ii.

Windsor cites several Alabama cases that he contends support his position that the State failed to present sufficient evidence for a conviction. First, Windsor

references *Hallford v. State*, 548 So. 2d 526 (Ala. Crim. App. 1988), for the elements of § 13A-5-40(a)(2), doc. 16 at 44-45 ¶ 76, which is "a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing." 548 So. 2d at 534. But, the defendant in *Hallford* "was not an accomplice, but the actual killer," *id.* at 546, and consequently, *Hallford* does not advance Windsor's claim.

Next, Windsor cites *Sweat v. State*, 326 So. 2d 671 (Ala. Crim. App. 1975), as an example of a conviction overturned due to insufficient evidence. Doc. 16 at 46-47 ¶ 77. But, in *Sweat*, no witness testified that the bullet in the automatic pistol in the defendant's hand matched the caliber of the one used in the crime. *Sweat*, 326 So. 2d at 673. The ACCA reversed the conviction "because the jury was left to rely on conjecture and suspicion as to the guilty person [out of three burglars] who wounded Officer Westcott with the [.25 caliber] bullet extracted from his body." *Id.* The court concluded that "[t]he trial court erred in refusing defendant's written request for the affirmative charge" which challenged the adequacy of the state's evidence and ordered a new trial. *Id.* While the outcome in *Sweat* may lend some support to Windsor's unintentional killing claim, a state court holding in a criminal assault case is insufficient to satisfy AEDPA's deferential standard.

Windsor also discusses *Chatom v. State*, 348 So. 2d 828, 835 (Ala. Crim. App. 1976), *rev'd and remanded on other grounds by* 348 So. 2d 838 (Ala. 1977), because of the court's observation that "[u]nless circumstantial evidence is sufficiently strong to point toward the appellant as the guilty party, it is insufficient, standing alone, to support a conviction." 348 So. 2d at 835. The defendant in *Chatom* challenged his conviction for the murders of two deputies based "entirely of circumstantial evidence." *Id.* at 829, 830. Briefly, Mike Wilson and Chatom, who was riding as a passenger in Wilson's car, became involved in "a high speed chase" after a deputy pulled Wilson over for speeding. *Id.* at 830. During the chase, Chatom fired shots from a .12 gauge shotgun at a deputy's car. *Id.* Chatom and Wilson retreated to a swamp and when some officers entered the area, "[a] fierce gun battle ensued in which fifteen to twenty shots were fired within a matter of seconds." *Id.* Other officers found the slain deputies and Wilson's body within sixty feet of each other. *Id.* None of the officers witnessed the shootings. *Id.* The bullets which killed the two deputies were from "a .20 gauge shotgun which was the same as found along with a pistol beside Wilson's body." *Id.* Chatom had "a .12 shotgun and other weapons, which he abandoned in the swamp," and was subsequently captured. *Id.* At trial, the State presented evidence that the results of an atomic absorption test showed that Wilson had not fired a gun on the day of the murders. *Id.* at 831.

92

On appeal, the ACCA determined that the trial court should have granted Chatom's motion to exclude that inculpatory evidence because of an "[im]proper predicate for the admission of the atomic absorption test[.]" *Id.* at 834. The court found that "the circumstantial evidence . . . d[id] not point toward the [defendant] as the person who fired the fatal shots. Instead, it strongly point[ed] toward Wilson." *Id.* at 835. The court stated that in a retrial "there must be sufficient evidence presented to establish beyond a reasonable doubt that [the defendant] shot [the deputies] or that he aided or abetted Wilson in shooting them per Title 14, §14, Code of Alabama 1940." *Id.* at 834. On rehearing, the ACCA clarified that "the conviction of [Chatom] was not reversed due to insufficiency of the evidence." *Id*. at 837. Instead, "the reversal was due to the introduction into evidence of the atomic absorption test without a proper predicate." *Id.* The court stated that "Section II of the opinion was intended as a helpful comment, directed to the District Attorney, pointing out obvious weaknesses in the remaining circumstantial evidence at the first trial" and "emphasiz[ed] that [the] reversal result[ed] solely from admission of the improperly predicated test." *Id.* at 835. Thus, because the sufficiency of evidence discussion in *Chatom* is dicta in light of the rehearing opinion, it is not useful in analyzing Windsor's claim.

A more on-point case Windsor cites is *Ex parte Raines*, 429 So. 2d 1111 (Ala. 1982). Doc. 16 at 45 ¶ 76. A jury convicted the *Raines* defendant under § 13A–5–31(a)(2) for killing a store employee during the course of a robbery. *Raines*, 429 So. 2d at 1112. The defendant received a death sentence even though he was not the triggerman. *Id*. The defendant argued on appeal that his death penalty conviction was "disproportional to the crime [and a] violation of the eighth and fourteenth amendments" because he "did not actually kill the victim and was convicted solely as an accomplice to the robbery." *Id.* The Alabama Supreme Court disagreed and held that "it is still the law in this state that a non-triggerman accomplice may be convicted of a capital offense and sentenced to death if the state proves that the defendant was an accomplice to the intentional killing." *Raines*, 429 So. 2d at 1112. The Court noted that requiring proof of a "'particularized intent to kill'" on the part of a non-triggerman accomplice was "entirely consistent" with the Supreme Court's decision in *Enmund*.[81]  *Id* at 1112.

The Alabama Supreme Court evaluated the evidence in *Raines* and found that "the testimony concerning the defendant's words and actions during the course of the robbery" supported an inference of his intent to kill as an accomplice. 429 So. 2d at

---

[81]*Enmund*, 458 U.S. at 795 (observing that juries have rejected the death penalty in cases . . . where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder").

1113. After confirming that the trial court had instructed the jury properly regarding

intent, the Court found no basis for disturbing the capital conviction:

> Pulling the trigger is only one factor in determining intent to kill. *Ritter v. State*, 375 So.2d 270, 274–275 (Ala.1979). From the testimony concerning the defendant's words and actions during the course of the robbery, the jury had sufficient evidence from which to infer that the defendant was prepared to kill, intended to kill, and supported Watkins in his killing of Mr. Mayfield and, thus, that the defendant was an accomplice to the intentional killing of Mr. Mayfield.

> To affirm a finding of a "particularized intent to kill," the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill. The Court of Criminal Appeals found in the affirmative on both parts of this two-part test; and, upon careful review of the record, we discern no basis for disturbing that finding.

*Id.* at 1113. Thus, *Raines* does not help Windsor.

In reply, Windsor quotes extensively from *Ex parte Brown*, 499 So. 2d 787

(1986), doc. 28 at 35-36, a case where the jury convicted the defendant of murder

because "the defendant was in possession of various items which had belonged to the

victim, and that the defendant was staying a few blocks from where the victim's

stolen car was recovered." 499 So. 2d at 787. The prosecution relied also on a witness

who later recanted his testimony and "stated that he was coerced into making the

statement [that the defendant had confessed to the murder] through threats of the

interrogating officers[.]" *Id.* at 791. Based on the trial testimony of investigating

officers, another suspect had "relayed certain facts to the police officers that were not common knowledge and that fit the fact pattern of the Smith murder." *Id.* at 790. On appeal, the Alabama Supreme Court described the standard for using circumstantial evidence to support a conviction:

> The humane provisions of the law are, that a prisoner, charged with a felony, should not be convicted on circumstantial evidence, unless it shows by a full measure of proof that the defendant is guilty. Such proof is always insufficient, unless it excludes, to a moral certainty, every other reasonable hypothesis, but that of the guilt of the accused. No matter how strong the circumstances, if they can be reconciled with the theory that some other person may have done the act, then the defendant is not shown to be guilty, by that full measure of proof which the law requires.

*Brown*, 499 So. 2d at 787-88 (quoting *Ex parte Acree*, 63 Ala. 234, 234 (1879)).

The Court added:

> Thus, if the circumstances can be reconciled with the theory that someone else may have done the act, then the conviction is due to be reversed. We are of the opinion that, in the case before us, the circumstances are such that the act might very well have been done by someone other than the defendant. Therefore, the conviction must be reversed.

*Id.* at 788.

### c.

Windsor argues that only circumstantial evidence links him to the murder of Mr. Howard as an intentional accomplice and that the prosecution did not rule out the

hypothesis that Guthrie was the only robber who had an intent to kill Mr. Howard. This contention overlooks that "the State is not required to rule out every hypothesis except that of the guilt of the defendant[.]" *Johnson*, 256 F.3d at 1172 (citing *Jackson*, 443 U.S. at 326). Moreover, whether this court "believes the evidence was sufficient to sustain a conviction" under Alabama law is irrelevant. *See Coleman*, 566 U.S. at 655. Instead, habeas relief is only available if "'no rational trier of fact could have could have agreed with the jury[,]'" and if the state court unreasonably applied Supreme Court precedent. *Id.* at 651 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)). Windsor has not overcome this high bar. Rather, based on the State's circumstantial evidence case, a rational trier of fact could infer beyond a reasonable doubt that Windsor "knew that [Guthrie] was armed with a shotgun; knew that [Guthrie] intended to kill [Mr. Howard];" and assisted Guthrie with that plan, regardless of whether Windsor entered the convenience store or stayed in the Mustang to facilitate their getaway. *Coleman*, 566 U.S. at 656. And, that Windsor did not retreat but remained with Guthrie afterwards, including when they committed a second murder later that evening, bolsters a rational inference that Windsor was an intentional accomplice in the killing of Mr. Howard. Therefore, Windsor does not clear the first deferential habeas hurdle.

Nor does Windsor satisfy the second hurdle. Although Windsor cites to *Enmund*, *Jackson*, and *Winship*, *see* doc. 16 at 44-45 ¶ 76; *id.* at 45 ¶ 77, he does not explain why these cases establish that the Alabama Supreme Court contradicted or unreasonably applied Supreme Court precedent in upholding his conviction. In fact, *Jackson* and *Winship* are not accomplice liability death penalty cases. As for the third case, unlike the petitioner in *Enmund* who received a death sentence based on a felony murder conviction as an accomplice, Windsor's accomplice capital conviction was based on the jury's finding that Windsor had a particularized intent to kill Mr. Howard.

Finally, Windsor has not shown that the Alabama Supreme Court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" or overcome the court's factual determination that the record contained sufficient evidence to support his particularized intent to kill Mr. Howard. *See* 28 U.S.C. §§ 2254(d)(2), (e)(1).

For all these reasons, the court denies Claim K.

## 9.

Windsor contends in Claim M that the trial court's failure to instruct the jury on voluntary intoxication and manslaughter violated his Fifth, Sixth, Eighth, and

Fourteenth Amendments rights.[82] Doc. 16 at 49; *id.* at 51 ¶ 86. Allegedly, the evidence supported a reasonable inference of his intoxication at the time of Mr. Howard's death. As proof of his intoxication, Windsor relies on (1) Ms. S.S. Osborne's testimony that Windsor and Guthrie visited her home "[a]bout midday" on the day of the murder, drank Budweiser beer, and "stayed for about thirty minutes," Vol. 3 at 402-03; doc. 16 at 50 ¶ 83; (2) Thomas Kerr's testimony that about five-thirty p.m. that day, he saw two people "set two [Budweiser] beer cans out on the righthand side" and drive off "in a hurry" from his convenience store in a black Boss Mustang, Vol. 4 at 632, 633, 638, 642, 645; doc. 16 at 50 ¶ 83; and (3) the prosecutor's comments in closing that Windsor drank alcohol, doc. 16 at 50 ¶ 83.

Windsor raised this claim on his direct appeal, listing alleged violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments within the claim's caption. Vol. 9, Tab 32 at iv, 57-62; Vol. 11, Tab 42 at iv, 52-57. Although Windsor asserted that the trial court's erroneous instructions resulted in an unfair trial under Alabama and federal law, his briefs focused on Alabama law exclusively. Vol. 9, Tab 32 at 57-62;

---

[82] Although Windsor alleges in his petition that the absence of the intoxication and manslaughter charges violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights, doc. 16 at 51 ¶ 86, Windsor focuses only on Eighth and Fourteenth Amendment authorities in framing this constitutional issue, *id.* at 50-51 ¶ 84; doc. 28 at 37-38, 39-40. But the Fifth Amendment is inapplicable. *See* n. 28 *supra*. And, because Windsor does not elaborate why he has a cognizable constitutional right under the Sixth Amendment, the court dismisses Windsor's claim based on it as abandoned, underdeveloped, or unproven.

Vol. 11, Tab 42 at 52-57. And, noting that Windsor did not challenge the jury instructions at trial,[83] the ACCA explained that a court should instruct a jury on intoxication and manslaughter only when the evidence supported a reasonable doubt about an accused's level of intoxication and intent to kill. *Windsor II (ACCA)*, 683 So. 2d at 1037. The court found no error in the trial court's omission of those charges in Windsor's case because "there was no evidence concerning the quantity of beer [Windsor] consumed that day at the time of the murder" or other proof of intoxication from drinking alcohol for the jury to consider. *Id.* The Alabama Supreme Court agreed, finding that "no 'reasonable theory' . . . support[ed] an instruction on intoxication because there was no evidence of intoxication." *Windsor II*, 683 So. 2d at 1058 (quoting *Windsor II (ACCA)*, 683 So. 2d at 1037).

### a.

To obtain habeas relief on this claim, Windsor must show that the state appellate courts' decisions to affirm "resulted in a decision that was contrary to, or

---

[83]Consequently, the ACCA reviewed the claim for plain error. *Windsor II (ACCA)*, 683 So. 2d at 1037. Under that standard, the court

> shall notice any plain error or defect in the [death penalty] proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.

Ala. R. Crim. App. Proc. 45A.

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Windsor relies primarily on the Supreme Court's due process decision in *Beck* in support of this claim.[84] Doc. 16 at 50-51 ¶ 84. But even accepting that Windsor exhausted this claim, *Beck* does not afford habeas relief because the trial court charged the jury on the lesser included offenses of intentional homicide without

_____

[84]In *Beck*, the Supreme Court addressed Alabama's previous capital punishment regimen which precluded a judge from giving a

> jury the option of convicting the defendant of a lesser included offense. Instead, the jury [was] given the choice of either convicting the defendant of the capital crime, in which case it [was] required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties for his alleged participation in the crime. If the defendant [was] convicted and the death penalty imposed, the trial judge [was then required to] hold a hearing with respect to aggravating and mitigating circumstances; after hearing the evidence, the judge [was permitted to] refuse to impose the death penalty, sentencing the defendant to life imprisonment without possibility of parole.

*Beck*, 447 U.S. at 628-29 (footnotes omitted). The State charged the defendant with the capital offense of an intentional killing during a robbery. *Id.* at 627. The trial evidence supported an instruction on felony murder as a lesser included offense, absent the Alabama statutory prohibition. *Id.* at 630. The Court explained that

> [b]ecause of the statutory prohibition, the court did not instruct the jury as to the lesser included offense of felony murder. Instead, the jury was told that if petitioner was acquitted of the capital crime of intentional killing in the course of a robbery, he "must be discharged" and "he can never be tried for anything that he ever did to Roy Malone [the victim]." The jury subsequently convicted petitioner and imposed the death penalty; after holding a hearing with respect to aggravating and mitigating factors, the trial court refused to overturn that penalty.

*Id.* (record citation omitted). The Court held that Alabama's blanket prohibition on lesser included offense instructions in capital cases increased the risk of prejudicial harm in the factfinding process when the evidence supported a noncapital offense guilty verdict. *Id.* at 628, 637.

robbery in the first degree, robbery in the first degree without intentional homicide, and felony murder—reckless or criminally negligent homicide with robbery in the first degree. Vol. 6, Tab 16 at 1058-1063. Consequently, "[t]he central concern of *Beck* is simply not implicated . . . [because the] jury [did] not face[] . . . an all-or-nothing choice between the offense of conviction (capital murder) and innocence." *Schad v. Arizona*, 501 U.S. 624, 647 (1991). [85] Therefore, Windsor has not demonstrated that the denial of his *Beck* claim involved a contradicting or unreasonable application of Supreme Court precedent. To the contrary, the jury in Windsor's case did not face a binary choice of guilt or innocence on the capital offense, and instead were also charged on the lesser included offenses which the record reasonably supported. Moreover, as the state appellate courts noted, the evidence did not support the intoxication defense. The limited evidence that Windsor drank beer on the afternoon of the murders was insufficient for a reasonable jury to

---

[85]In *Schad*, the defendant claimed that his death penalty conviction violated *Beck* because the trial court did not charge the jury on robbery as a lesser included offense. *Schad*, 501 U.S. at 645. The trial court instructed the jury on the lesser included noncapital offense of second-degree murder. *Id.* at 646. The Supreme Court clarified that *Beck* does not "entitle[] a defendant to instructions on all offenses that are lesser than, and included within, a capital offense as charged." *Id.* at 627. Additionally, the *Beck* rule did not apply in *Schad* because the trial court's second-degree murder instruction satisfied the Supreme Court of the verdict's reliability. *Id.*; *see also Roberts v. Comm'r, Alabama Dep't of Corr.*, 677 F.3d 1086, 1094-95 (11th Cir. 2012) ("The Court concluded that because the jury in *Schad* was instructed on second degree murder, and therefore 'was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence[,]' *Beck* was not implicated.").

conclude that Windsor was inebriated to the point of insanity before killing Mr. Howard or to support a reasonable theory that Windsor committed manslaughter due to intoxication. *See Ex parte Bankhead*, 585 So. 2d 112, 120-21 (Ala. 1991)(holding that the level of intoxication necessary to negate a specific intent to kill and support a manslaughter charge "must amount to insanity.").

To close, under AEDPA, a presumption of correctness attaches to the state courts' factual findings. *See* 28 U.S.C. § 2254(e)(1). And Windsor does not offer clear and convincing evidence to refute the finding. Accordingly, the court denies Claim M.

## 10.

Windsor contends in Claim N that the trial court improperly admitted withheld fingerprint evidence in violation of the Sixth and Fourteenth Amendments.[86] Doc. 16 at 54-55 ¶ 92. Windsor describes the evidence as "photographic enlargements of fingerprints and palm prints and other prints taken from [him]." *Id.* at 51 ¶ 87. Windsor states that the prosecution produced "[m]ost of this evidence . . . too late for

---

[86]Although Windsor alleges in his petition that the admission of the fingerprint evidence violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights, doc. 16 at 54-55 ¶ 92, he focuses only on Sixth and Fourteenth Amendment authorities in framing this issue, *id.* at 54 ¶ 90; Doc. 28 at 41. Thus, he has abandoned his claims, if any, related to these other amendments. Moreover, the Fifth Amendment is inapplicable. *See* n. 28 *supra*. And, because Windsor does not elaborate why he has a cognizable constitutional right under the Eighth Amendment, the court dismisses Windsor's claim based on it as abandoned, underdeveloped, or unproven.

[him] to obtain a fingerprint expert to independently evaluate it" and that the State never produced the beer can fingerprint evidence. *Id.* at 51-52 ¶ 87. In rejecting Windsor's contention, the trial court noted:

> 'The Court renews its finding and cannot find that the evidence--this fingerprint stuff--was in the possession of the District Attorney and not made available to the defendant in a timely fashion. The main problem with this case is the evidence in this case has been in St. Clair County, Colbert County, and one or two courts of appeal, and collected from different sources at different times. The Court has made available fingerprint records and the Court granted this morning the defendant funds for a fingerprint expert. The Court cannot find the Court's order has been violated by the State. The Court will require the State to refrain from any other testimony concerning fingerprints for the remainder of the day, and allow the defendant a chance to review these fingerprint documents which are now in their possession.'

*Windsor II (ACCA)*, 683 So. 2d at 1034; Vol. 3 at 575-76.

The ACCA and the Alabama Supreme Court rejected this claim on direct appeal. In doing so, the ACCA did not characterize Windsor's claim as a federal one and cited Alabama Rule of Criminal Procedure 16—Alabama's criminal discovery rule—as the governing authority. *Windsor II (ACCA)*, 683 So. 2d at 1034. The court observed that "after a lengthy discussion, the [trial] court found that the state had not violated the discovery order." *Id.* The court found that the trial court committed no error in its finding that "the state had [not] violated the discovery order and Rule 16," and that while "[t]he state must make fingerprint evidence available to an accused as

soon as it can do so," no evidence existed that "the state failed to make that evidence available as soon as practicable in this case." *Id.* For its part, the Alabama Supreme Court "agree[d] . . . that there was no violation of the discovery order," and added that "[t]he trial judge gave the defense additional time to examine the materials before allowing the State to present testimony in relation thereto." *Windsor II*, 683 So. 2d at 1055.

### a.

The Respondents challenge one aspect of this claim as procedurally barred, i.e. Windsor's claim that "[b]ut for the State's dilatory response to the trial court's discovery orders, an expert could have shown the jury that the partial fingerprint was not [his]." Doc. 16 at 53 ¶ 88. The Respondents argue that the allegation is procedurally defaulted in light of Windsor's failure to raise this contention in his direct appeal. Doc. 26 at 51. Windsor counters that because he argued on direct appeal that he could not adequately rebut the State's fingerprint expert witness's testimony without his own expert, this additional allegation "falls under the heading of rebuttal evidence." Doc. 28 at 42.

"[I]n order to exhaust state remedies, a petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Ward*, 592 F.3d at 1156 (citing *Castille v. Peoples*, 489 U.S.

105

346, 351 (1989)). "The exhaustion requirement springs from principles of comity, which protect the state court's role in the enforcement of federal law and prevent disruption of state court proceedings." *Id.* (citing *Rose v. Lundy*, 455 U.S. 509, 518 (1982)). As it relates to exhaustion,

> The procedural default doctrine ensures that "state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding." *Picard v. Connor*, 404 U.S. 270, 276, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). To avoid procedural default, the defendant must have presented in his state appeal more than just the facts necessary to support his federal constitutional claim: "The *substance* of a federal habeas corpus claim must first be presented to the state courts." *Id.* at 278, 92 S.Ct. at 513–14 (emphasis added); *see Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (quoting *Picard*). However, the Supreme Court has also indicated that courts should exercise flexibility in determining whether defendants have met this requirement. *Picard*, 404 U.S. at 278, 92 S.Ct. at 513–14; *see Mattox v. Dugger*, 839 F.2d 1523, 1524 (11th Cir.), *cert. denied*, 488 U.S. 833, 109 S.Ct. 92, 102 L.Ed.2d 68 (1988) (defendant need not "[label] his original claims as 'federal' constitutional ones"); *Osborne v. Wainwright*, 720 F.2d 1237, 1239 (11th Cir.1983) (specific words not necessary so long as state court has "adequate opportunity to consider a party's objection").

*Cummings v. Dugger*, 862 F.2d 1504, 1506-07 (11th Cir. 1989). The Eleventh Circuit does not "require petitioners to give a separate federal law heading to each of the claims they raise in state court to ensure exhaustion for federal review." *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004). But "petitioners [must] present their claims to the state courts such that the reasonable reader would

106

understand each claim's particular legal basis and specific factual foundation." *Kelly*, 377 F.3d at 1344-45 (citing *Picard*, 404 U.S. at 277). And, a petitioner can "expand on the topics raised earlier in state court . . . when they involve the same issues raised there . . . in the context of [the federal] claim." *Pope v. Sec'y, Dep't of Corr.*, 680 F.3d 1271, 1287 (11th Cir. 2012).

When briefing this claim to the Alabama Supreme Court, Windsor conclusively alleged that the State's withholding and the trial court's admission of the fingerprint evidence violated "his rights to confrontation, due process and a fair trial guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments and Alabama law." Vol. 11, Tab 41 at 44, 48. Windsor cited state law, developed state law arguments, but left underdeveloped the alleged federal claims.[87] *Id.* at 44-48. While one of the Alabama authorities that Windsor referenced—*Ex parte Geeslin*, 505 So. 2d 1246 (Ala. 1986)—evaluated whether the State's failure to produce "an exculpatory medical report" violated *Brady v. Maryland*, 373 U.S. 83 (1963), Windsor did not present his fingerprint evidence claim as a *Brady* violation. And Windsor did not raise a third-party defense. Instead, he argued that "the State's failure

---

[87]The court notes that Windsor included federal cases when he briefed this claim on appeal to the ACCA. Vol. 9, Tab 32 at 47-48.

to comply with the Court's discovery orders is not mitigated by the fact that this material was not exculpatory in nature." Vol. 11, Tab 41 at 47.

Under these circumstances, and in the absence of any contention that the cause and prejudice, firmly established, or fundamental injustice exceptions to procedural default apply, Windsor's additional allegation that a defense expert could show that the partial fingerprint on the cigarette butt belonged to someone else is an expansion of the claim he presented in state court instead of a refinement of that claim. Consequently, that portion of Windsor's claim is procedurally barred. Still, the court considers this new allegation as it proceeds with the habeas analysis.

**b.**

Before considering the merits of this claim, the court must decide whether AEDPA's deferential or de novo review applies. Windsor argues that because the state appellate court decisions do not address his federal claims, they are "contrary to" Supreme Court precedent under *Williams* and *Romine*. Doc. 28 at 42. Again, Windsor is correct that both state court opinions are devoid of federal analysis. Also, the Respondents argue only that the defense expert portion of this habeas claim is subject to dismissal as unexhausted. Doc. 26 at 51. Under these circumstances, consistent with the court's handling of the *Romine* issue when evaluating Windsor's other claims, the court applies de novo review.

108

Windsor relies primarily on the following cases in support of this claim—*Holmes v. South Carolina*, 547 U.S. 319 (2004), *Crane v. Kentucky*, 476 U.S. 683 (1996), and *Wardius v. Oregon*, 412 U.S. 470 (1973).[88] Doc. 16 at 54 ¶ 90; Doc. 28 at 41. For analysis purposes, the court accepts Windsor's position that a trial error occurred with respect to the fingerprint evidence. Given that assumption, the court considers these and other Supreme Court cases to determine whether that evidentiary error violated Windsor's constitutional rights.

The Supreme Court determined in *Holmes* that the exclusion of evidence related to a third-party defense violated the constitutional "right to have a meaningful opportunity to present a complete defense." 547 U.S. at 331 (internal quotation marks omitted) (quoting *Crane*, 476 U.S. at 690) (quoting in turn *California v. Trombetta*, 467 U.S. 479, 485 (1984)). And in *Crane*, the Court held that "foreclosing petitioner's efforts to introduce testimony about the environment in which the police secured his confession" was unconstitutional in light of the meaningful and complete defense rule. *Crane*, 476 U.S. at 691. Finally, the Court held in *Wardius* that "the Due Process

---

[88]Windsor cites *Flowers v. Wainwright*, 783 F.2d 203 (11th Cir. 1986), for the proposition that the Eleventh Circuit does not "review alleged state discovery violations unless they constitute a denial of fundamental fairness." Doc. 28 at 41. Windsor does not discuss the facts from *Flowers*, and Westlaw identifies the non-binding authority as one listed "in a 'Table of Decisions Without Reported Opinions' appearing in the Federal Reporter." Therefore, the court has not included *Flowers* in the constitutional analysis of this claim.

Clause of the Fourteenth Amendment forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants," and because the statute the trial court applied in the petitioner's case did not provide for reciprocal discovery, the exclusion of the alibi evidence was unconstitutional. *Wardius*, 412 U.S. at 471-72.

On their face, none of these cases suggests that the trial court or the State violated Windsor's constitutional rights. Windsor's claim is not based on the exclusion of evidence helpful to defending his case. Windsor argues instead that the trial court should have precluded the State from introducing the fingerprint evidence because the State failed to comply with the discovery order and caused Windsor to have insufficient time to rebut the evidence. Doc. 16 at 51, 53-54 ¶¶ 87, 89, 90. In that respect, the cases Windsor cites are not on point.

Moreover, a review of additional Supreme Court authorities confirm that Windsor has no viable due process or Sixth Amendment claim based on these facts. For example, in *Weatherford v. Bursey*, 429 U.S. 545 (1977), the Court clarified that the Constitution does not entitle a criminal defendant to general discovery:

> *Brady* does not warrant the Court of Appeals' holding. It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably. There is no general constitutional right to discovery in a criminal case, and *Brady* did not

> create one; as the Court wrote recently, "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded. . . ." *Wardius v. Oregon*, 412 U.S. 470, 474, 93 S.Ct. 2208, 2212, 37 L.Ed.2d 82 (1973). *Brady* is not implicated here where the only claim is that the State should have revealed that a government informer would present the eyewitness testimony of a particular agent against the defendant at trial.

429 U.S. at 559-560. As such, the Court has rejected a due process claim based on a conviction obtained "with the aid of surprise testimony of an accomplice who was an undercover agent." *Gray v. Netherland*, 518 U.S. 152, 168 (1996).

In *Gray*, the Court addressed a situation somewhat similar to Windsor's claim pre-AEDPA. The petitioner claimed that he received insufficient "notice of the Commonwealth's evidence[,]" including two witnesses "whom he was advised that the prosecutor would call only on the evening before the sentencing hearing." *Gray*, 518 U.S. at 167. The petitioner moved to exclude and in rejecting his claim, the Court explained:

> On these facts, for petitioner to prevail on his notice-of-evidence claim, he must establish that due process requires that he receive more than a day's notice of the Commonwealth's evidence. He must also establish that due process required a continuance whether or not he sought one, or that, if he chose not to seek a continuance, exclusion was the only appropriate remedy for the inadequate notice. We conclude that only the adoption of a new constitutional rule could establish these propositions.

*Id.* The Court contrasted "[a] defendant's right to notice of the charges against which he must defend" with a claim of "a right to notice of the *evidence* that the state plans to use to prove the charges" and observed that the latter "stands on quite a different footing." *Id.* at 168 (emphasis by court). After considering *Wardius* and *Weatherford*, the Court stated that "these cases do not compel a court to order the prosecutor to disclose his evidence; their import, in fact, is strongly against the validity of petitioner's claim." *Id.* In reaching the decision, the Court distinguished the petitioner's claim from *Gardner* because that defendant "literally had no opportunity to even see the confidential information [contained in a presentence report], let alone contest it." *Id.* In contrast, the petitioner in *Gray* heard the challenged witnesses testify and cross-examined them. *Id.*

Based on these cases, Windsor has not carried his burden of demonstrating that the State's late disclosure and the trial court's admission of fingerprint evidence violated his constitutional rights. These cases confirm that ordinarily the due process clause does not require a state to produce non-exculpatory evidence to a criminal defendant prior to the trial. And consistent with these authorities, the State's late disclosure or non-disclosure (as in the beer can fingerprint evidence) of non-exculpatory information is not a cognizable constitutional claim, especially when the State's reliance on the evidence at trial was unsurprising. Vol. 7 at 264-68; *id.* at 304-

05 (denying Windsor's motion to depose the State's fingerprint expert witnesses because of the transcript from Guthrie's prior trial in Colbert County which included the same expert's testimony).

### c.

Windsor also had a meaningful opportunity to challenge the evidence. During the discussion of Windsor's objection to the fingerprint evidence, the trial court ordered "all exhibits that were delivered to the Clerk's Office [to be] brought to the courtroom." Vol. 3 at 565. The trial court provided Windsor with a set of fingerprint exhibits, noted Windsor's objection to their admission, and expressed difficulty in "ascertain[ing] where they were" because "they were all in [and transferred from] Colbert County . . . and then in the D.A.'s office." *Id.* at 568. The trial court found that the records "were equally available to the defendant as the State." *Id.* Concerning evidence located somewhere else than the D.A.'s office, the trial court determined that the prosecution had no obligation to produce the exhibits, "particularly [because the court] ha[d] approved an investigator and other special expenses in this case" for Windsor. *Id.*

The trial court gave Windsor's counsel time to review the fingerprint evidence and funds to retain a defense expert. Vol. 3 at 575-76; *see also id.* at 570-571 ("I showed [Windsor's counsel] the gun and told him the Colbert County exhibits were

here. If it will expedite this matter, I'll give [Windsor's counsel] the chance to examine all this, and we will not ask any more fingerprint questions today."). Windsor's counsel examined the State's fingerprint expert on voir dire and cross-examined her about the partial fingerprint. Vol. 5 at 916-17, 936-37. Based on these facts, the trial court did not deny Windsor a meaningful opportunity to defend the fingerprint evidence and committed no constitutional error. Moreover, Windsor could have moved earlier to compel production of the fingerprint evidence pretrial based on the State's noncompliance with the trial court's order requiring production, Vol. 7 at 304-05, 306; Vol. 5 at 916, or requested a continuance on the basis of nonproduction and could have developed the defense expert witness theory and sought relief from his conviction post-trial. Instead, the only relief he sought was to exclude the fingerprint evidence, *see* Vol. 3 at 562-63—a remedy which he has not shown that the constitution requires under these circumstances.[89]

### e.

Finally, even if the trial court erred, Windsor has the additional burden of showing that the non-structural error satisfies the "substantial-and-injurious-effect"

---

[89]*Cf. Gray*, 518 U.S. at 169 ("[W]e have acknowledged that exclusion of evidence is not the sole remedy for a violation of a conceded right to notice of an alibi witness."); *Taylor v. Illinois*, 484 U.S. 400, 413 (1988) (recognizing that "a less drastic sanction [than exclusion] is always available" for a failure to disclose a witness and that "granting a continuance" is an option).

*Brecht* standard.[90]  Windsor does not mention the *Brecht* standard or substantiate how the fingerprint evidence caused him actual prejudice. While conceivably the new partial fingerprint allegation could confirm actual prejudice, Windsor has made no effort to prove a third-party defense theory based on his partial fingerprint in state or federal court. ADEPA prohibits habeas consideration of a previously undeveloped claim unless "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B).

For all these reasons, the court denies Claim N.

## 11.

Windsor contends in Claim P that the trial court should have excluded inculpatory evidence obtained from an unreasonable search and seizure in violation of the Fourth Amendment.[91]  Doc. 16 at 65-66 ¶ 107. At issue here is the investigatory

---

[90]*See Brecht*, 507 U.S. at 638.

[91]Although Windsor alleges in his petition that the admission of arrest-related evidence violated his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights, doc. 16 at 68-69 ¶ 111, Windsor focuses only on Fourth Amendment authorities in framing this constitutional issue, *id.* at 66-67 ¶¶ 108, 109. Thus, he has abandoned his claims, if any, related to these other amendments. Moreover, the Fifth Amendment is inapplicable here. *See* n. 28 *supra.* And, because Windsor does not elaborate why he has a cognizable Sixth, Eighth, or (aside from incorporation) Fourteenth Amendment right, his claims based on those amendments are abandoned, underdeveloped, or unproven.

stop that led to his arrest. Specifically, after confirming the identities of and arresting Windsor and Guthrie based on a BOLO bulletin, authorities found a .25 caliber pistol on Windsor and a sawed-off shotgun in the Mustang. Doc. 16 at 66 ¶ 107. Windsor contends that the stop and subsequent search were improper. For procedural and substantive reasons, the court denies this claim.

### a.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. And "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." *Mapp v. Ohio*, 367 U.S. at 655.[92] In Windsor's case, the ACCA denied this claim post-remand. *See Windsor II (ACCA)*, 683 So. 2d at 1031. The Alabama Supreme Court affirmed, summarizing the circumstances of Windsor's arrest:

> The BOLO, asking officers to be on the lookout for men resembling the bulletin description, contained a photograph of Windsor and Guthrie and described the vehicle in which they were thought to be traveling. The BOLO alerted the Tennessee police officer who spotted the two men asleep in a car matching the description given in the bulletin, at a rest area on or about March 6, 1988. The car was backed into the parking space, with the front tires sharply turned toward the exit ramp of the rest area. One of the occupants of the car was wearing a

---

[92]*See also Terry v. Ohio*, 392 U.S. 1, 15 (1968) ("[P]olice conduct which is over-bearing or harassing, or which trenches upon personal security without the objective evidentiary justification . . . . must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials.").

dark-colored ball cap, as described in the bulletin. The officer called for reinforcements. Windsor and Guthrie were thereafter arrested and charged with the murder of [Mr.] Howard.

*Windsor II*, 683 So. 2d at 1052. Citing *United States v. Hensley*, 469 U.S. 221 (1985), the Court found no Fourth Amendment violation because the arresting officer relied on the BOLO description and the attached photograph in apprehending Windsor and Guthrie. *Id.* The Alabama Supreme Court's ruling is consistent with United States Supreme Court precedent that an officer's reliance on a BOLO containing "articulable facts supporting a reasonable suspicion that the wanted person has committed an offense . . . justifies a stop to check identification." *Hensley*, 469 U.S. at 232) (internal quotation marks omitted).

### b.

The Respondents challenge this claim under 28 U.S.C. § 2244(d)(1)'s one-year bar which expired several months before Windsor amended his petition. Docs. 26 at 58; 16. Windsor concedes this point but argues that his illegal search claim relates back to the initial petition. Docs. 28 at 47; 1 at 21-24. "So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order." *Mayle*, 545 U.S. at 664. Here, however, based on the allegations Windsor relies on to support relation back, *see* docs. 1 at 21-24; 28 at 47, application of the doctrine is inappropriate.

On page 21 of his original petition, Windsor includes a "Trial Counsel Failed to Procure Necessary Expert Assistance" subheading and asserts that his lawyers should have retained fingerprint, firearm and projectile, pathologist, and medical experts. Doc. 1 at 21-22. And beginning on page 23, Windsor starts a new subsection called "Trial Counsel Failed to Object to Egregious Instances of Prosecutorial Misconduct in Closing Argument" and identifies several areas, including when the prosecutor suggested to the jury that the gun found on Windsor may have been the same gun used to kill Mr. Howard. *Id.* at 23-24. But Windsor does not assert a Fourth Amendment search and seizure claim on these pages or elsewhere within the petition. Thus, Windsor's *Mapp* claim is without "a common core of operative facts" that ties it to a timely habeas filing, and it is barred by § 2244(d)(1)'s statute of limitations.[93]

### c.

The Respondents argue alternatively that *Stone v. Powell*, 428 U.S. 465 (1976), precludes a merits-based review of this claim. Doc. 26 at 59-60. *Stone* held that a state prisoner cannot base habeas relief on a *Mapp* violation if "the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim[.]" *Stone*, 428 U.S. at 494. Citing *Wallace v. Kato*, 549 U.S. 384 (2007), Windsor maintains that

---

[93]Windsor's reliance upon *Mandacina v. United States*, 328 F.3d 995, 1000-01 (8th Cir. 2003), is unhelpful because the petitioner there asserted *Brady* violations in both petitions.

*Stone* is inapplicable because he did not receive a full and fair hearing of this Fourth Amendment claim.[94]   Doc. 16 at 67 ¶ 109. The Court observed in *Kato* that "[u]nder *Stone*, Fourth Amendment violations are *generally* not cognizable on federal habeas, but they *are* cognizable when the State has failed to provide the habeas petitioner 'an opportunity for full and fair litigation of a Fourth Amendment claim.'" *Kato*, 549 U.S. at 395 n. 5 (emphasis in *Kato*) (quoting *Stone*, 428 U.S. at 482); Doc. 16 at 67 ¶ 109. Windsor cites the ACCA's differing views about the merits of this claim pre- and post-remand to support his contention that the *Stone* exception applies. Docs. 16 at 67-68 ¶ 110; 28 at 48. Additionally, Windsor questions the Alabama Supreme Court's omission of the Fourth Amendment claim from its opinion on the first appeal and its understanding of the underlying BOLO and investigatory stop facts on the second appeal. Docs. 16 at 68 ¶110; 28 at 48. But Windsor does not substantiate why the trial and direct appeal processes were insufficient under *Stone*'s parameters—an unfavorable outcome does not mean that Windsor did not have a full and fair opportunity to contest the reasonableness of his arrest under the Fourth

---

[94]Windsor contested the reasonableness of his arrest and moved unsuccessfully to exclude the seized pistol and shotgun under the Fourth Amendment. Vol. 7 at 281-85. The trial court denied the motion. As mentioned in the background section, the ACCA questioned the soundness of the trial's court's exclusionary ruling in Windsor's first appeal. *Windsor I (ACCA)*, 683 So. 2d at 1018. But in the second appeal, the court had no Fourth Amendment concerns, *see Windsor II (ACCA))*, 683 So. 2d at1041, and the Alabama Supreme Court affirmed, *Windsor II*, 683 So. 2d at 1062.

Amendment.[95] Therefore, the court finds that *Stone* bars the consideration of the merits of the unreasonable search and seizure claim.

### d.

The Respondents challenge also Windsor's ability to show that the Alabama Supreme Court contradicted or unreasonably applied Supreme Court precedent. Doc. 26 at 60-63. Windsor offered nothing in response to this argument. *See* doc. 28 at 46-48. Based on Windsor's silence, he has conceded the appropriateness of a § 2254(d)(1) dismissal. Alternatively, Windsor's reliance on the BOLO bulletin's description of the suspects' vehicle as a brown Plymouth Volare instead of a black Mustang, doc. 16 at 68 ¶ 110, does not meet the contrary to or unreasonable application standard. Other identifying information, including the dark-colored cap and the attached photograph, reasonably supported the officer's investigatory stop and arrest of Windsor.

For all these reasons, the court denies Claim P.

---

[95]Windsor mentions that the *Stone* habeas bar may not apply in death penalty cases. Doc. 16 at 67 ¶ 109. "[The Eleventh Circuit], however, has applied this doctrine to capital cases in the past, and [found] nothing in the language or reasoning of *Powell* itself or the Supreme Court's more recent pronouncements to support such a distinction." *Devier v. Zant*, 3 F.3d 1445, 1455 (11th Cir. 1993) (footnote omitted).

**B.**

The court turns now to Windsor's claims related to the penalty phase, Claims H and I.

**1.**

Windsor raises alleged improper prosecutorial comments in Claim H. More specifically, he states that the cumulative impact of the prosecutor's improper penalty-phase closing argument rendered the jury's death-sentence recommendation unreliable in violation of his Eighth and Fourteenth Amendment rights.[96] Doc. 16 at 34 ¶ 61. At issue here are the following comments by the prosecutor:

- that Windsor's mother could not "remember how long" Windsor "ha[d] been sitting in prison" after describing Windsor's life "over the past eight or ten years" as involving "stealing and sitting around a penitentiary. . . . [and] not just one or two stealings but a bunch of stealings . . . ." Doc. 16 at 35 ¶ 62; Vol. 6, Tabs 22, 23 at 1095, 1100;

---

[96]Although Windsor alleges in his petition that the prosecutor's improper penalty-phase closing violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights, doc. 16 at 39 ¶ 67, Windsor focuses only on Eighth and Fourteenth Amendment authorities in framing this issue, *id.* at 34, 35-36, 37-38 ¶¶ 61, 63, 64-65; doc. 28 at 26, 29-30. Thus, he has abandoned his claims, if any, related to the other amendments. Moreover, the Fifth Amendment is inapplicable here. *See* n. 28 *supra*. And, because Windsor does not elaborate why he has a cognizable Sixth Amendment right, the court dismisses the claim based on it as abandoned, underdeveloped, or unproven.

- that the jury "may disregard their mitigating circumstances." Doc. 16 at 35 ¶ 62; Vol. 6, Tab 23 at 1100;

- suggesting that the jury show Windsor "the same mercy that he showed [Mr.] Howard when he walked into that store with that sawed off shotgun and blew his heart out" and judge Windsor "by the same standard that he judged [Mr.] Howard . . . . [Mr.] Howard was a good citizen." Doc. 16 at 36 ¶ 63; Vol. 6, Tab 23 at 1102;

- invoking the prosecutorial office, his 12 years of experience "tr[y]ing scores of cases," and his history of requesting the death penalty five times and asking the jury "on behalf of the State of Alabama . . . to do the right thing. . . . [and] sentence Harvey Lee Windsor to death by electrocution . . . . It is the right thing to do. I don't hesitate one bit to ask each of you to do it." Doc. 16 at 37 ¶ 64; Vol. 6, Tab 23 at 1097-98; and

- comparing Windsor to a "cold . . . snake" that "went through this county" and "coiled up and struck," and that "[t]he only thing [the jury] can do . . . to keep it from striking again is to cut its head off." Doc. 16 at 38 ¶ 65.

Vol. 6, Tab 25 at 1110.

**a.**

The court must evaluate the statements cumulatively, considering whether "the misconduct of the prosecuting attorney was [more than] slight or confined to a single instance, but . . . was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Berger*, 295 U.S. at 89. In this Circuit, the following framework applies when evaluating this type of sentencing claim:

> The law relating to prosecutorial argument at the sentencing stage of a capital case has been settled in this circuit since four en banc decisions on the subject were released in Georgia cases 16 years ago. *See Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985) (en banc), *vacated on other grounds*, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *reinstated*, 809 F.2d 700 (1987) (en banc); *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985) (en banc); *Tucker (William) v. Kemp*, 762 F.2d 1480 (11th Cir.1985)(en banc), *vacated on other grounds*, 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985), *extended and reinstated*, 802 F.2d 1293 (11th Cir.1986) (en banc); *Tucker (Richard) v. Kemp*, 762 F.2d 1496 (11th Cir.1985) (en banc). Under that well-settled law, habeas relief is due to be granted for improper prosecutorial argument at sentencing only where there has been a violation of due process, and that occurs if, but only if, the improper argument rendered the sentencing stage trial fundamentally unfair. *See Brooks*, 762 F.2d at 1400; *Drake*, 762 F.2d at 1458; *see also Spivey v. Head*, 207 F.3d 1263, 1275 (11th Cir.2000). An improper prosecutorial argument has rendered a capital sentencing proceeding fundamentally unfair if there is a reasonable probability that the argument changed the outcome, *Brooks*, 762 F.2d at 1401, which is to say that absent the argument the defendant would not have received a death sentence. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.*

123

(citation omitted); *Drake*, 762 F.2d at 1458; *Spivey*, 207 F.3d at 1275–76.

> The first step in analyzing any sentence stage prosecutorial argument is to determine if it is improper, because no matter how outcome-determinative it is[,] a proper argument cannot render the proceedings fundamentally unfair and therefore cannot be the basis for a constitutional violation. *Brooks*, 762 F.2d at 1403 ("A permissible argument, no matter how 'prejudicial' or 'persuasive,' can never be unconstitutional."); *Spivey*, 207 F.3d at 1276 ("Proper arguments, regardless of their impact on the outcome of the case, do not render a trial unfair.").

*Romine*, 253 F.3d at 1365-66. An improper argument is one that "encouraged the jury to take into account matters that are not legitimate sentencing considerations." *Johnson v. Wainwright*, 778 F.2d 623, 630 (11th Cir. 1985). "If a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair." *Tucker v. Kemp*, 802 F.2d 1293, 1296 (11th Cir. 1986) (en banc).

If the prosecutor argued improperly, then "the second step of the legal analysis . . . is to determine . . . . [whether] absent the argument, there is a reasonable probability that the result would not have been a death sentence[.]" *Romine*, 253 F.3d at 1368. Not all improper statements "warrant[] habeas relief. . . . because not all of them render the proceeding unfair, which is the measure of a due process violation." *Id.* (citing *Darden v. Wainwright*, 477 U.S. 168, 179–181 (1986)). This second

124

inquiry requires considering the impact of improper comments on "the entire context of the judicial proceeding." *Id.* (internal quotation marks omitted).

### b.

The ACCA and the Alabama Supreme Court rejected this claim on appeal. *Windsor II (ACCA)*, 683 So. 2d at 1039-40; *Windsor II*, 683 So. 2d at 1061. Because Windsor argues that de novo review applies, doc. 28 at 31, the court examines the appellate courts' decisions to determine if either court addressed Windsor's federal claim sufficiently under AEDPA's contrary to test.[97]  The ACCA found that "no error occurred" from the prosecutor's comments under Alabama's plain-error doctrine. *Windsor II (ACCA)*, 683 So. 2d at 1040. The court noted that Windsor failed to object to the remarks and quoted from a footnote in *Wainwright* on the issue of harmfulness:

> 'This court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'

*Id.* (quoting *Kuenzel v. State*, 577 So. 2d 474, 489 (Ala. Crim. App. 1990), *aff'd*, 577 So. 2d 531 (Ala. 1991) (quoting in turn *Wainwright*, 778 F.2d at 629 n. 6)). The court held that the prosecutor "permissibl[y] comment[ed] on facts in evidence or

---

[97]*See Romine*, 253 F.3d at 1365 (applying de novo habeas review after expressing "grave doubt that the Georgia Supreme Court applied federal law at all, let alone the governing law set down in Supreme Court decisions"); *Wilson*, 138 S. Ct. at 1192 (describing "look through" habeas presumption).

arguments concerning the weight to accord aggravating and mitigating circumstances." *Id.* The court cited no other federal authorities, did not screen for improper arguments under federal law, and did not reach the second inquiry of whether a reasonable probability existed that, absent any improper comments, the jury would have recommended a life sentence.

For its part, the Alabama Supreme Court summarized Windsor's challenged remarks to include:

> that the State improperly urged the jury to disregard any mitigating evidence; that the State misled the jury into believing that the death penalty was mandatory; that the State referred to Windsor in inflammatory and prejudicial terms; and that the State urged the jury to abjure mercy.

*Windsor II*, 683 So. 2d at 1061. The Court's analysis mirrored the ACCA in noting an absence of trial objections and quoting *Wainwright* on harmlessness. *Id.* The Court relied on *United States v. Butler*, 792 F.2d 1528, 1532 (11th Cir. 1986), a non-death penalty case, to define plain error. *Id.* Opting not to analyze each area for plain error, the Court considered the comments "in the full context of the prosecution's remarks" and found that the trial court's "cautionary instruction to the jury following the State's remarks cured any error."[98]  *Id.*

---

[98]The trial court gave the curative instruction after the prosecutor compared Windsor to a coiling and striking cold snake:

Based on the state appellate court opinions, this court, like the Eleventh Circuit in *Romine*, has "grave doubt" that either court applied federal law consistent with Supreme Court precedent when considering the merits of Windsor's federal sentencing-phase claim. *See Romine*, 253 F.3d at 1365. The court bases this determination on the courts' inclusion of Alabama plain error review only in their analyses and the absence of a constitutional standard or a statement that the plain error and federal framework for this claim are essentially the same. In reaching this determination, this court notes that both state courts relied on a block quote from

---

THE COURT: All right, Mr. Livingston, that is not proper.

MR. LOWERY: We ask [that] it be excluded.

THE COURT: Ladies and Gentlemen, of the Jury, your decision is based solely on weighing aggravating and mitigating circumstances and you are to consider nothing else.

Vol. 6, Tab 25 at 1110-11. After requesting a discussion outside the jury's presence, Windsor's counsel moved for a directed-verdict finding of life without parole based on the snake analogy. *Id.* at 1111. The trial court found no error because the prosecutor had completed half of the closing statement and the jury had received a limiting instruction. *Id.* And before the prosecutor resumed his closing, the trial court cautioned the jury again:

Ladies and Gentlemen, any arguments that do not have to do with the aggravating circumstances referred to by the State, I will instruct you to exclude any other remarks by the District Attorney concerning any other factors or reasons for your decision.

*Id.* While the Alabama Supreme Court considered the impact of the trial court's curative instruction on the prosecutor's remarks, it did so under plain error review without reference to a federal standard. *Windsor II*, 683 So. 2d at 1061.

127

*Wainwright* to evaluate the absence of objections, but failed to consider whether the prosecutor's argument was constitutional under the two-part test that the Eleventh Circuit followed in *Wainwright*. Additionally, the courts relied on dicta from *Wainwright* in the discussion of harmfulness when a defendant fails to object:

> Of the three arguments criticized by the petitioner, only one precipitated any objection on the part of the defense lawyer. This court has concluded that the failure to object to improper prosecutorial arguments does not necessarily preclude review, but should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful. *See Brooks*, 762 F.2d at 1397 n. 19; *Drake*, 762 F.2d at 1461 n. 16; *Tucker (William)*, 762 F.2d at 1484 n. 5; *Tucker (Richard)*, 762 F.2d at 1505 n. 13. Because we conclude that the arguments being criticized here, when viewed in the context of the entire proceeding, failed to render the trial fundamentally unfair, we find it unnecessary to consider how the lack of an objection should be assessed.

*Wainwright*, 778 F.2d at 629 n. 6. Thus, the court reviews Windsor's unfair sentencing claim de novo.

### c.

Windsor satisfies the first step of the penalty-phase claim—he has shown that the challenged prosecutorial comments were improper or very close to that line. For example, a prosecutor should not undermine a mitigating factor by commenting on a defendant's criminal or custodial history in a manner that the evidentiary record does not substantiate. Otherwise, "the sentencer . . . [will be unable to] giv[e] [proper]

independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation [and] creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Lockett*, 438 U.S. at 605. Also, a prosecutor should not argue that the jury should not consider mercy.[99] "[T]he suggestion that mercy is inappropriate was not only a misrepresentation of the law, but it withdrew from the jury one of the most central sentencing considerations, the one most likely to tilt the decision in favor of life."[100] *Drake*, 762 F.2d at 1460. And a prosecutor should not pressure a jury to do the right thing or endorse the imposition of the death penalty implicitly by invoking his office and highlighting his experience.[101] Finally, a prosecutor should not refer to

---

[99] Windsor acknowledges that under *Buttrum v. Black*, 479 U.S. 902, 903 (1986), an improper comment about mercy alone may not be sufficient to show a constitutional violation but that in his case the "prosecutor bootstrap[ed] the mercy comments to the inference that the State thinks death is the appropriate punishment for the murder of a good citizen." Doc. 28 at 30.

[100] *Cf. Penry v. Lynaugh*, 492 U.S. 302, 327 (1989) ("But as we made clear in *Gregg*, so long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant."), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002), *and holding modified by Boyde v. California*, 494 U.S. 370 (1990); *California v. Brown*, 479 U.S. 538, 545-46 (1987) (O'Connor, J., concurring) ("[O]ne difficulty with attempts to remove emotion from capital sentencing through instructions such as those at issue in this case is that juries may be misled into believing that mitigating evidence about a defendant's background or character also must be ignored."), *holding modified by Boyde*, 494 U.S. 370.

[101] *See, e.g., United States v. Young*, 470 U.S. at 1, 18 (1985) (finding during guilt phase that prosecutor erred in "try[ing] to exhort the jury to 'do its job' [because] that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice") (citing ABA Standards for Criminal Justice, 3–5.8(c) and 4–7.8(c)); *Brooks*, 762 F.2d at 1410 (discussing

a defendant as an animal, and the "use of the word 'animal' . . . . undoubtedly is improper."[102]  *Darden*, 477 U.S. at 180.

## d.

This court must decide in step two whether these improper comments resulted in an unfair death sentence. The court must keep in mind that the measure of an unfair death sentence is whether a reasonable probability exists that the jury would have reached a different result absent the improper remarks. *Romine*, 253 F.3d at 1368-69. Viewing the record as a whole and in relation to binding precedent, a reasonable probability of a different outcome without the prosecutor's challenged comments is absent here. To begin, the prosecutor's remark about Windsor's indefinite amount of time spent in prison was isolated and ambiguous. And "'isolated, or ambiguous or unintentional remarks must be viewed with lenity,' *Brooks*, 762 F.2d at 1400, and a brief remark is less likely to cause prejudice." *Romine*, 253 F.3d at 1369.

---

years of criminal experience and "practice of seeking death only in a few cases" was improper as argument "implied to the jury that the prosecutor's office had already made the careful judgment that this case, above most other murder cases, warranted the death penalty"); *Berger*, 295 U.S. at 88 (observing that a prosecutor's "improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight" with an "average jury").

[102]But similar to the animal remark in *Darden*, the snake remark "did not manipulate or misstate the evidence, nor did it implicate other specific [sentencing] rights of [Windsor]." *Darden*, 477 U.S. at 182. Therefore, omitting the snake reference would not have a reasonable probability of altering the sentencing outcome.

Additionally, Windsor's mother confirmed that Windsor "had spent a lot of his time in the penitentiary" during Windsor's counsel's examination. Vol. 6, Tab 22 at 1083; *See also id.* at 1087.

The court considers the mitigation, mercy, prosecutorial experience, and snake statements with more scrutiny and context.[103] No relief is warranted here because while the prosecutor overstepped or misspoke at times in discussing mitigation and mercy, he clarified to the jury that whether the aggravating circumstance of "a murder committed during a robbery" outweighed any mitigating circumstances would "be a call that each of you will be asked to make" and that "the defendant has th[e] right to have you consider everything you possibly can about his life." Vol. 6, Tab 23 at 1099, 1100. The prosecutor commented similarly on the jury's weighing role in his opening statement. Vol. 6, Tab 19 at 1074. In other words, he correctly informed the jury regarding their role.

Next, the prosecutor's comments about his state office and prosecutorial experience fall short of qualifying as direct or impactful as the challenged remarks in *Caldwell v. Mississippi*, 472 U.S. 320 (1985). The *Caldwell* prosecutor told the jury unequivocally to absolve themselves of any belief that they would be responsible for

---

[103] *See Cargill v. Turpin*, 120 F.3d 1366, 1379 (11th Cir. 1997) ("[A] reviewing court should not assess prosecutorial comments in isolation, shorn of their context.").

killing the defendant because their decision was reviewable. *Caldwell*, 472 U.S. at 325. In contrast, here, the prosecutor did not minimize the jury's role in making a life or death decision to the degree of a reasonable probability of altering the outcome. Although the prosecutor asked the jury "to do the right thing"[104] and invoked his office, his years of experience, and the handful of times in which he had sought the death penalty, he tempered those improper statements when he recognized how "painful" and "difficult" it would be for the jury "to summon up that courage to return that verdict." Vol. 6, Tab 23 at 1098. And the prosecutor never referred to the jury's decision as an advisory decision or mentioned the opportunities for appellate and collateral review of a death sentence judgment. In that respect, he never engaged in conduct that impacted the cardinal rule "that capital sentencers would view their task as the serious one of determining whether a specific human being should die at the hands of the State." *Caldwell*, 472 U.S. at 329.

**e.**

No relief is warranted also because "this court also evaluates whether 'defense counsel's closing argument . . . ameliorate[d] the damage done to the defense by the prosecutor's [statements].'" *Cargill*, 120 F.3d at 1379 (quoting *Davis v. Zant*, 36 F.3d

---

[104]Directly referencing this particular prosecutorial remark, Windsor's counsel asked the jury "to do the right thing too." Vol. 6, Tab 24 at 1105.

1538, 1551 (11th Cir. 1994))). Here, in response to the first part of the prosecutor's closing argument which included most of the challenged comments, Windsor's counsel asked the jury to "consider all those factors and not all this stuff the D.A. has talked about--just weigh the evidence--take it seriously. It is not something you can clown around with like he does." Vol. 6, Tab 25 at 1107. And, countering the impact of the prosecutor's remarks, Windsor's counsel told the jury that "[t]he District Attorney wants to make it some type of promise or macho thing - - you have this power." Vol. 6, Tab 24 at 1106. Based on this record, counsel's statements ameliorated the prosecutor's inappropriate comments.

### f.

Windsor is also not entitled to relief because the trial court gave a curative instruction.[105] In particular, after the coiling and striking cold snake comment, the

---

[105]This is in stark contrast to the more prejudicial comments in *Romine* which the judge endorsed. In particular, "[t]he prosecutor's admonition to the jurors to base their decision on whether Romine should live or die on Biblical law [which] struck home with at least some of the jurors." *Romine*, 253 F.3d. at 1362. The prosecutor delivered "a hell fire and brimstone mini-sermon the effect of which was to tell them that regardless of the law of Georgia, they ought to follow the law of God" without "any consideration of mercy." *Id.* at 1369. To make matters worse, the trial court essentially endorsed the prosecutor's Biblical theme: "'The circumstances here include a sentence stage trial saturated with evidence relating to religion, in which the jurors are sequestered at a Baptist assembly, where the judge suggested having 'Brother Caylor out there' put the jurors in a room and 'give you a good sermon.'" *Id.* at 1369. Additionally, "[t]here was no curative instruction from the court at the time of the argument, and the final instructions to the jury did not effectively cure the error, either." *Id.*

court interjected that the prosecutor's comments were improper and gave two curative charges instructing the jury to disregard remarks unrelated to aggravating or mitigating factors. Vol. 6, Tab 25 at 1110-11. The trial court instructed the jury a third time on this point before deliberations, telling the jury "you must avoid any influence of passion, prejudice or any other arbitrary factor. . . . There is no room for influence of passion, prejudice or arbitrary factors." *Id.* at 1121.

### g.

Relief is also not warranted because the relative strength of the aggravating and mitigating factors favors finding no "reasonable probability that but for the improper argument the result might have been different." *Romine*, 253 F.3d at 1370. Windsor argued mitigation based on an intent to commit a robbery only and the absence of violent offenses on his criminal record. Vol. 6, Tabs 20, 21, 22 at 1076, 1077, 1087. Windsor called his mother to testify about the limited experiences he had growing up and the disconcerting changes in him after a motorcycle accident. Vol. 6, Tab 21 at 1077, 1083-84, 1086-87, 1088-90, 1092-94. Consistent with the relative strength of the aggravating evidence, unlike *Romine,* Windsor's sentencing proceedings did not involve a deadlocked jury, juror questions, an *Allen* charge, or anything to suggest that the prosecutor's statements at issue infected the deliberation

process.[106]  Vol. 6, Tab 27 at 1126. Instead, the jury recommended a death sentence unanimously based on the strength of the aggravating factors.

### h.

Finally, although not dispositive of the second step, the failure to object to most of the challenged comments and lodging the objection to the snake comment only <u>after</u> the trial court flagged that argument as improper "weigh[] against a finding that the improper argument rendered the sentencing proceeding unfair." *Romine*, 253 F.3d at 1370. As the Circuit has noted on a similar issue, "that no objection was made during the prosecutor's closing argument further supports our belief that the statement was not severe enough to render the sentencing hearing fundamentally unfair." *Williams v. Kemp*, 846 F.2d 1276, 1283 (11th Cir. 1988). And, this failure to object further distinguishes the facts here from those in Guthrie's case. While Windsor is correct that Guthrie obtained a favorable new trial outcome based partially on "the prosecutor's vouching for the credibility of the state's witnesses[] [d]uring the state's closing argument in the guilt phase," *Guthrie v. State*, 616 So. 2d 914, 929-

---

[106]One of the jurors in *Romine* testified during a state habeas hearing that she discussed and reviewed Biblical passages during deliberations. *Romine*, 253 F.3d at 1362. The jury deadlocked twice during the process and asked a question about mitigating circumstances. *Id.* After the trial court denied two motions for a mistrial and gave the jury an *Allen* charge, the jury resumed deliberations and returned with a unanimous death sentence verdict. *Id.*

30 (Ala. Crim. App. 1993), in that case, Guthrie's counsel contemporaneously objected to the improper remark, *id.*; doc. 16 at 37-38 ¶ 64. Moreover, the court granted Guthrie a new trial because the prosecutor vouched for the witnesses in his closing. That situation is too different factually and legally to prove helpful to Windsor.

To close, Windsor has not demonstrated that the impact of the prosecutor's improper comments, singularly or cumulatively, rendered the jury's sentencing decision fundamentally unfair under de novo review. Consequently, the court denies Claim H.

## 2.

Windsor maintains in Claim I that the trial court's exclusion of mitigating evidence violated his Eighth and Fourteenth Amendment rights.[107]  Doc. 16 at 39-40 ¶ 68. During the sentencing hearing, the trial court sustained a hearsay objection that precluded Windsor's mother from completing a thought about how Windsor's motorcycle accident in 1985 had caused a decline in his mental health and stability.

---

[107]Although Windsor alleges conclusively that the trial court's preclusion of Ms. Windsor's mitigation testimony violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights, doc. 16 at 41 ¶ 71, Windsor focuses only on Eighth and Fourteenth Amendment authorities in framing this constitutional issue, *id.* at 40 ¶ 69; doc. 28 at 32. Thus, he has abandoned his claims, if any, related to these other amendments. Moreover, the Fifth Amendment is inapplicable here. *See* n. 28 *supra*. And because Windsor does not elaborate why he has a cognizable Sixth Amendment right, the court dismisses Windsor's claim based on it as abandoned, underdeveloped, or unproven.

Vol. 6, Tab 22 at 1086. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Brown*, 479 U.S. at 545 (O'Connor, J., concurring). For that reason, the Court has stressed the importance of guaranteeing an individualized assessment during the penalty phase of a death penalty case:

> the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

*Lockett*, 438 U.S. at 604 (footnote omitted) (emphasis in original). Based on these precedents, Windsor argues that the trial court erred in precluding him from presenting a relevant mitigating factor for the jury.

### a.

Relevant here, in Ms. Windsor's direct testimony, when counsel asked whether Windsor had an accident in the 1980s, Ms. Windsor responded:

> Yes, it was September 13, on a Friday morning, he had a motorcycle wreck and he had a broken leg and they came and told me he was in the hospital and they wanted to transfer him from Guntersville Hospital to Huntsville Hospital. They thought he was bleeding on the inside. From

> the 13th of that Friday to the 20th of the next Friday, of September, something snapped in his mind just like a rubberband.

Vol. 6, Tab 22 at 1083. The medical personnel did not think that Windsor suffered a head injury, but Ms. Windsor disagreed because when "[she] went to see him, he didn't know who [she] was." *Id*. Ms. Windsor explained:

> I walked in that room, and he said, "Who are you?" He didn't know nobody and was talking crazy saying 'nuts and bolts' and things like that. They transferred him from Huntsville to St. Margaret's Hospital so they could operate on his leg. . . .
>
> I rode in the ambulance with him down there. When I went in the room, he said, "Are you going with me, Mommy?" That is the first time he called me mommy since he was a little boy. I told him, "No, son, I can't go with you." . . . He throwed a fit. He said, "If you don't go, I'm not going."

*Id.* at 1083-84.

Ms. Windsor testified that Windsor stayed in the hospital for "[m]aybe three or four months," *id.*, or six months, *id.* at 1093, and was "'pretty banged up,'" *id.* at 1085. As for her visits to Windsor during this period, Ms. Windsor relayed:

> I went down there, but they wouldn't let me in. They said, "He won't even know who you are." They said they was afraid he might hurt himself. He said they was not worried about him hurting anybody, but that he might try to hurt himself. They was more concerned about him hurting himself than--

*Id.* at 1085-86. At that point the prosecutor objected to "what 'they' said" on the ground of hearsay, *id.*, and the trial court sustained the objection, *id.* at 1086.

138

The sentencing hearing resumed, and counsel asked Ms. Windsor whether Windsor underwent a psychiatric evaluation while hospitalized. *Id.* at 1086. Ms. Windsor answered, "Yes, sir[.] I was told at the hospital that they had run tests on him and everything." *Id*. Ms. Windsor acknowledged that Windsor improved after leaving the hospital but that "he was not the man I knew." *Id*. And she reconfirmed that Windsor had "not been the same since [the accident]," *id.*, stating "NO, he is not [the same since the accident,]" *id.* at 1094 (emphasis in original). Her testimony about post-discharge visits included:

> We would visit him. When they found him guilty in Colbert County, we would go visit. We would be talking and he would quit talking and start staring out in space, just like nobody was in there but him. . . . He would just sit and stare in front of him and not say a word. . . . You could ask him something, and he would stop and think what he wanted to say. . . . That is the reason I knew he was not the same man before the accident.

*Id.* at 1086-87. And Ms. Windsor expressed concern about Windsor, including his mental status, testifying that "he [wa]s not the same [son]" after the accident, *id.* at 1088, 1094, "[h]e don't act like the same one I gave birth to," *id.* at 1088, and "I love him now, but he is not the one I gave birth to and cared for when he was sick," *id.* at 1094.

Nearing the end of her direct examination, counsel asked Ms. Windsor if she had anything else pertinent to share, and Ms. Windsor added:

> When we started taking him to Birmingham, I was riding in the ambulance with him. He was talking out of his head and all at once, he yelled out, "big red spiders on me. Get them off." I had to act like I was getting them off to calm him down. We would ride a little piece and say there was snakes on him and biting him. I would have to try to calm him down by hugging him and telling him I would get the snakes off him. He was saying they was beating him with snakes. I [have] never seen my son in that shape.

Vol. 6, Tab 22 at 1092-93. As a result, Ms. Windsor requested medical attention for Windsor during this episode but no one came to help. *Id.* at 1093. And Ms. Windsor ended her direct testimony by telling the jury:

> If he done anything, he did not know he was doing it. That is all I can say. Before he had that accident, he was a healthy, happy man. He could do anything he set his mind to do. All I can say is he is not the same . . . Even though he is not the same as when he was born, he still ain't no violent man. He could not take another man's life.

*Id.* at 1094.

### b.

The ACCA and the Alabama Supreme Court rejected this claim on appeal. The ACCA found that the trial court improperly precluded Ms. Windsor from explaining what medical personnel had told her about Windsor's unstable condition during an attempted hospital visit, holding that "hearsay evidence is admissible at the penalty phase of a capital case under § 13A–5–45(d)."[108] *Windsor II (ACCA)*, 683 So. 2d at

---

[108]The relevant code section states:

1039. Nonetheless, the court affirmed because Ms. Windsor's extensive testimony "about the effects of [Windsor's] motorcycle accident" satisfied the plain error doctrine. *Windsor II (ACCA)*, 683 So. 2d at 1039. The court did not discuss a constitutional right or cite a federal authority when addressing this claim. *See generally id.* at 1038-39. For its part, the Alabama Supreme Court "agree[d] with the Court of Criminal Appeals that, although the trial court did err, because Mrs. Windsor testified extensively with regard to the effects the accident had on the defendant no plain error occurred." *Windsor II*, 683 So. 2d at 1061. In other words, the Court's decision is similarly devoid of federal analysis. *See generally id.*

This court has "grave doubt" that either state court applied federal law consistent with Supreme Court precedent when considering the merits of Windsor's federal mitigation claim. [109] The court bases this determination on the courts' inclusion of Alabama plain error review only and the absence of a constitutional

---

Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama.

Ala. Code § 13A-4-45(d).

[109] *See Romaine*, 253 F.3d at 1365.

standard or a statement that the plain error and federal framework for this claim are essentially the same. Thus, the court reviews Windsor's mitigation claim de novo.

### c.

To obtain habeas relief, Windsor must establish that the trial court's erroneous hearsay ruling under Alabama law violated his federal constitutional rights. To meet this burden, Windsor cites *Lockett*, *Eddings v. Oklahoma*, 455 U.S. 104 (1982), *Skipper v. South Carolina*, 476 U.S. 1 (1986), and *Payne v. Tennessee*, 501 U.S. 808 (1990). Docs. 16 at 40 ¶ 69; 28 at 32.   The court considers these decisions in the context of Windsor's constitutional claim.

The Supreme Court struck down a state statute in *Lockett* that precluded individualized consideration of mitigating evidence with limited exceptions. *Lockett*, 438 U.S. at 593, 607. In particular, the statute precluded consideration of a defendant's "character, prior record, age, lack of specific intent to cause death, and her relatively minor part in the crime." *Id.* at 597. According to the defendant's presentence report and mental evaluations, she was

> a 21-year-old with low-average or average intelligence, and not suffering from a mental deficiency. One of the psychologists reported that "her prognosis for rehabilitation" if returned to society was favorable. The presentence report showed that Lockett had committed no major offenses although she had a record of several minor ones as a juvenile and two minor offenses as an adult. It also showed that she had once used heroin but was receiving treatment at a drug abuse clinic and

142

> seemed to be "on the road to success" as far as her drug problem was
> concerned. It concluded that Lockett suffered no psychosis and was not
> mentally deficient.

*Id.* at 594. "After considering the reports and hearing argument on the penalty issue,

the trial judge concluded that the offense had not been primarily the product of

psychosis or mental deficiency" and imposed the death penalty. *Id.* And after

announcing "that the sentencer, in all but the rarest kind of capital case, not be

precluded from considering, *as a mitigating factor*, any aspect of a defendant's

character or record and any of the circumstances of the offense that the defendant

proffers as a basis for a sentence less than death," *id.* at 604 (emphasis by Court), the

Court concluded that "[t]he limited range of mitigating circumstances . . . [available

to a sentencer] under the Ohio statute" was "incompatible" with this constitutional

pronouncement, *id.* at 597, 604, 608.

    The Court considered in *Eddings* whether a death sentence violated the

petitioner's Eighth Amendment rights because the trial court, "'in following the

law,'" determined that it could not consider "evidence of a turbulent family history,

of beatings by a harsh father, and of severe emotional disturbance[.]" 455 U.S. at 113,

115. The Court found that that the trial court's impression that, as a matter of law, it

was unable to rely on the petitioner's violent background as a mitigating factor

violated the *Lockett* rule: "Just as the State may not by statute preclude the sentencer

from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Id.* at 114-15 (emphasis by Court). The Court found that "no doubt" existed about the relevance of the mitigating evidence because the petitioner was sixteen when he committed the offense. *Id.* at 115. And the Court clarified that it reached its holding based on a concern "with the manner of the imposition of the ultimate penalty: the death sentence imposed for the crime of murder upon an emotionally disturbed youth with a disturbed child's immaturity." *Id.* at 116.

Next, the Court considered in *Skipper* whether the trial court's exclusion of several witnesses' testimony regarding the petitioner's good behavior pending trial violated the Eighth and Fourteenth Amendments under *Lockett* and *Eddings*. *Skipper*, 476 U.S. at 3. Specifically, the trial court found as irrelevant and inadmissible under state law the "testimony of two jailers and one 'regular visitor' to the jail to the effect that petitioner had 'made a good adjustment' during his time spent in jail." *Id.* The state supreme court agreed, finding that "'[t]he trial judge properly refused to admit evidence of [petitioner's] *future* adaptability to prison life" and that "'evidence of his past adaptability was admitted through [other witnesses].'" *Id.* at 3-4 (emphasis in original) (quoting *State v. Skipper*, 285 S.C. 42, 48 (1985)). The Supreme Court reversed, finding the reasoning "inconsistent" with *Lockett* and *Eddings*. *Id.* at 4. The

144

Court reiterated the "rule that the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence,'" and held that "[t]he exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender." *Id.* And in *Payne*, the Court recognized that "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances[.]" 501 U.S. at 822.

Finally, in *Green v. Georgia*, 442 U.S. 95, 97 (1979), the Court considered whether the trial court's exclusion of evidence under a state hearsay rule violated the petitioner's penalty-phase due process rights under the Fourteenth Amendment. The excluded confession testimony showed that the petitioner "was not present when [the victim] was killed and had not participated in her death" and thus "was highly relevant to a critical issue in the punishment phase of the trial[.]" *Id.* at 96-97. The Court determined that "substantial reasons existed to assume the [confession's] reliability[,]" including that the state had used the same evidence in another capital murder trial. *Id.* at 97. The Court held that under "these unique circumstances," the trial court's "mechanical" application of the hearsay rule was unconstitutional because the evidentiary exclusion "denied petitioner a fair trial on the issue of punishment." *Id.*

145

A takeaway from these constitutional authorities is that a sentencer must consider all relevant mitigating evidence to secure a fair punishment for the defendant under the Eighth and Fourteenth Amendments. Additionally, categorical exclusions of mitigation information are constitutionally inappropriate. And, based on *Green*, a trial court errs if it excludes relevant and reliable mitigating evidence on hearsay grounds.

### d.

In Windsor's sentencing hearing, the trial court allowed Ms. Windsor to testify about the negative effects of Windsor's motorcycle accident. Vol. 6, Tab 22 at 1083-86. But the court precluded her from completing her thoughts about what she had learned from the doctors. *Id.* at 1086. Still, Windsor is not entitled to relief on this issue because, unlike the cases he cites, he fails to describe the purportedly relevant mitigating evidence. Basically, Windsor argues that the trial court's violation of a statutory sentencing law which precludes applying the hearsay rule constitutes an automatic constitutional infringement that entitles him to a resentencing. However, Windsor cites no authorities that adopt such a per se constitutional violation approach to evaluating an unfair sentencing claim based on an erroneous application of a state exclusionary rule. Without knowing what potentially mitigating information the trial court's hearsay ruling prevented Ms. Windsor from sharing during the sentencing

hearing, this court is left to speculate to what degree, if any, the omission impacted Windsor's sentence. *Cf. Turner v. Crosby*, 339 F.3d 1247, 1277 (11th Cir. 2003) (failing to present cumulative evidence during penalty phase is not ineffective assistance). Therefore, because the record is silent about whether Ms. Windsor's precluded testimony would be materially different from or merely redundant of the testimony regarding the motorcycle accident and its impact Ms. Windsor did provide, Windsor has not proven that the sustained hearsay objection resulted in a constitutionally unfair sentence. Consequently, the court denies Claim I.

## C.

The court turns now to the remaining claims—J, L, O, and Q—all of which Windsor has essentially abandoned. More specifically, Windsor consents to the dismissal of Claims J and L.[110] And, as discussed below, Windsor has not pursued Claims O and Q, despite acknowledging their deficiencies in reply.

## 1.

Windsor contends in Claim O that his trial counsel's ineffectiveness in presenting mitigation evidence during the penalty phase violated his Sixth

---

[110]*See* doc. 28 at 34 (conceding to dismissal of Claim J regarding his motion to excuse a juror for cause); *id.* at 37 ("In view of the trial court's evaluation of the security measures and a lack of objective evidence of prejudice, Windsor concedes the State is correct in asserting Windsor is not due relief on [Claim L].").

Amendment rights under *Strickland*.[111] Doc. 16 at 54-55 ¶ 93. Windsor raised this claim during the state collateral review process. Doc. 16 at 60, 61 ¶¶ 99, 102; Vol. 21, Tab 79 at 449-453, 458-462. The Rule 32 court observed that Windsor's trial counsel "appear[ed] . . . not [to] present more mitigating evidence because it was not available." Vol. 21, Tab 79 at 461. The court denied this claim because Windsor "fail[ed] to meet the specificity and full factual pleading requirements of Rule 32.6(b)." *Id.* at 462. The court identified several pleading deficiencies, including the absence of "a single witness [Windsor's] trial counsel could have interviewed that might have provided any beneficial information for the penalty phase" or "anyone that treated [Windsor] after his 1985 motorcycle wreck that could have provided any testimony about his physical or mental condition that might have been mitigating." *Id.* at 459. The ACCA adopted the Rule 32 court's findings and affirmed.[112] *Windsor Rule 32*, 89 So. 3d at 824.

---

[111]Windsor alleges in his petition that the ineffective assistance of trial counsel violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Doc. 16 at 65 ¶ 106. But a *Strickland* penalty-phase claim arises under the Sixth Amendment. *Id.* at 55 ¶ 93 (citing *Strickland*, 466 U.S. at 686-67). And, the Fifth Amendment is inapplicable. *See* n. 28 *supra*. Moreover, because Windsor does not elaborate why he has a cognizable Eighth or (aside from incorporation) Fourteenth Amendment right, his claims based on those amendments are abandoned, underdeveloped, or unproven.

[112]In affirming the Rule 32 court's dismissal of Windsor's mitigation-based *Strickland* claim, the ACCA ruled:

The Respondents argue that Windsor cannot show that the ACCA contradicted or unreasonably applied Supreme Court precedent in affirming the Rule 32 court. Doc. 28 at 56. In reply, Windsor concedes that "[w]ithout additional discovery, the undersigned cannot question the legal conclusion of the [ACCA] on this issue." Doc. 28 at 45. But, during the course of this habeas proceeding, Windsor failed to take advantage of the opportunity to conduct discovery to advance this *Strickland* claim. Doc. 61 at 2-3. The court granted Windsor the right to conduct limited discovery under Rule 6 of the *Rules Governing Section 2254 Cases*. Doc. 33 at 22-23. In the September 29, 2017 order, the court set a deadline of March 30, 2018 for Windsor to complete discovery. Doc. 33 at 26. And the court subsequently extended the deadline five times, with the final order extending the deadline to February 8,

---

The record supports the circuit court's findings, and we adopt them as part of this opinion. We are well aware of the United States Supreme Court's decisions in *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), and *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), regarding mitigation investigations by capital defense counsel. However, Windsor did not make sufficient allegations to satisfy his burden of pleading that his trial attorneys rendered deficient performance in this regard and that that allegedly deficient performance prejudiced him. *See* Rules 32.3 and 32.6(b), Ala. R.Crim. P., and *Strickland*. Rather, he simply made bare allegations that were not sufficient to warrant further proceedings as to this allegation. Accordingly, summary dismissal was proper as to this allegation.

*Windsor Rule 32*, 89 So. 3d at 824.

2019.[113]  In addition to the extensions, the court approved funds for Windsor to depose his trial counsel to substantiate his ineffective assistance claim. *See* doc. 54. After the last extension expired, Windsor requested additional time. Doc. 58. The Respondents opposed the motion, doc. 60, and the court denied the request for lack of good cause, doc. 61 at 3. The court noted, in part, that Windsor "had more than sixteenth months to conduct discovery" and had waited until the day before the close of discovery to depose one of his trial lawyers. Doc. 61 at 3.

Thereafter, Windsor moved for the allocation of expert expenses "to retain Dr. John Goff, a neuropsychiatrist, in preparation of an evidentiary hearing in this matter" on his *Strickland* claim. Doc. 62 at 1. The motion is tardy and, like Windsor's request to extend the discovery deadline, lacks good cause. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). "This good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (quoting 1983 amended version of Fed. R. Civ. P. 16(b)). Windsor has demonstrated a lack of diligence in pursuing this

---

[113]*See* docs. 34, 35 (extending deadline to May 29, 2018, at Windsor's request); 36, 37 (extending deadline to July 28, 2018, at Windsor's request); 41 (extending deadline to November 30, 2018, after a telephone conference); 46, 47 (extending deadline to December 31, 2018, after a joint request); 48, 49 (extending deadline to February 8, 2019, at Windsor's request).

claim, and "[t]he record makes clear that [Windsor's] failure to comply with the court's scheduling order resulted from a lack of diligence in pursuing [his] claim." *Id.* at 1419. And because "[d]eadlines are not meant to be aspirational; [and] counsel must not treat the goodwill of the court as a sign that, as long as counsel tries to act, he has carte blanche permission to perform when he desires," *Young v. City of Palm Bay*, 358 F.3d 859, 864 (11th Cir. 2004), the court will deny Windsor's untimely expert motion and will not hold an evidentiary hearing.[114] Therefore, because the status of Windsor's ineffective assistance of trial counsel claim remains the same as it was in 2012 when he filed his amended petition and admitted in reply its deficiency, the court denies Claim O as effectively conceded and unproven.[115]

---

[114]*See, e.g., Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 397 (1993) (observing that a party "cannot . . . avoid the consequences of the acts or omissions of   . . . . his lawyer-agent") (internal quotation marks omitted) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 (1962)); Rule 8 of the *Rules Governing Section 2254 Cases* (providing that the court determines whether holding "an evidentiary hearing is warranted" based on the habeas record). The Eleventh Circuit clarified recently that "[i]f . . . the petitioner was diligent, 'a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.'" *Ledford v. Warden, Ga. Diagnostic Prison*, No. 19-11090, __ F.3d __,   2020 WL 5536386, at *11 (11th Cir. Sept. 15, 2020) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). The court added that a non-diligent petitioner "must satisfy the conditions of § 2254(e)(2)" to obtain an evidentiary hearing. *Id.* Because Windsor concedes the deficiency of his *Strickland* claim, determining "whether or not [he] pursued his [mitigation] claim diligently" in state court is unnecessary. *Id.* at *12.

[115]In light of the § 2254(d)(1) dismissal, the court does not reach the Respondents' additional argument that part of Windsor's *Strickland* claim is procedurally barred. Doc. 26 at 56-57.

## 2.

Windsor contends in Claim Q that the State's failure to produce photographic and fingerprint evidence consistent with its discovery obligations violated his Fourteenth Amendment due process rights under *Brady*.[116] Doc. 16 at 69 ¶ 112. Windsor raised this claim during the State collateral review process. Doc. 16 at 70, ¶ 113; Vol. 21, Tab 77 at 280-82. The Rule 32 court denied the photo array and fingerprint evidence allegations as procedurally barred by Alabama Criminal Procedure Rule 32.2(a). Vol. 21, Tab 77 at 280. The Rule 32 court denied the remainder of this claim for lack of specificity under Alabama Criminal Procedure Rule 32.6(b). *Id.* at 281-82. The ACCA affirmed:

> [Windsor] contends that the State did not deliver to the defense "the photo array which was shown to State witnesses Sammie Sue Osborne and Tommy Pepper for the purpose of identifying Mr.

---

[116]Windsor alleges conclusively in his petition that the State's noncompliance with *Brady* violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Doc. 16 at 71 ¶ 114. But a *Brady* claim arises under the Fourteenth Amendment. *See Brady*, 373 U.S. at 86 ("We agree with the Court of Appeals that suppression of this confession was a violation of the Due Process Clause of the Fourteenth Amendment."). And the Fifth Amendment is inapplicable here. *See* n. 28 *supra*. Moreover, because Windsor does not elaborate why he has a cognizable constitutional right under the Sixth or Eighth Amendment, his claims based on those amendments are abandoned, underdeveloped, or unproven.

Relevant to the claim itself, a *Brady* violation occurs when a prosecutor "fail[s] to disclose evidence material to the prosecution, even when 'there has been no request by the accused.'" *Blanco v. Sec'y, Fla. Dept of Corr.*, 688 F.3d 1211, 1238 (11th Cir. 2012) (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). To establish a *Brady* claim, the litigant must show: "(1) that the evidence at issue is favorable to the accused; (2) that the State suppressed the evidence, either willfully or inadvertently; and (3) that the evidence is material to the guilt or punishment of the defendant such that the defendant suffered prejudice as a result." *Id.*

Windsor." (C.R. 208.) He also contends that, "despite a court order and admonitions from the trial court, the state failed to deliver the fingerprint evidence against Mr. Windsor and Mr. Guthrie in time for the defense to respond effectively to it." (C.R. 209.)

Windsor did not allege that his *Brady* claims were based on newly discovered evidence or that any alleged suppression by the State continued until such time as the claims could not have been raised at trial. *See Boyd v. State*, 913 So.2d 1113 (Ala.Crim.App.2003); *Williams v. State*, 782 So.2d 811 (Ala.Crim.App.2000). Therefore, the circuit court correctly concluded that his claims were precluded pursuant to the provisions of Rule 32.2(a), Ala. R.Crim. P. Specifically, with regard to the photo array, the circuit court properly found that Windsor's claim was precluded because he raised it at trial and could have raised it on direct appeal, but did not. *See* Rule 32.2(a)(2) and (5), Ala. R.Crim. P. Also, with regard to the fingerprint evidence, the circuit court properly found that Windsor's claim was precluded because it was raised and addressed at trial and on direct appeal. *See* Rule 32.2(a)(2) and (4), Ala. R.Crim. P.; *Windsor*, 683 So.2d at 1033–34.

*Windsor Rule 32*, 89 So. 3d at 825.

The Respondents argue that Windsor has inadequately pleaded this claim under Rule 2(c) of the *Rules Governing Section 2254 Cases*, doc. 26 at 63-64, procedurally defaulted on new allegations, *id.* at 64-67, and presented a merits-based challenge of the ACCA's decision that fails to satisfy a § 2254(d)(1) or (2). Doc. 26 at 68. In reply, Windsor "does not question the general validity of the State's assertion that this issue may be procedurally barred," doc. 28 at 48, and admits that "[a]s the record stands, [he] is afraid the State is correct in its brief," *id.* at 49. Instead, Windsor "request[s] this court for discovery of the records contained in both his and Mr.

Guthrie's files from St. Clair and Colbert Count[ies] to determine the prejudice he suffered for the failure of the trial court to order discovery." *Id.* But, during the course of this habeas proceeding, Windsor never moved to conduct discovery on this *Brady* claim under Rule 6 or expand the record under Rule 7 of the *Rules Governing Section 2254 Cases*. The *Rules Governing Section 2254 Cases* do not permit Windsor to shift the burden onto this court through a brief to discover and produce to him the St. Clair and Colbert County criminal trial records to substantiate his speculative *Brady* claim. Even if the *Rules Governing Section 2254 Cases* were broad enough for Windsor to request discovery assistance from this court, *Cullen* precludes the court from considering de novo any new information which the discovery might contain.[117] Additionally, Windsor leaves unaddressed the Respondents other reasons for dismissing this claim. Therefore, the court denies Claim Q as effectively conceded and unproven.

## IV.

After applying AEDPA or de novo review, Windsor has not shown an entitlement to habeas relief. Consequently, the court denies his § 2254 petition, doc.

---

[117]*Cullen* held that "review under § 2254(d)(1) [and (d)(2)] is limited to the record that was before the state court that adjudicated the claim on the merits," *Cullen*, 563 U.S. at 181, and a federal habeas court conducting § 2254(d) review should not consider new evidence "in the first instance effectively *de novo*," *id*. at 182.

16, as well as expert motion, doc. 62, for lack of good cause. The court will enter a

separate order consistent with this memorandum opinion.

      **DONE** the 23rd day of October, 2020.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE